# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JEFF MERKLEY
313 Hart Senate Office Building
120 Constitution Ave NE
Washington, DC 20510

|                   |           |
|-------------------|-----------|
| Plaintiff,        | Case No. _____ |

v.

DONALD J. TRUMP
1600 Pennsylvania Avenue NW
Washington DC 20500

MITCH MCCONNELL
317 Russell Senate Office Building
2 Constitution Avenue NE
Washington, DC 20510

CHARLES GRASSLEY
135 Hart Senate Office Building
120 Constitution Ave NE
Washington, DC 20510

WILLIAM BURCK
1300 I Street NW Suite 900
Washington DC 20005

JULIE ADAMS
312 United States Capitol
East Capitol St NE & First St SE
Washington, DC 20004

MICHAEL STENGER
151 United States Capitol
East Capitol St NE & First St SE
Washington, DC 20004

NATIONAL ARCHIVES AND RECORDS
ADMINISTRATION (as indispensable party
per Fed. R. Civ. P. 19)
700 Pennsylvania Ave NW
Washington, DC 20408

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Defendants.

1

**INTRODUCTION**

1.      One of the most distinctive examples of separation of powers in our system of constitutional government is the Advice and Consent Clause of the United States Constitution. This clause envisions a power to "nominate" that rests solely with the President and that cannot be blocked or interfered with by the Senate, and an "Advice and Consent" power that rests solely with the Senate and that cannot be blocked or interfered with by the President. In the Federalist Papers, Alexander Hamilton explained this plan, which combines the judgment of a single individual with a Senate check on the possibility that that individual might misuse that power by appointing an "unfit character," as follows: "It is not easy to conceive a plan better calculated than this to promote a judicious choice of men for filling the offices of the Union." The Federalist No. 76 (Alexander Hamilton).

2.      United States Senator Jeff Merkley brings this action to uphold the "advice and consent" responsibility of the Senate, which requires an informed deliberative Senate process to review the qualification of a nominee for the position of an Associate Justice of the Supreme Court of the United States free of obstruction by the executive branch. Senator Merkley has been injured by being prevented from performing the constitutional duty that he swore to perform when he took the oath of office. This case arises from the direct and substantial interference by President Trump and other agents of the executive branch in the ability of the Senate to examine the record and evaluate the fitness of Judge Brett Kavanaugh, the President's nominee for a lifetime appointment as an Associate Justice of the Supreme Court of the United States. President Trump and agents of the executive branch interfered in the ability of Senator Merkley and the Senate to provide advice and consent by, *inter alia,* imposing a broad and unprecedented blockade on the Senate's and public's access to reams of key documents that

directly bear on Judge Kavanaugh's views, experience, and character. This improper process regarding the production of relevant documents prevents Senator Merkley and his colleagues from properly exercising their constitutional obligation to provide advice and consent on the qualifications of the nominee and deprives them of the ability to fully assess the nominee's fitness to assume the position of an Associate Justice of the United States Supreme Court.

3.      Hamilton explained the logic behind the separation of powers in the Advice and Consent Clause of the Constitution at length in Federalist No. 76, noting that it makes the best use of both the President and the Senate. Placing the nomination power in one person "will naturally beget a livelier sense of duty and a more exact regard to reputation," and that "a single well-directed man, by a single understanding, cannot be distracted and warped by that diversity of view, feelings, and interest, which frequently distract and warp the resolutions of a collective body."  But he then explained the critical role of the Senate, noting that the "necessity of their concurrence . . . would be an excellent check upon a spirit of favoritism in the President, and would tend greatly to prevent the appointment of unfit characters."

4.      To exercise this responsibility, to "prevent the appointment of unfit characters," Senators must have the full ability to examine a nominee's record and to do so without interference or obstruction from the executive branch. Such obstruction or interference deeply compromises the separation of powers envisioned in the Advice and Consent Clause.

5.      This case arises from direct interference by President Trump and officers of the executive branch in the deliberations of the Senate as the Senate examines the record of Judge Kavanaugh. President Trump and officers of the executive branch interfered with the advice and consent deliberations of the Senate by working to block access by Senators to key documents necessary to the evaluation of Judge Brett Kavanaugh. Their actions have compromised the

ability of Senator Merkley and his colleagues to assess the nominee's fitness to assume the position of an Associate Justice of the United States Supreme Court and thereby to properly exercise their constitutional obligation to provide advice and consent on the qualifications of the nominee.

6.      The President and officers of the executive branch have interfered in the Senate's advice and consent responsibility in three critical ways: encouraging the Senate Majority to not request documents related to Kavanaugh's time while serving as Staff Secretary to George W. Bush;  blocking access to an extensive set of documents related to the nominee's views and actions while serving in President George W. Bush's Office of White House Counsel; and blocking full access by all Senators and the public to documents delivered to the Senate Judiciary Committee but marked "Committee Confidential."

### Three Acts of Deliberate and Substantial Interference by Executive Officers

7.      The President and his team intervened to block access to the documents and records related to Judge Kavanaugh's time as White House Staff Secretary. The Senate Judiciary Committee has a "longstanding, bipartisan expectation . . . that any materials produced while a nominee was a public servant that could shed light on his or her views, thinking, or temperament, that are not privileged, should be subject to public scrutiny and carefully considered by the Senate prior to confirmation." *See* August 17, 2018 Letter from Patrick Leahy to Donald McGahn, *available at* https://www.leahy.senate.gov/imo/media/doc/081718LeahyToMcGahnLetter.pdf. This view was confirmed by Senator Cornyn, the Majority Whip and senior member of the Judiciary Committee, on July 19, 2018. As Senator Leahy relayed in his letter to Mr. McGahn, Senator Cornyn stated that the production of documents Judge Kavanaugh had "generated . . . authored . .

. or contributed to" during his tenure as White House Staff Secretary should be conveyed to the Committee.  He added that this "just seems to be common sense."

8.     But on July 24th, five days after Senator Cornyn's statements, Donald McGahn, the White House Counsel, summoned some Republican Senators to a meeting at the White House. Immediately following that meeting, Senator Cornyn changed his position, describing the records related to the nominee's service as Staff Secretary as "a bridge too far." *Id.* The Chair of the Committee then excluded any mention of such documents from his records request to the National Archives and Records Administration, including documents that the nominee authored. Thus did the executive branch directly and substantially interfere in the Senate exercise of its advice and consent responsibility.

9.     The second act of interference by the executive branch in the deliberations of the Senate pertains to access to documents related to the nominee's work as a lawyer in the White House Counsel's Office during the administration of George W. Bush. Chairman Grassley requested these documents from the National Archives, which traditionally supervises the release of records for Supreme Court nominees. On August 2, 2018, however, The National Archives informed Chairman Grassley that it could not meet the August 15th, 2018 deadline set by Chairman Grassley.  Despite this, Chairman Grassley proceeded to schedule Judge Kavanaugh's nomination hearing on September 4, 2018, depriving the Judiciary Committee of the relevant documents.

10.     In place of the document release process from the National Archives, President George W. Bush gave Defendant William Burck the power to selectively release Kavanaugh's documents from the George W. Bush Presidential Library related to the nominee's service in the White House Counsel's Office. In this manner the executive branch substituted a vetting process

by a neutral and professional agent, the National Archives, with a partisan agent. Defendant

Burck has extensive conflicts of interest. He is not a neutral federal career employee. He is a

private attorney who formerly worked with the nominee at the White House during the tenure of

President George W. Bush. He now represents Steven Bannon, Reince Priebus, and Donald

McGahn in Special Counsel Robert Mueller's investigation into Russian interference in the 2016

presidential election. His clients may stand to benefit should this nominee be confirmed to the

Supreme Court because the nominee, if confirmed, may participate in deciding whether those

clients can be subpoenaed, compelled to testify, and potentially prosecuted for contempt, perjury,

or other crimes.

11.     Defendant Burck sent a letter to Defendant Grassley, four days before Judge

Kavanaugh's hearing, informing the Senator that he was withholding more than 100,000 pages

of documents on the basis of "presidential privilege." This assertion of privilege was not made

by President George W. Bush for whom Judge Kavanaugh had served. Instead, this decision was

invoked by Defendant Burck on behalf of President Trump. Defendant Burck has not provided

any privilege log explaining why each document was withheld on the basis of presidential

privilege. Thus, the President and his Department of Justice, by arranging for a partisan operative

to block Senate access to key documents on the basis of an unexplained and vague "presidential

privilege," did directly and substantially interfere a second time in the Senate exercise of its

advice and consent responsibility.

12.     The third act of interference by the executive branch in the deliberations of the

Senate is related to 141,000 pages of documents that were released to the U.S. Senate Judiciary

Committee but were marked "Committee Confidential." This designation bars Senators from

releasing or even describing the content of these documents during the hearings or to their

constituents. This designation appears to have been added by Defendant Burck, and the Judiciary

Committee consulted him about the designation during the confirmation hearings. *See* Kevin

Breuninger and Tucker Higgins, *Democrats defy GOP warnings about Senate rules, release*

*Kavanaugh documents*, CNBC (Sept. 6, 2018) (quoting Burck's statement to NBC: "We cleared

the documents last night shortly after Senator Booker's staff asked us to . . . we had already told

him he could use the documents publicly."). This interference in the Senate review of

information is without precedent.  In the past, a bipartisan group of Senators, rather than a

private attorney operating as an agent of the executive branch, has determined that a very limited

number of documents were required to be designated as "Committee Confidential." *See* June 7,

2010 Letter from Patrick Leahy to Jeff Sessions, *available at*

https://www.judiciary.senate.gov/imo/media/doc/2010-06-07%20Leahy%20to%20Sessions%20-

%20Kagan%20Records.pdf.

13.     The "Committee Confidential" label profoundly compromised the ability of

Senators to address information in these documents at the hearings or to discuss the contents

with experts or the public. Thus, the executive branch, through its agent Defendant Burck's

involvement in restricting access and use of an extensive set of documents delivered to the

Judiciary Committee, did directly and substantially interfere a third time in the Senate exercise of

its advice and consent responsibility.

14.     These three actions by an overreaching executive branch into the Senate's process

for considering Supreme Court nominees in the modern era combine to threaten the integrity of

any final vote. Defendant Trump and Defendant Burck's actions deprive Senators of the ability

to carry out their advice and consent duties. Defendants McConnell and Grassley have been

complicit in allowing the executive branch to deprive the remaining members of the Senate of

the information necessary to fulfill its constitutional role. The impact on the public is so great as to warrant the consideration of the judicial branch despite the prudential concerns that would ordinarily counsel in favor of declining to reach the merits of this claim.

15.     When assessing the Constitution's placement of the advice and consent obligation in the Senate, it must be noted that, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). "Even before the birth of this country, separation of powers was known to be a defense against tyranny. . . . [I]t remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another. Even when a branch does not arrogate power to itself, moreover, the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757 (1996) (internal citations omitted). Although matters of Senate procedure are typically left to the Senate alone, "[o]ne can, nevertheless, envision different and unusual circumstances that might justify a more searching review. . . . If the Senate were to act in a manner seriously threatening the integrity of its results . . . judicial interference might well be appropriate. In such circumstances, the Senate's action might be so far beyond the scope of its constitutional authority, and the consequent impact on the Republic so great, as to merit a judicial response despite the prudential concerns that would ordinarily counsel silence." *Nixon v. United States*, 506 U.S. 224, 253–54 (1993) (Souter, J., concurring).

**The Importance of the Advice and Consent Clause to Our Constitutional Government**

16.     The Appointments Clause requires that the U. S. Senate provide "advice and consent" to nominations to the United States Supreme Court. The Framers required that the Senate affirmatively provide "advice and consent" instead of merely having the option to veto

nominees, a choice made so that transparency and democratic accountability would attach to the confirmation of Supreme Court Justices. Defendants have violated the Advice and Consent Clause by abandoning such transparency and accountability standards, the concealment of the nominee's record, and by holding hearings and advancing the nomination before anything close to a full documentary record of the nominee is available to the Senate or the public.

17.     While the Clause leaves the responsibility of voting to confirm a President's nominee to the Senate alone, the process and procedure governing such a vote nonetheless must comply with the Constitution's mandates. As the Federalist Society explains on its website, in context the public understanding of the word "advice" in the 18th Century is analogous to the public understanding of "deliberation" in the 21st Century, with "advice and consent" meaning, effectively, "with the deliberation and approval of the Senate." *See* The Federalist Society, *Advice in the Constitution's Advice and Consent Clause: New Evidence From Contemporaneous Sources*, (July 17, 2018), https://fedsoc.org/commentary/publications/advice-in-the-constitution-s-advice-and-consent-clause-new-evidence-from-contemporaneous-sources.

## JURISDICTION AND VENUE

18.     This case arises under the United States Constitution. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. This Court has jurisdiction to grant both declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred, and are occurring, in this District.

## PARTIES

20.     Plaintiff JEFF MERKLEY is a United States Senator from the state of Oregon. He is harmed by Defendants' violation of the Advice and Consent Clause because he is deprived of the information necessary to comply with his constitutionally delegated role. Beyond his own vote, Senator Merkley is deprived of the ability to engage in a full debate with his colleagues as to the fitness of this nominee to assume the role of an Associate Justice of the United States Supreme Court.

21.     Defendant DONALD J. TRUMP is the President of the United States of America. He is being sued in his official capacity. He has invoked, or claimed to have invoked, "presidential privilege" over a trove of documents necessary for the Senate to comply with its advice and consent duties without providing an explanation for the basis of asserting this privilege or producing a privilege log. Defendant has also improperly delegated the invocation of "presidential privilege" to a private lawyer, Defendant Burck.

22.     Defendant MITCH MCCONNELL is a Senator from the state of Kentucky and the Senate Majority Leader. He has publicly stated that he plans to have a full Senate vote on the nominee's confirmation before the information from the National Archives is available.

23.     Defendant CHARLES GRASSLEY is a Senator from the state of Iowa and the Chair of the Senate Judiciary Committee. He has pushed for a Committee vote before the documents necessary to fulfill the Senate's obligation of advice and consent were available, abdicated the designation of "Committee Confidential" to a private attorney, and permitted the executive branch to invoke "presidential privilege" without demanding any basis for the assertion of the privilege or the production of a privilege log.

24.     Defendant WILLIAM BURCK is a private attorney supervising the release of the documents to the Senate from the George W. Bush Presidential Library. He has infringed on the

Senate's advice and consent power by selectively releasing documents to the Senate and the public in place of the National Archives, arbitrarily designating over 140,000 pages of documents "Committee Confidential," withdrawing the "Committee Confidential" designation as he deems appropriate, and withholding another 100,000 documents under executive privilege. He is operating simultaneously as an agent of the President in asserting executive privilege while purporting to be an agent of the Senate in designating documents as "Committee Confidential."

25.    Defendant JULIE ADAMS is Secretary of the Senate. The Secretary of the Senate supervises an extensive array of offices and services to expedite the day-to-day operations of the United States Senate. She is an agent of the Congressmen defendants.

26.    Defendant MICHAEL STENGER is the United States Senate Sergeant at Arms. He is charged with overseeing security and continuity of operations policies and programs. He is an agent of the Congressmen defendants. Defendants Adams and Stenger are staff members of the Senate whose involvement support the underlying decisions by Defendants McConnell and Grassley. *See Powell v. McCormack*, 395 U.S. 486, 504 (1969) ("That [congressional] employees are acting pursuant to express orders of [Congress] does not bar judicial review of the constitutionality of the underlying legislative decision").

27.    Defendant NATIONAL ARCHIVES AND RECORDS ADMINISTRATION ("National Archives") is a United States organization created by Congress. It is a defendant named as an indispensable party pursuant to Fed. R. Civ. P. 19.

## LEGAL BACKGROUND

28.    Article II, Section 2 of the United States Constitution states that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Judges of the [S]upreme Court."

29.     The doctrine of separation of powers in the Advice and Consent Clause is clear: The President alone is responsible for nominating Supreme Court Justices, and the Senate alone is responsible for advice and consent.

30.     The Advice and Consent Clause "is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 117 S. Ct. 1573, 1579 (1997) (Scalia, J.). It is "designed to ensure public accountability for both the making of a bad appointment and the rejection of a good one." *Id.*

31.      "Through the confirmation process, the public, individuals, and interested organizations alike have an opportunity to inform the decision-making process and scrutinize the President's nominee." *Washington Legal Foundation v. Department of Justice*, 691 F. Supp. 483, 492 (D.D.C. 1988). The purpose of the Senate nomination hearing is for "the public and Congress [to] have a full opportunity to evaluate the actual nominee and to probe more deeply." *Id.* at 495.

32.     Charles Mathias, Jr. explained the importance of exacting Senate scrutiny of Presidential nominees when he was a Republican Senator from Maryland:

> [T]he full Senate should have the opportunity to consider each nomination on a complete record. . . . The paramount constitutional duty of the Senate in the process of advice and consent is to satisfy itself that the nominee before it is fully qualified, by virtue of education, experience, integrity, and character, to be granted a lifetime commission to sit in judgment upon the liberties and the legal rights of the American people. . . . [O]f course, in the case of nominations to the Supreme Court, which has the ultimate authority to interpret and apply the Constitution, the Senate's scrutiny must be exacting in every respect. Only with vigorous review can the Senate carry out the role envisioned for it by the framers of the Constitution.

Charles Mathias, Jr., *Advice and Consent: The Role of the United States Senate in the Judicial Selection Process*, 54 U. Chi. L. Rev. 200, 206-07 (1987).

## HISTORICAL PRECEDENT

33.     The Framers of the Constitution at the 1787 Constitutional Convention discussed

a diverse array of methods for appointing Supreme Court Justices, including pure presidential

appointment and senatorial appointment. James Madison proposed a plan in which the President

could appoint Justices and Senators had the option (but not the obligation) to veto the nominees.

The Convention voted down such a plan in favor of the current form of the Appointments

Clause, in which the Senate has an affirmative obligation to provide advice and consent to the

President in making appointments. In 1789, future President John Adams stated in a letter to

Rodger Sherman of the Advice and Consent Clause that "[t]he whole senate must now deliberate

on every appointment."

34.     In the first several years of the Republic, the Senate used secret ballots to vote on

the confirmation of judges. In 1789, the Senate reformed its rules, forbidding the secret ballot in

confirming judges as inconsistent with constitutional design. Instead, Senators were required to

signify their assent or dissent by answering, viva voce, yay or nay.

35.     Such a public vote has continued in the years since to fulfill the Advice and

Consent Clause's requirement of transparency and accountability to the public.

36.     In the modern era, hearings on Supreme Court nominees have not commenced

until a documentary record was made available to the Senators who have the responsibility to

vote on their nominations that was sufficiently complete for them to fulfill their deliberative

function under the Constitution.

37.     On July 31, 1986, President Ronald Reagan invoked executive privilege[1] to

prevent the release of Office of Legal Counsel memoranda written by William Rehnquist to the

---

[1] Executive privilege is the power of the President to in certain circumstances withhold information from the legislature, judiciary, or public if disclosing such information would drastically affect the functions and decision-making of the executive

Senate Judiciary Committee when Justice Rehnquist had been nominated to be Chief Justice. The Senate Judiciary Committee, with members of both parties upset at this executive branch incursion into the Senate's process, objected and threatened to subpoena the material. In response, President Reagan reversed his position and released the documents five days after first invoking executive privilege. Members of the Senate Judiciary Committee described the decision as "a substantial victory for the constitutional process." Ronald J. Ostrow and David Savage, *Senate Panel to Receive Rehnquist Documents: Administration Ends Impasse on Memos Written as Legal Adviser to Nixon; Scalia Hearings Open*, Los Angeles Times, (Aug. 6, 1986).

38.     When now-Chief Justice John Roberts was nominated to the Supreme Court, the National Archives released relevant documents related to his work in the White House in time for review by members of the Senate's Judiciary Committee prior to the commencement of his nomination hearing.

39.     The documents revealed relevant and previously non-public information regarding then-Judge Roberts, such as his opposition to the 1982 reauthorization of the Voting Rights Act.

40.     When now-Justice Samuel Alito was nominated to the Supreme Court, the National Archives released relevant White House documents to the Senate and the public in time for review by members of the Judiciary Committee in advance of his nomination hearing.

41.     The documents revealed previously non-public information, such as then-Judge Alito's statement in a job application for the position of Deputy Attorney General that "the

---

branch."Executive privilege is an extraordinary assertion of power not to be lightly invoked." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 389 (2004) (internal quotation marks omitted).

Constitution does not protect a right to an abortion." Jo Becker and Charles Babington, *No Right to Abortion, Alito Argued in 1985*, The Washington Post (Nov. 15. 2005).

42.     When now-Justice Elena Kagan was nominated to the Supreme Court, Senate Judiciary Committee Chairman Patrick Leahy and Ranking Member Jefferson Sessions sent a joint letter dated May 18, 2010 to the William J. Clinton Presidential Library and Museum, requesting all documents related to the nomination of then-Solicitor General Elena Kagan to be an Associate Justice of the Supreme Court of the United States.

43.     On May 24, 2010, then-Senator and now Attorney General Sessions stated on the Senate floor, "[T]he public record of a nominee [there, Elena Kagan] to such a lifetime position as Justice on the Supreme Court is of such importance that we cannot go forward without these documents. I hope we will get those in a timely fashion. If not, I think we will have no choice but to ask for a delay in the beginning of the hearings." "Kagan Nomination," *Congressional Record* 156:79 (May 24, 2010), p. S4108.

44.     On June 15, 2010, Senator Grassley stated on the Senate floor, "[I]n order for the Senate to fulfill its constitutional responsibility of advise and consent [sic], we must get all of her documents from the Clinton Library and have enough time to analyze them so we can determine whether she should be a Justice. I share the concerns of the Judiciary Committee ranking member, Senator Sessions, that Solicitor Kagan's documents will not be fully produced in time for the committee to conduct a thorough review of the nominee's record." "Kagan Nomination," *Congressional Record* 156:89 (June 15, 2010), p. S4928.

45.     President Barack Obama did not assert executive privilege over any documents.

46.     The small number of records on which President Clinton asserted statutory restrictions against public release for Justice Kagan were provided to the Senate Judiciary Committee on a "Committee Confidential"[2] basis.

47.     Less than 1% of the total number of pages of records pertaining to then-Solicitor General Kagan that were requested were withheld from the public, and only on personal privacy grounds. Even this small number of documents was eventually provided to the Senate Judiciary Committee.

48.     When now-Justice Neil Gorsuch was nominated to the United States Supreme Court, Chairman Grassley and the Judiciary Committee's Ranking Minority Member, Dianne Feinstein, jointly requested all documents related to Gorsuch's time as Principal Deputy Associate Attorney General from June 2005 to July 2006. The Department of Justice produced all such records.

49.     The production of these documents revealed previously undisclosed information, including Justice Gorsuch's role in drafting legislation stripping Guantanamo detainees of *habeas corpus* rights, legislation later struck down by the United States Supreme Court in *Boumediene v. Bush*, 553 U.S. 723 (2008).

50.     When Dr. Christine Blasey Ford alleged that the nominee had sexually assaulted her and requested that the Federal Bureau of Investigation investigate, Defendant Grassley insisted that the advice and consent responsibility belongs to the Senate alone: "The Constitution assigns the Senate, and only the Senate, with the task of advising the President on his nominee and consenting to the nomination if the circumstances merit. We have no power to commandeer

---

[2] Documents marked "Committee Confidential" may be viewed only by members of the U.S. Senate Judiciary Committee and their staff. Such documents may not be released or described to the public.

an Executive Branch agency into conducting our due diligence. The job of assessing and

investigating a nominee's qualifications in order to decide whether to consent to the nomination

is ours, and ours alone." September 19, 2018 Letter from Charles Grassley to Debra S. Katz

*available at* https://www.judiciary.senate.gov/imo/media/doc/2018-09-

19%20Grassley%20to%20Katz%20-%20Ford%20Testimony.pdf.

## FACTUAL ALLEGATIONS

### Privatizing the Role of the National Archives in the Supreme Court Nomination Process

51.     Defendants McConnell and Grassley have discarded the accepted principle that

nomination hearings on Supreme Court nominees should only proceed upon receipt of all

relevant documents from the National Archives. Further, by delegating the role of producing

documents to private actors – rather than to neutral and unbiased career professionals employed

by the National Archives – President Trump and others within the executive branch have

substituted a neutral vetting process with a conflicted, partisan one. Judicial intervention to

restore minimal standards of care and caution are required.

52.     Consistent with the overreaching position of President Trump, Chairman Grassley

has refused to request documents from the nominee's tenure as White House Staff Secretary,

writing in a July 25, 2018 letter to Minority Leader Charles Schumer that "most Democrats have

already made up their mind about Judge Kavanaugh" and therefore "[he] fail[s] to see how

additional documents will be useful." He also argued that such documents were unnecessary

because of the "up to one million pages of documents from Judge Kavanaugh's service in the

White House Counsel's Office." Referring to these records, he wrote, "The Senate will receive

more White House records for Judge Kavanaugh than it did for the five previous Supreme Court

17

nominees combined." *See* https://www.judiciary.senate.gov/download/grassley-to-schumer_-kavanaugh-records.

53.     The National Archives has traditionally supervised the record release for Supreme Court nominees.

54.     The National Archives has stated that Judge Kavanaugh's records will not be ready for release until the end of October.

55.     After learning that Judge Kavanaugh's records would not be available until the end of October, Chairman Grassley and Majority Leader Mitch McConnell nonetheless scheduled Judge Kavanaugh's nomination hearing to begin September 4, 2018.

56.     Majority Leader McConnell has stated publicly that he plans on scheduling a final vote on Judge Kavanaugh before October 1, 2018, weeks before all relevant documents can be produced by the National Archives.

57.     The nomination hearing scheduled by Chairman Grassley and Majority Leader McConnell therefore relied on selectively released records from the Bush Presidential Library. Defendant Burck has selectively released only a portion of Judge Kavanaugh's records.

58.     Some Senators have filed Freedom of Information Act requests to the National Archives in an attempt to obtain the documents prior to Judge Kavanaugh's hearing in order to fulfill their constitutional obligation to provide advice and consent. These requests, however, were not acted upon prior to the hearing and will almost certainly not be acted upon before Senator McConnell brings Judge Kavanaugh's nomination to the full Senate for a vote. On September 17, 2018, the Senators filed suit in the United States District Court for the District of Columbia, claiming a violation of the Freedom of Information Act and seeking preliminary relief ordering the release of documents.

59.     Defendants have offered no justification for why Judge Kavanaugh's hearing should take place before the National Archives releases his records.

60.     There is no urgency in holding a final vote on Judge Kavanaugh's nomination by October 1, especially when the National Archives document production is scheduled for just a few weeks later. In 2016, Defendant Grassley called any argument that the Supreme Court functions poorly with eight members an "absurdity" in explaining why he would hold a Supreme Court seat vacant for over a year. "[T]he court can deal with a vacancy and continue its work. It can order a case to be reargued after the vacancy is filled. It can reschedule a case for a later time. It can reach an evenly divided decision and resolve the issue another day." Charles Grassley, *Sky Won't Fall With One Less Justice*, Des Moines Register (Apr. 10, 2016).

### Judge Kavanaugh's Involvement in Torture and Anti-Terrorism Policy

61.     In May 2006, Judge Kavanaugh testified before the Senate Judiciary Committee during his confirmation hearing for the D.C. Circuit Court of Appeals. When Judge Kavanaugh was asked about his involvement in the Bush Administration's post-9/11 terrorism policies, he testified that he had had no such involvement. He also testified that he did not know about a memorandum setting out the Bush Administration's interpretation of torture or the existence of the National Security Agency's warrantless surveillance program.

62.     After his confirmation, however, news reports from the Washington Post and National Public Radio suggested that Judge Kavanaugh had in fact been included in discussions regarding Bush-era detention policies.

63.     On June 26, 2007, Senator Richard Durbin wrote a letter to Judge Kavanaugh questioning whether his 2006 testimony had misrepresented his role in the Bush Administration's detention and interrogation policies. "By testifying under oath that you were

not involved in this issue, it appears that you misled me, the Senate Judiciary Committee, and the

nation," wrote Senator Durbin. Kavanaugh has yet to respond to this inquiry.

64.     Despite his apparent involvement with Bush-era detention policies, Judge

Kavanaugh has sat on panels at the D.C. Circuit Court of Appeals that determined the legality of

certain aspects of the Bush-era detention regime without recusing himself. David Graham, *How*

*Kavanaugh's Last Confirmation Hearing Could Haunt Him*, The Atlantic (July 17, 2018).

65.     At least two documents recently released by the Bush Library from Judge

Kavanaugh's time with the Bush Administration show that he was included on emails with

talking points on "torture memos." These further suggest that Judge Kavanaugh's 2006

testimony was incomplete and that without the additional release of documents, the Senate

cannot fully consider Judge Kavanaugh's involvement in the Bush Administration's post-9/11

terrorism policies and the accuracy and completeness of Judge Kavanaugh's 2006 testimony.

### Judge Kavanaugh's Position on *Roe v. Wade*

66.     Judge Kavanaugh has stated during the Supreme Court confirmation process that

he believes that *Roe v. Wade* is "settled law." Recently released documents, however, designated

as "Committee Confidential" directly contradict his statements. In an email sent by Judge

Kavanaugh to James Ho, then part of Senate Judiciary Committee staff as chief counsel to

Senator John Cornyn, he advised against referring to the Court's decision in *Roe v. Wade* as

"settled law" because he was "not sure that all legal scholars refer to Roe as the settled law of the

land at the Supreme Court level since [the] Court can always overrule its precedent, and three

current Justices on the Court would do so." Charlie Savage, *Leaked Kavanaugh Documents*

*Discuss Abortion and Affirmative Action*, The New York Times (Sept. 6, 2018). This statement

contradicted his testimony to the Committee that *Roe* was settled precedent. Judge Kavanaugh's

complete documentary record could allow Senators to explore which of his contradictory statements reflect his true beliefs.

**Additional Roadblocks from the Executive Branch During the Judiciary Committee's Hearing**

67.     Days before Judge Kavanaugh's confirmation hearings, the White House announced that it would withhold more than 100,000 pages of documents arising during his tenure in the White House Counsel's Office during the George W. Bush administration based on a claim of executive privilege.

68.     In a letter sent to the Senate Judiciary Committee days before the confirmation hearing, Defendant Burck wrote that while former-President Bush had advised him to err "on the side of transparency and disclosure," the Trump administration directed him not to release the records, citing "presidential privilege." John Bowden, *Trump officials withhold 100k pages of Kavanaugh's records*, The Hill (Aug. 31, 2018).

69.     The documents in question, according to Defendant Burck, concerned "deliberations and candid advice concerning the selection and nomination of judicial candidates." *Id.* These documents are likely to contain relevant information concerning Judge Kavanaugh's views on the proper role of a federal judge. They are also likely to contain Judge Kavanaugh's views on matters that are likely to come before the Supreme Court, which he largely declined to answer when asked during his Senate confirmation hearing testimony. Defendant Trump's use of "presidential privilege" to bar disclosure of documents to Congress for a judicial confirmation hearing is without precedent.

70.     Although Justice Kagan worked in multiple presidential administrations, President Obama did not invoke executive privilege on a single document.

21

71.     In addition to the over 100,000 pages withheld on the basis of executive privilege, 141,000 pages of documents were marked "Committee Confidential," released to the Senate Judiciary Committee but were not allowed to be released to or even described to the public.

72.     No previous Supreme Court confirmation process has involved the use of the "Committee Confidential" designation in any way close to this scale. For example, approximately 2,000 pages of Justice Kagan's documents that contained personal information were deemed "Committee Confidential."

73.     During Judge Kavanaugh's hearing before the Senate Judiciary Committee, several Senators discussed and released documents despite the "Committee Confidential" designation. Upon their release, it became clear that there was no justifiable basis for many of the documents to have been labeled "Committee Confidential." These materials did not concern national security or raise concerns regarding personal privacy. Many of the released documents concerned relevant and probative information related to topics frequently raised by the Senators during Judge Kavanaugh's hearing.

74.     In response to one Senator's release of documents, Defendant Burck stated, "We were surprised to learn about Senator [Cory] Booker's histrionics this morning, because we had already told him he could use the documents publicly," in response to a request made hours previously.

75.     It is therefore clear that Defendant Burck made the determination as to whether documents were deemed "Committee Confidential" and made determinations about if and when to lift the designation. Burck's statements also raise questions about his neutrality and bias.

76.     In one email, Judge Kavanaugh wrote that "any program targeting Native Hawaiians as a group is subject to strict scrutiny and of questionable validity under the

Constitution." This raises issues about his position on legal protections for historically disadvantaged groups.

77.     Several "Committee Confidential" documents also speak to Judge Kavanaugh's truthfulness in earlier sworn testimony. During his confirmation hearing in 2006 for his judgeship on the D.C. Circuit, Judge Kavanaugh downplayed his involvement in the attempted confirmations of two judges to the federal appellate courts, Judge William Pryor and Judge Charles Pickering Sr. The limited documents produced from Judge Kavanaugh's time in the White House Counsel's Office, however, suggested that he had led critical aspects of shepherding through their successful or attempted confirmations.

78.     Additional emails suggest other discrepancies. In 2004 and 2006 sworn testimony, for example, Judge Kavanaugh had denied being aware of the theft of the documents of certain Senate information stolen by staffer Manuel Miranda until he read about the theft in media reports. Released emails, however, show that Miranda had sent emails directly to Judge Kavanaugh with the stolen information.

79.     On the first day of Judge Kavanaugh's hearing before the Senate Judiciary Committee, several members of the Committee moved to adjourn the hearing until Judge Kavanaugh's documentary record was released.

80.     Although Rule Four of the Committee states, "The [Committee] Chairman shall entertain a non-debatable motion to bring a matter before the Committee to a vote," no vote on the motion to adjourn was ever held, effectuating the executive branch's desire for the hearing to proceed without a full documentary record.

81.     The following week, at a Senate Judiciary Committee meeting on September 13, 2018, Senator Dianne Feinstein moved to issue a subpoena for some of the records from Judge Kavanaugh's time as White House Staff Secretary. The motion was defeated 11-10.

82.     Senators Amy Klobuchar and Sheldon Whitehouse moved for the production of documents marked "constitutional privilege" and for a privilege log. They noted that no one has appeared to have actually asserted executive privilege, that "constitutional privilege" was of unknown provenance, and that the subpoena would merely require that the executive branch articulate its basis for withholding documents, not necessarily turn over documents. The motion was defeated 11-10.

83.     Senator Mazie Hirono moved to issue a subpoena requiring the production of records from Judge Kavanaugh's service as Staff Secretary relating to the rights of native Hawaiians. The motion was defeated 11-10.

84.     Senator Richard Blumenthal moved to issue a subpoena for the testimony of several witnesses, including Manual Miranda and Don Willett to testify regarding what Judge Kavanaugh knew about documents stolen from Democratic staffers that were then sent to Judge Kavanaugh, although he previously testified that he had no knowledge of these documents. The motion was defeated 11-10.

## CLAIM FOR RELIEF

### First Claim for Relief
### (Violation of Article II, Section 2 of the United States Constitution)

85.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 84 above as if set forth fully herein.

86.     The Advice and Consent Clause requires that the U.S. Senate conduct a thorough evaluation of Supreme Court nominees. To fulfill this constitutional mandate Senators must have

access to a full and complete record. The executive branch's interference with the Senate's ability to comply with its constitutional mandate violates the separation of powers. This is the heart of the claim stated in this Complaint.

87.     The Clause also leaves to the Senate, and the Senate alone, the power to give advice and consent. In the modern era, the Constitutional norm is to use the National Archives to provide the documents necessary for the U.S. Senate to fulfill this role. While the Senate may be able to veto Judge Kavanaugh's nomination with the currently available information, the Framers explicitly rejected this veto-only model in favor of the affirmative deliberative process contained in the Appointments Clause. As Senators Grassley and Sessions made clear during the confirmation of now-Justice Kagan, the Senate is currently incapable of fulfilling its constitutional mandate to provide advice and consent absent access to Judge Kavanaugh's records.

88.     When the Senate "act[s] in a manner seriously threatening the integrity of its results," the action might require judicial intervention even if "prudential concerns . . . would ordinarily counsel silence." *Nixon v. United States*, 506 U.S. 224, 253–54 (1993) (Souter, J., concurring). Although the Senate alone is tasked with providing advice and consent on the President's nominations, in doing so it is not free to disregard the Constitution's requirements. *See Powell v. McCormack*, 395 U.S. 486, 522 (1969) (holding that the agents of Congressmen had violated the Constitution by excluding an elected Representative from its membership). By interfering with the Senate's procedures and proceeding with a confirmation hearing before the documents necessary to evaluate the nominee are made available to the Senate and the public, Defendants have threatened the integrity of such a confirmation hearing to an extent that requires

judicial intervention to remedy a violation of the Advice and Consent Clause and a violation of the separation of powers.

89.     By taking a series of unprecedented actions to block the Senate and the public from seeing records necessary to evaluate the nominee's fitness for office, the Defendants, on behalf of the executive branch, have rendered the Senate unable to conduct its constitutional duty of advice and consent, and judicial intervention is therefore warranted. "[I]t remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another. Even when a branch does not arrogate power to itself, moreover, the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757 (1996).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court:

1.     Enter judgment in favor of Plaintiff and against Defendants on the claims for relief as alleged in this Complaint;

2.     Enter judgment declaring that Defendants have prevented the Plaintiff and his colleagues from fulfilling their constitutional obligations to provide advice and consent regarding a nomination to the Supreme Court of the United States by advancing and potentially concluding the nominee's confirmation hearing before the National Archives releases his records.

3.     Grant Plaintiff injunctive relief by ordering that:

(a)  Defendant Trump withdraw his excessive invocation of executive privilege and produce a privilege log for documents truly subject to executive privilege;

(b)  Defendants McConnell, Grassley, Adams, and Stenger not hold or permit a vote on the nominee's confirmation, or otherwise act to advance the

confirmation process, until the National Archives releases his records,

including the records requested by Senator Grassley regarding the nominee's

work at the Office of White House Counsel, and there is sufficient time for the

U.S. Senate to review the documents and conduct a careful review of the

newly released documents;

(c) National Archives expedite the production of the documents to the earliest

date practical;

(d) Defendant Burck cease and desist from usurping the traditional role of the

neutral professionals at the National Archives.

4.      Retain jurisdiction over Defendants for such period of time as may be appropriate

to ensure Defendants' compliance with relief ordered by this Court;

5.      Grant Plaintiffs such other and further relief as may be just and equitable.

Dated this 26th day of September, 2018.

RESPECTFULLY SUBMITTED,

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
Samuel Weiss* (NY Bar # 5383229)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K St. NW
Suite 900
Washington, DC 20005
(202) 662-8600
kclarke@lawyerscommittee.org

27

\* Member of the NY bar only; practicing in the
District of Columbia under the supervision of
members of the D.C. Bar while application for D.C.
Bar membership is pending. *Pro hac vice* motion to
be submitted.

Cyrus Mehri (D.C. Bar # 420970)
U.W. Clemon (D.C. Bar # AL0013)
Joanna K. Wasik (D.C. Bar # 1027916)
MEHRI & SKALET, PLLC
1250 Conn. Ave., NW
Suite 300
Washington, DC 20036
(202) 822-5100
cmehri@findjustice.com