# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JEFF MERKLEY
313 Hart Senate Office Building
120 Constitution Ave NE
Washington, DC 20510

                             Plaintiff,          Case No. 18-cv-02226-ABJ

v.

DONALD J. TRUMP
1600 Pennsylvania Avenue NW
Washington DC 20500

MITCH MCCONNELL
317 Russell Senate Office Building
2 Constitution Avenue NE
Washington, DC 20510

CHARLES GRASSLEY
135 Hart Senate Office Building
120 Constitution Ave NE
Washington, DC 20510

WILLIAM BURCK
1300 I Street NW Suite 900
Washington DC 20005

JULIE ADAMS
312 United States Capitol
East Capitol St NE & First St SE
Washington, DC 20004

MICHAEL STENGER
151 United States Capitol
East Capitol St NE & First St SE
Washington, DC 20004

NATIONAL ARCHIVES AND RECORDS
ADMINISTRATION (as indispensable party
per Fed. R. Civ. P. 19)
700 Pennsylvania Ave NW
Washington, DC 20408

                    Defendants.

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff Senator Merkley hereby moves for a temporary restraining order as set forth in the accompanying Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order ("Memorandum"). *See* Fed. R. Civ. P. 65(b).

Pursuant to Local Rule 7(m), counsel for Plaintiffs state that they were unable to discuss this motion with opposing counsel because the initial Complaint was filed a few business days ago and opposing counsel has not yet been identified.

For the foregoing reasons, Plaintiff respectfully requests that this Court grants his Motion for Temporary Restraining Order.

A proposed Order is attached hereto.

RESPECTFULLY SUBMITTED,

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
Samuel Weiss* (NY Bar # 5383229)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K St. NW
Suite 900
Washington, DC 20005
(202) 662-8600
kclarke@lawyerscommittee.org

* Member of the NY bar only; practicing in the
District of Columbia under the supervision of

members of the D.C. Bar while application for D.C. Bar membership is pending. *Pro hac vice* motion to be submitted.

Cyrus Mehri (D.C. Bar # 420970)
U.W. Clemon (D.C. Bar # AL0013)
Michael Lieder (D.C. Bar # 444273)
Joanna K. Wasik (D.C. Bar # 1027916)
MEHRI & SKALET, PLLC
1250 Conn. Ave., NW
Suite 300
Washington, DC 20036
(202) 822-5100
cmehri@findjustice.com

## CERTIFICATE OF SERVICE

I hereby certify that Plaintiff's Motion for Temporary Restraining Order and all attendant papers ("Motion") were filed via ECF on October 2, 2018. Plaintiffs effectuated service of the Complaint in this action (ECF 1) via hand delivery on the U.S. Attorney for the District of Columbia as well as the Attorney General of the United States on September 28, 2018. Plaintiffs also caused Defendants to be served with the Complaint (ECF 1) via registered mail.

Given that Counsel has not yet been identified, Plaintiff will endeavor to provide hand-delivery of this motion to all Defendants for whom hand-delivery is feasible on October 3, 2018. Plaintiff will also mail this motion by UPS express delivery to all Defendants as well as the U.S. Attorney for the District of Columbia and the Attorney General of the United States on October 3, 2018.

Cyrus Mehri (D.C. Bar # 420970)
MEHRI & SKALET, PLLC
1250 Conn. Ave., NW
Suite 300
Washington, DC 20036
(202) 822-5100
cmehri@findjustice.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JEFF MERKLEY,

*Plaintiff*,

v.

DONALD J. TRUMP et al.,

*Defendants*.

No. 18-cv-2226 (ABJ)

Electronically Filed

Hon. Amy Berman Jackson

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

**Table of Contents**

**INTRODUCTION**........................................................................................................1

**FACTUAL BACKGROUND**....................................................................................2

      A.     Defendant Trump Instructed Members of the Judiciary Committee Not to

              Request Documents Related to the Nominee's Tenure as Staff Secretary for

              President Bush ...............................................................................................2

      B.     Defendant Trump Blocked Senators' Access to Information Concerning the

              Nominee's Work as Associate Counsel to President Bush Through An

              Overbroad, Unchecked Assertion of Executive Privilege and Through

              Delegation of Document Review to a Private Non-Government Attorney

              with Disabling Conflicts of Interest ..............................................................5

      C.     Defendant Trump Made It Impossible for Senators to Share Important

              Information with Staff, Experts, or the Public ............................................10

      D.     The Actions of the Defendants Have Harmed Senator Merkley...................11

**PROCECURAL BACKGROUND**...........................................................................14

**ARGUMENT**...........................................................................................................14

      A.     Plaintiffs are Likely to Succeed on the Merits ...........................................15

           1.    Executive Defendants' Overreaching Prevents Senator Merkley From

               Carrying Out His Advice and Consent Duties ......................................15

                  a.    The Advice and Consent Clause of the U.S. Constitution ............15

                  b.    Defendants' Unprecedented Withholding of Documents

.............................................................................................................16

        c.    Courts Regularly Adjudicate Disputes of Privilege and

           Confidentiality ..............................................................................19

     2.    Senator Merkley Has Standing ............................................................20

        a.    Personal Injury ............................................................................21

        b.    Institutional Injury under *Coleman v. Miller* ................................24

        c.    Causation and Redressability ........................................................26

     3.    This Case Presents a Justiciable Question Concerning the Separation of

        Powers ................................................................................................27

  B.    Plaintiff Will Suffer Immediate, Irreparable Harm Absent Preliminary Relief .29

  C.    The Balance of Equities and the Public Interest Support Preliminary Relief ....31

**CONCLUSION**...............................................................................................................34

# Table of Authorities

**Cases**

*Advance Am. Cash Advance Ctrs., Inc. v. FDIC*, Civ. No. 14-953, 2017 U.S. Dist. LEXIS 27887, (D.D.C. 2017)..................................................................................................................29

*Archdiocese of Washington v. Wash. Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, (D.D.C. 2017) ......................................................................................................................15

*Baker v. Carr*, 369 U.S. 186, (1962)............................................................................27

*Blumenthal v. Trump*, Case No. 17-1154, 2018 U.S. Dist. LEXIS 167411, (D.D.C. 2018).... 23, 25

*Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000).......................................................26

*Coleman v. Miller*, 307 U.S. 433 (1939).........................................................21, 24, 25

*Comm. on Oversight v. Holder*, 979 F. Supp. 2d 1, (D.D.C. 2013)...................19, 27, 28

*Comm. on Oversight & Gov't Reform v. Lynch*, 156 F. Supp. 3d 101 (D.D.C. 2016) ....................2

*Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 107 (D.D.C. 2008) ......................................................................................................18, 20

*Cummings v. Murphy*, Case No. 17-cv-02308, 2018 WL 3869132 (D.D.C. 2018).................24, 25

*Doe v. Mattis*, 889 F.3d 745, (D.C. Cir 2018...............................................................31

*Edmond v. United States*, 520 U.S. 651, (1997) ...........................................................15

*EPA v. Mink*, 410 U.S. 73, (1973)................................................................................33

*I.N.S. v. Chadha*, 462 U.S. 919, (1983) .......................................................................16

*In re Sealed* Case, 121 F.3d 729, (D.C. Cir. 1997) .......................................................19

*Judicial Watch v. Dep't of Justice*, 365 F.3d 1108, (D.C. Cir. 2004)............................19

*Kirwa v. United States DOD*, 285 F. Supp. 3d 21, (D.D.C. 2017) .................................31

*League of Women Voters of the United States v Newby*, 838 F 3d 1, (D.C. Cir. 2016)..............1, 30

*Loving v. United States*, 517 U.S. 748, (1996).................................................................................16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, (1992)...................................................................20

*Marbury v. Madison*, 5 U.S. 137, (1803). .....................................................................................16

*Marks v. Stinson*, 19 F.3d 873, (3d Cir. 1994) .............................................................................31

*Mills v. District of Columbia*, 571 F.3d 1304, (D.C. Cir. 2009) ....................................................31

*Murphy v. Dep't of Army*, 613 F.2d 1151, (D.C. Cir. 1979)..........................................................22

*Nelson v. NASA*, 530 F.3d 865, (9th Cir. 2008) ...........................................................................31

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, (1977) ...................................................................19

*Nixon v. United States*, 506 U.S. 224 (1993) ................................................................................28

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, (D.D.C. 2001) ........................................15

*Powell v. McCormack*, 395 U.S. 486, (1969) ..........................................................................21, 28

*Raines v. Byrd*, 521 U.S. 811, (1997) ..............................................................21, 23, 24, 25, 26

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, (D.C. Cir.

   1974) ........................................................................................................................................20

*United States v. AT&T*, 86 F.R.D. 603, (D.D.C. 1979)..................................................................19

*United States v. Nixon*, 418 U.S. 683, (1974) ..........................................................................19, 33

*United States v. U.S. Coin & Currency*, 401 U.S. 715, (1971)......................................................34

*Walker v. Cheney*, 230 F. Supp. 2d 51, (D.D.C. 2002)..................................................................24

*Washington Legal Found'n v. Dep't of Justice*, 691 F. Supp. 483, (D.D.C. 1988)........................15

**Other Authorities**

Charles Mathias, Jr. *Advice and Consent: The Role of the United States Senate in the Judicial Selection Process*, 54 U. Chi. L. Rev. 200, 206-07 (1987).............................................................1

James E. Gauch, *The Intended Role of the Senate in Supreme Court Appointments*, 56 U. Chi. L. Rev. 337, 348 (1989)................................................................................................................15

Steven Friedland, *"Advice and Consent" in the Appointments Clause: From Another Historical Perspective*, 65 Duke L.J. 173, 177-78, 190 (2015) .................................................................32

The Federalist Society, *Advice in the Constitution's Advice and Consent Clause: New Evidence From Contemporaneous Sources*, (July 17, 2018), https://fedsoc.org/commentary/publications/advice-in-the-constitutions-advice-and-consent-clause-new-evidence-from-contemporaneous-sources ..............................................................16

Todd Garvey, *Presidential Claims of Executive Privilege: History, Law, Practice, and Recent Developments*, Cong. Research Serv. (Dec. 15, 2014), https://fas.org/sgp/crs/secrecy/R42670.pdf ................................................................................9

U.S. Senate, "Filibuster Derails Supreme Court Appointment" (Oct. 1, 1968), https://www.senate.gov/artandhistory/history/minute/Filibuster_Derails_Supreme_Court_Appointment.htm.) ................................................................................................................12

# I.  <u>INTRODUCTION</u>

Article II, Section 2 of the United State Constitution states that the President
"shall nominate, and by the Advice and Consent of the Senate, shall appoint … Judges of the
Supreme Court."  The Senate's paramount constitutional duty in the process of advice and
consent is to satisfy itself that the nominee is fully qualified by virtue of education, experience,
integrity and character to receive a lifetime appointment based upon the review of a complete
record.  *See* Charles Mathias, Jr., *Advice and Consent: The Role of the United States Senate in
the Judicial Selection Process*, 54 U. Chi. L. Rev. 200, 206-07 (1987).

President Donald Trump has nominated Brett Kavanaugh for lifetime appointment to the
U.S. Supreme Court. But the executive branch has prevented the U.S. Senate from fulfilling its
constitutional duties by completely denying it access to three years of the nominee's
documentary record while he served in the White House for President George W. Bush, claiming
executive privilege to deny the Senate access to over 100,000 pages of documents from the other
two years, and restricting access to and use of over 140,000 pages of documents that were
produced by designating them as "committee confidential."

U.S. Senator Jeff Merkley has brought this action as a last resort to gain access to the
withheld and restricted documents, and now brings this motion for a temporary restraining order
to prevent irreparable harm to him personally and to the constitutional system of advice and
consent.  *See League of Women Voters of the United States v Newby*, 838 F 3d 1, 9 (D.C. Cir.
2016) (in some situations, "there can be no do over and no redress").  He asks the Court to order
that (a) the President or persons working on his behalf produce expeditiously a log or similar
document adequately identifying the withheld documents and adequately describing the bases for
withholding those documents and (b) Senator Merkley and his representatives be given an

opportunity promptly to review and challenge the designations of documents marked as "committee confidential."

As this court has noted in *Committee on Oversight & Government Reform v. Lynch*, 156 F. Supp. 3d 101 (D.D.C. 2016), courts may exercise jurisdiction in a dispute between the Executive and Congress when "the case involved a discrete, narrow question of law" such as "the scope and application of Executive privilege." *Id.* at 103-04. Much like *Committee on Oversight* and other disputes over production of documents, this Court can remedy this constitutional violation by instituting expedited procedures for determinations to be made about the propriety of the Executive's withholding and privilege designation of documents, and to the extent the Executive acted improperly, to order production of the documents necessary for Senators to fulfill their constitutional duties.

## II.  FACTUAL BACKGROUND

### A.     Defendant Trump Instructed Members of the Judiciary Committee Not to Request Documents Related to the Nominee's Tenure as Staff Secretary for President Bush[1]

President Donald Trump nominated Judge Kavanaugh on July 9, 2018 to be an Associate Justice on the Supreme Court. Before his nomination, he had served five years in the administration of President George W. Bush (from 2001 to 2003 as Associate Counsel and Senior Associate Counsel to the President and then from July 2003 until May 2006 as Staff Secretary to the President) and twelve years between 2006 and 2018 as a judge on the D.C.

---

[1]     Notwithstanding the relevance and probative value of these documents, Plaintiff does not seek any relief in this TRO motion for the denial of access to any documents from the years in which the nominee served as President George W. Bush's Staff Secretary. The information is included in this fact section to demonstrate the pattern of denying access to relevant records.

Circuit Court of Appeals. Brett M. Kavanaugh Professional Biography, *available at* https://www.cadc.uscourts.gov/internet/home.nsf/Content/VL+-+Judges+-+BMK.

On July 19, 2018, members of the Senate Judiciary Committee met to discuss preparations for the confirmation hearing.  During that meeting, Senator John Cornyn, a senior member of the Judiciary Committee, agreed that the production of documents the nominee had "generated . . . authored . . . or contributed to" during his tenure as White House Staff Secretary should be produced to the Committee.  He stated that production of the Staff Secretary period documents "just seems to be common sense."  Letter from Senator Patrick Leahy to White House Counsel Don McGahn (Aug. 17, 2018), *available at* https://www.leahy.senate.gov/imo/media/doc/081718LeahyToMcGahnLetter.pdf.  That characterization, according to Senator Leahy, a longtime member of the Judiciary Committee, was consistent with the Committee's "longstanding, bipartisan expectation . . . that any materials produced while a nominee was a public servant that could shed light on his or her views, thinking, or temperament, that are not privileged, should be subject to public scrutiny and carefully considered by the Senate prior to confirmation."  *Id.*

That expectation lasted for five days, when on July 24, 2018, Mr. McGahn summoned several members of the Judiciary Committee to the White House.  Immediately following that meeting, Senator Cornyn spoke with the press.  According to Senator Cornyn, Mr. McGahn described "what a 'reasonable, relevant document production would look like.'"  Seung Min Kim, *White House counsel huddles with Senate Republicans on dispute over documents from Supreme Court nominee*, The Washington Post (July 24, 2018), *available at* https://www.washingtonpost.com/powerpost/white-house-counsel-huddles-with-senate-republicans-on-dispute-over-documents-from-supreme-court-nominee/2018/07/24/f7e7ea0a-

8f57-11e8-bcd5-9d911c784c38_story.html?utm_term=.e618b0b2a65e.[2]  Senator Cornyn added

that documents from the nominee's time in the White House Counsel's Office were "fair game"

but that documents from his service as Staff Secretary were not.  *Id.*  Senator Patrick Leahy

described it as "probably one of the fastest U-turns I've seen outside of a racetrack."  Abruptly

after the meeting with Mr. McGahn, "Republicans who thought it was great to have these

records" now maintained that "all of Judge Kavanaugh's staff secretary records were off-limits.

Even those that he authored."  Taylor Dobbs, *Leahy Meets With Kavanaugh, Says Republicans*

*Are Botching Review*, Seven Days (Aug. 21, 2018), *available at*

https://www.sevendaysvt.com/OffMessage/archives/2018/08/21/leahy-meets-with-kavanaugh-

says-republicans-are-botching-review.

Three days after the White House meeting, on July 27, 2018, Senator Charles Grassley,

the Chair of the Judiciary Committee and a Defendant in this lawsuit, complied with the

executive's instructions to limit the scope of the request.  He excluded documents from the

nominee's time as White House Staff Secretary in his records request to the George W. Bush

Presidential Library.  (Letter from Charles Grassley to Patrick Mordente dated July 27, 2018,

*available at* https://www.archives.gov/files/foia/07.27.2018-grassley-to-bush-library-re-

kavanaugh.pdf)

---

[2]      The decision of whether to grant preliminary relief is often based on "procedures that are less complete than a trial on the merits." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). "[C]ourts generally permit consideration of hearsay evidence in connection with" motions for preliminary relief. *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp. 2d 145, 155 (D.D.C.), *vac'd and remanded on grounds of mootness*, 493 F. App'x 108 (D.C. Cir. 2012); *see also Mullins v. City of New York,* 626 F.3d 47, 52 (2d Cir. 2010) (collecting cases from six other circuit courts holding the same).

Documents related to the nominee's work as Staff Secretary were excluded even though Plaintiff and other Senators have good reason to believe that they would contain information relevant to his qualifications for a seat on the Supreme Court.  The nominee himself said in May 2010, "When people ask me which of my prior experiences has been most useful to me as a judge … I … do not hesitate to say that my five and a half years in the White House — and especially my three years as Staff Secretary for President Bush — were the most interesting and in many ways among the most instructive."  Seung Min Kim, *White House counsel huddles with Senate Republicans on dispute over documents from Supreme Court nominee*, The Washington Post (July 24, 2018). And in May 2006, during the debate over Judge Kavanaugh's nomination to the D.C. Circuit Court of Appeals, then-Judiciary Committee Chairman Orrin G. Hatch stated, "His background as staff secretary may prove to be particularly good judicial training."  152 Cong. Rec. 9611 (2006).

**B.**    **Defendant Trump Blocked Senators' Access to Information Concerning the Nominee's Work as Associate Counsel to President Bush Through An Overbroad, Unchecked Assertion of Executive Privilege and Through Delegation of Document Review to a Private Attorney with Disabling Conflicts of Interest**

Chairman Grassley did request documents from the George W. Bush Presidential Library, which is administered by the National Archives, related to the nominee's work as a lawyer in the White House Counsel's Office during the administration of President George W. Bush.  The National Archives traditionally supervises the release of records for Supreme Court nominees.  Patrick Leahy Press Release, "Comment of Senator Patrick Leahy (D-Vt.) On The Senate Judiciary Committee's Reliance On An Unprecedented Partisan Records Production For Judge Kavanaugh" (Aug. 2, 2018), *available at* https://www.leahy.senate.gov/press/comment-of-senator-patrick-leahy-d-vt-on-the-senate-judiciary-committees-reliance-on-an-unprecedented-partisan-records-production-for-judge-kavanaugh.

Although Chairman Grassley had requested that documents be produced by August 15, the National Archives on August 2 informed him that it could not commit to finishing the job until the end of October 2018.  Letter from Gary Stern to Chairman Grassley (Aug. 2, 2018), *available at* https://www.archives.gov/files/foia/stern-letter-to-grassley-8-2-2018.pdf .) In a break from normal practice, Defendant President Trump was unwilling to wait until the professional archivists completed their review before the Judiciary Committee conducted hearings.  Letter from Judiciary Committee Democrats to Chairman Grassley dated Aug. 28, 2018, *available at* https://www.judiciary.senate.gov/press/dem/releases/judiciary-committee-democrats-protest-withholding-of-kavanaugh-documents.  Instead, a private attorney, Defendant William Burck, was engaged, nominally by President Bush, to supervise the review of the documents archived in the Bush Presidential Library.  Michael D. Shear and Michael S. Schmidt, *A Coveted Lawyer's Juggling Act May Be Good, and Bad, for Trump,* N.Y. Times (Sep. 2, 2018), *available at* https://www.nytimes.com/2018/09/02/us/politics/william-burck.html. However, as described below, he is wearing so many hats that it is impossible to know to whom Mr. Burck answered in this work.

Mr. Burck manages the Washington office of the law firm of Quinn Emanuel Urquhart & Sullivan.  *Id.*  He is active in partisan politics and represents or has represented at least three current or former White House officials – Mr. McGahn, Reince Priebus, and Steve Bannon — regarding special counsel Robert Mueller's investigation.  *Id.*  Mr. McGahn also is the primary White House official in charge of Judge Kavanaugh's confirmation, after which he will leave President Trump's administration.  In addition, the nominee was "Mr. Burck's boss when he was a young lawyer in the Bush White House [and] is also one of his closest friends." *Id.*

Mr. Burck hired a team of 50 lawyers from three firms (including his own) to review the Bush presidential library papers for documents responsive to the Committee's requests. *Id.* While this allowed production of documents by the end of August, a few days before the Committee's hearing on the nomination, "officials at the Archives have described Mr. Burck's effort as 'something that has never happened before' and stated [in a news release], 'This effort by former President Bush does not represent the National Archives or the George W. Bush Presidential Library.'" *Id.*

This use of a private party to review a nominee's papers during the "advice and consent" process is unprecedented. As stated by Senator Leahy, "For every Supreme Court nominee since Watergate, professional archivists with the National Archives have reviewed any associated White House records of the nominee and provided them to the Senate Judiciary Committee as required by statute. If Senate Republicans sideline this nonpartisan process and instead rely on self-selected partisan lawyers to self-select documents from just two of the nominee's five years in the White House, it will mark the most partisan and incomplete vetting of a Supreme Court nominee in my memory." Patrick Leahy Press Release, "Comment of Senator Patrick Leahy (D-Vt.) On The Senate Judiciary Committee's Reliance On An Unprecedented Partisan Records Production For Judge Kavanaugh" (Aug. 2, 2018), *available at* https://www.leahy.senate.gov/press/comment-of-senator-patrick-leahy-d-vt-on-the-senate-judiciary-committees-reliance-on-an-unprecedented-partisan-records-production-for-judge-kavanaugh. Senator Leahy's "memory" encompasses 19 nominations to fill seats on the Supreme Court, including 17 as a member of the Judiciary Committee. Taylor Dobbs, *Leahy Meets With Kavanaugh, Says Republicans Are Botching Review*, Seven Days (Aug. 21, 2018),

*available at* https://www.sevendaysvt.com/OffMessage/archives/2018/08/21/leahy-meets-with-kavanaugh-says-republicans-are-botching-review.

This "incomplete vetting" also resulted in huge gaps in the record. By letter dated August 31, 2018, Mr. Burck informed the Committee that the White House was asserting executive privilege (which he called "constitutional privilege") as to more than 100,000 pages of documents. According to Mr. Burck, the White House and the Department of Justice made the decision about which documents were privileged and "directed that we not provide these documents." Letter from Mr. Burck to Senator Grassley (Aug. 31, 2018), *available at* https://www.judiciary.senate.gov/imo/media/doc/2018-08-31%20Burck%20to%20Grassley%20-%20Accounting%20of%20Kavanaugh%20WHCO%20Records.pdf. The withheld documents represented about 15% of the 663,817 pages reviewed by Burck's team, and about 25% of the 415,000 pages that were produced. Shear & Schmidt, *A Coveted Lawyer's Juggling Act, supra*; Seung Min Kim, *Trump to withhold 100,000 pages of Kavanaugh's White House records*, The Washington Post (Sep. 1, 2018), *available at* https://www.washingtonpost.com/politics/trump-to-withhold-100000-pages-of-kavanaughs-white-house-records/2018/09/01/217cf9e0-adf9-11e8-8f4b-aee063e14538_story.html?utm_term=.683bc5a115fc.

Notwithstanding Mr. Burck's assertion in his August 31 letter that the withheld documents were "of the type traditionally protected by constitutional privilege," Presidents traditionally have not withheld documents concerning Supreme Court nominees based on executive privilege. Ronald Reagan initially claimed privilege in 1986 over William Rehnquist's memos while serving as an advisor to the Attorney General but relented in a week after facing Congressional resistance. *Factbox: History of U.S. executive privilege*, Reuters (June 20, 2012), *available at* https://www.reuters.com/article/us-usa-mexico-guns-holder/factbox-history-of-u-s-

8

executive-privilege-idUSBRE85J1LP20120620.  Between then and the current nomination, six

Presidents nominated 15 persons to be Supreme Court Justices without asserting executive

privilege once.  *Compare* Todd Garvey, *Presidential Claims of Executive Privilege: History,*

*Law, Practice, and Recent Developments*, Cong. Research Serv. (Dec. 15, 2014), *available at*

https://fas.org/sgp/crs/secrecy/R42670.pdf (listing incidents in which executive privilege has

been asserted) *with* Wikipedia, List of nominations to the Supreme Court of the United States,

*available at*

https://en.wikipedia.org/wiki/List_of_nominations_to_the_Supreme_Court_of_the_United_State

s) (listing Supreme Court nominations).  While many of the nominees had not worked in the

White House and hence were unlikely to have documents potentially subject to executive

privilege, "President Barack Obama did not claim privilege on any of the documents involving

now-Justice Elena Kagan, the last Supreme Court nominee to have served in a White House."

Seung Min Kim, *Trump to withhold 100,000 pages*, *supra*.  Likewise, President George W. Bush

released documents from now-Chief Justice John Roberts' tenure at the White House under

President Ronald Reagan, as well as his tenure as special assistant to Attorney General William

French Smith. Jeffrey Smith, Jo Becker & Amy Goldstein, *Documents Show Roberts Influence*

*In Reagan Era*, Washington Post (July 27, 2005), *available at*

http://www.washingtonpost.com/wp-dyn/content/article/2005/07/26/AR2005072602070.html.

    Neither Defendant Burck nor President Trump has provided a log or any other

description of this unprecedented use of executive privilege to stymie the advice-and-consent

process.  The Senate does not even know the subject matter of the withheld documents, let alone

the extent to which Defendant Burck was involved in determinations that the documents were

subject to executive privilege and the standards used to determine that the documents should be

withheld, other than extremely broad categories identified in Mr. Burck's letter of August 31.

**C.   Defendant Trump Made It Impossible for Senators to Share Important Information with Staff, Experts, or the Public**

Of the 415,000 pages of documents sent to the Judiciary Committee by Mr. Burck, over

147,000 pages (35%) were marked "Committee Confidential.  Burck Aug. 31, 2018 Letter,

*supra*.  Public access to these documents was supposedly restricted by either the Presidential

Records Act or the Freedom of Information Act.  Letter from Senator Grassley to Senator Dianne

Feinstein (Aug. 28, 2018), *available at* https://www.judiciary.senate.gov/imo/media/doc/2018-

08-28%20CEG%20to%20Feinstein%20(Committee%20Confidentiality).pdf.  But again, the

scope of the designations was unprecedented.  *See* Letter from Senator Leahy to Senator Jeff

Sessions (June 7, 2010), *available at* https://www.judiciary.senate.gov/imo/media/doc/2010-06-

07%20Leahy%20to%20Sessions%20-%20Kagan%20Records.pdf  ("small number of

documents" with respect to Justice Kagan's nomination marked as Committee Confidential).

The confidentiality designation severely restricts the ability of Senators outside the

Committee, including Senator Merkley, to analyze the designated documents.  They must make

an appointment with Senator Grassley or Feinstein to review them and may not make copies of

the documents; they may only make notes concerning their content.  Letter from Senator

Grassley to Senator Dianne Feinstein (Aug. 28, 2018), *available at*

https://www.judiciary.senate.gov/imo/media/doc/2018-08-

28%20CEG%20to%20Feinstein%20(Committee%20Confidentiality).pdf; Merkley Decl., ¶ 25.

Their staff may not review the documents at all.  *Id.*  And of course, no Senator, even a

Committee member, can have the designated documents examined by experts, make the

documents available to the public, or even discuss their contents in public.  *Id.*

Defendant Burck has not indicated that the White House or Justice Department reviewed the documents that his team determined should be treated as confidential.  Apparently Defendant Burck and his team of lawyers acted on their own in making these designations; when Senator Cory Booker sought permission to reveal certain documents designated as "committee confidential" during the questioning of the nominee, it was Defendant Burck who released the restriction.  Tucker Higgins, *Cory Booker's 'I am Spartacus' document release during the Kavanaugh hearing wasn't as defiant as it seemed,* CNBC (Sept. 6, 2018), *available at* https://www.cnbc.com/2018/09/06/cory-bookers-kavanaugh-document-release-not-as-defiant-as-it-seemed.html.  Thus, a private citizen with conflicts of interest that arise from the interests of his clients in the outcome of the nomination process, has decided which documents are essentially inaccessible to and unusable by Plaintiff Merkley and other non-members of the Judiciary Committee.

**D.     The Actions of the Defendants Have Harmed Senator Merkley**

The actions of the Defendants have harmed Senator Merkley in two fundamental ways.

First, the denial of access to any documents from the period in which the nominee was Staff Secretary to President Bush, the sweeping assertion of executive privilege as to over 100,000 pages of documents from the period in which he was an associate counsel or senior associate counsel, and the restriction of access to the documents that were produced but restricted as a result of the "committee confidential" designation have impeded Senator Merkley's ability to persuade Senators and his constituents about how to evaluate the nominee Merkley Decl., ¶¶ 14-17.While a large number of Senators have announced their intention to vote in favor of the nominee, several Senators have not announced their intentions and appear undecided.  Steven T. Dennis, *Four Key Undecided Senators Meet Privately on Kavanaugh Vote*,

Bloomberg (Sep. 27, 2018), *available at* https://www.bloomberg.com/news/articles/2018-09-28/four-key-undecided-senators-meet-privately-on-kavanaugh-vote.  They are prime targets for Senator Merkley's efforts.

But even Senators who believe that their minds are made up may change their minds.  For example, Senator Flake announced on the morning of September 28, 2018 that he would support the nomination, and a few hours later changed his mind and urged an FBI investigation as a precondition to advancing the nomination out of Committee.  Nicholas Fandos and Sheryl Gay Stolberg, *Trump Agrees to Open 'Limited' F.B.I. Investigation Into Accusations Against Kavanaugh*, N.Y. Times (Sept. 28, 2018), *available at* https://www.nytimes.com/2018/09/28/us/politics/brett-kavanaugh-senate-judiciary.html.) Senators change their minds about how to vote on appointments to the Supreme Court and high executive positions.  *See, e.g.,* Merkley Decl., ¶ 15 (describing Senator Rand Paul's switch in position on Secretary of State Mike Pompeo; U.S. Senate, "Filibuster Derails Supreme Court Appointment" (Oct. 1, 1968), *available at* https://www.senate.gov/artandhistory/history/minute/Filibuster_Derails_Supreme_Court_Appointment.htm. (describing process by which Senate rejected nomination of Abe Fortas as Chief Justice).  Senator Merkley was able on one occasion to persuade a colleague to alter the way he had intended to vote on a judicial nominee by presenting this colleague with relevant documents regarding that nominee's background.  Merkley Decl., ¶ 17.

Senator Merkley has reason to believe that currently inaccessible documents could help him inform and persuade other Senators as they continue to formulate their position during the confirmation process.  Merkley Decl., ¶¶ 13-17.  Senator Collins, for example, has indicated that an important issue to her is whether the nominee considers *Roe v. Wade* to be settled law.  The nominee tried in a personal meeting to persuade her that he did consider it to be settled.  Sunlen

Serfaty, Lauren Fox, & Ted Barrett, *Susan Collins says Kavanaugh told her Roe v. Wade is settled law,* CNN (Aug. 22, 2018), *available at* https://www.cnn.com/2018/08/21/politics/susan-collins-says-kavanaugh-roe-v-wade-is-settled-law/index.html.  Already one document from the nominee's time serving President George W. Bush has indicated that he does not regard *Roe v. Wade* as settled law.  Lisa Mascaro & Mark Sherman, *Democrats make final attempt to block Kavanaugh confirmation*, Associated Press (Sept. 6, 2018), *available at* https://www.bostonglobe.com/news/politics/2018/09/06/mail-reveals-kavanaugh-questioned-roe-wade-settled-law/LXvHtBrNCIJW9u3TdafrsM/story.html.  It is reasonable to believe that some documents that Defendants have made unavailable to the Senator would shed additional light on the nominee's attitude toward that decision.

Second, Senator Merkley communicates regularly with his constituents about important issues affecting the nation, including this nomination.  Merkley Decl., ¶ 18.  Partly this entails keeping the people of Oregon as informed as possible about issues before the Senate.  Being deprived of relevant information interferes with his ability to ably servie his constituents.  *Id.*, ¶ 19.  Partly this entails listening to his constituents so that he has a sense of their positions on the issues.  Senator Merkley has received over 9,000 phone calls and 51,000 emails from Oregonians about the nomination, making this one of the issues during his decade in the Senate that has raised the most public interest.  *Id.*, ¶ 18.  He and his staff have responded or are in the process of responding to each of these communications.  They also have sent over 30,000 communications that address, at least in part, the nomination.  *Id.*, ¶ 19.  If, as seems likely, the withheld and confidential documents would shed light on the nominee's positions on topics such as immigration, the response to terrorism including use of torture, gun rights, and a woman's right

13

to abortion, this information would likely inform Senator Merkley's ability to provide accurate and full information and responses to his constituents.

Senator Merkley believes that the actions of the Defendants have deprived him and the Senate of the requisite record on which to engage in the advice and consent function, effectively rendering the process irrevocably deficient and stripping the Senate of a constitutionally meaningful process. *Id.*, ¶ 24.

### III.   PROCECURAL BACKGROUND

Senator Merkley filed the Complaint in this case on September 26, 2018. On September 28, the Judiciary Committee voted to forward the nomination to the full Senate.  However, Defendant Grassley asked the President to direct the FBI to conduct an investigation into the allegations that had been brought against the nominee, and the FBI was authorized to conduct an investigation of up to one week.  If that period is not extended, it would end no later than Friday, October 5.  A Senate vote on the nomination has not yet been scheduled, but Defendant McConnell announced on Monday, October 1, that the vote would occur before the end of the week.

Plaintiff seeks a temporary restraining order principally to (a) compel the President or his agents to provide a log or similar document identifying the materials withheld on the basis of executive privilege and the bases for their non-production, and (b) allow Senator Merkley and his representatives a reasonable opportunity to review the materials designated as "committee confidential" and to challenge those designations if unwarranted.

### IV.   ARGUMENT

To obtain a temporary restraining order, a party must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the

balance of equities tips in its favor; and (4) the injunction is in the public interest. *Archdiocese of Washington v. Wash. Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 99 (D.D.C. 2017); *see Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001) ("The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction."). Plaintiffs satisfy each of these factors.

A.     **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

1.     **Defendants' Overreaching Prevents Senator Merkley From Carrying Out His Advice and Consent Duties**

a.     The Advice and Consent Clause of the U.S. Constitution

Plaintiff Senator Merkley is likely to prevail on his claim under the Advice and Consent Clause. That clause "is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997). It is "designed to ensure public accountability for both the making of a bad appointment and the rejection of a good one." *Id.* As this Court has explained, "[t]hrough the confirmation process, the public, individuals, and interested organizations alike have an opportunity to inform the decision-making process and scrutinize the President's nominee." *Washington Legal Found'n v. Dep't of Justice*, 691 F. Supp. 483, 492 (D.D.C. 1988). The Senate nomination hearing allows "the public and Congress [to] have a full opportunity to evaluate the actual nominee and to probe more deeply." *Id.* at 495.

The original intent of the Advice and Consent clause was to require transparent deliberation in the Senate on the President's nominees. The 1787 Constitutional Convention voted down James Madison's plan, in which the President could appoint Justices and Senators had the option (but not the obligation) to veto the nominees. James E. Gauch, *The Intended Role of the Senate in Supreme Court Appointments*, 56 U. Chi. L. Rev. 337, 348 (1989). In its place, the Constitution required that the Senate affirmatively provide advice and consent. The public

understanding of the word "advice" in the 18th Century is analogous to the public understanding

of "deliberation" in the 21st Century, with "advice and consent" meaning, effectively, "with the

deliberation and approval of the Senate." *See* The Federalist Society, *Advice in the Constitution's*

*Advice and Consent Clause: New Evidence From Contemporaneous Sources*, (July 17, 2018),

*available at* https://fedsoc.org/commentary/publications/advice-in-the-constitutions-advice-and-

consent-clause-new-evidence-from-contemporaneous-sources.

The separation of powers inheres in the Advice and Consent Clause. As in many other

provisions of the Constitution, within the clause "[e]xplicit and unambiguous provisions …

prescribe and define the respective functions of the [Senate] and of the Executive." *I.N.S. v.*

*Chadha*, 462 U.S. 919, 945 (1983).  "[T]he principle of separation of powers was not simply an

abstract generalization in the minds of the Framers: it was woven into the documents that they

drafted in Philadelphia in the summer of 1787." *Id.* at 946.

 "Even before the birth of this country, separation of powers was known to be a defense

against tyranny. . . . [I]t remains a basic principle of our constitutional scheme that one branch of

the Government may not intrude upon the central prerogatives of another. Even when a branch

does not arrogate power to itself, moreover, the separation-of-powers doctrine requires that a

branch not impair another in the performance of its constitutional duties." *Loving v. United*

*States*, 517 U.S. 748, 757 (1996) (internal citations omitted). And in evaluating this question,

"[i]t is emphatically the province and duty of the judicial department to say what the law is."

*Marbury v. Madison*, 5 U.S. 137, 177 (1803).

b.      Defendants' Unprecedented Withholding of Documents

The executive branch has gone to extraordinary lengths to withhold information from the

Senate about the nominee. Such interference in the Senate's advice and consent process rises to

16

the level of a constitutional violation. Most significantly, the executive branch has purportedly marked over 100,000 pages of documents as subject to "presidential privilege" without providing specific justifications or even a privilege log. The private attorney Burck, at the behest of the executive branch, has designated over 140,000 pages of documents "committee confidential," ensuring that only members of the Judiciary Committee have reasonable access to them, preventing the Senators from discussing the documents with staff or experts, and sealing off the public from their information about the nominee.[3] The executive branch also instructed the Senate Judiciary Committee to not request a single document from the nominee's time as White House Staff Secretary, including documents that the nominee authored himself, even though the nominee described the experience at the heart of President George W. Bush's administration as a formative experience for his current role as a judge.

As described in the fact section, the withholding of over 100,000 pages of documents, and further designation of 140,000 pages as confidential, is unprecedented. Indeed, one of the Defendants has made this point explicitly. On June 15, 2010, Senator Grassley stated on the Senate floor regarding Supreme Court nominee Elena Kagan, "[I]n order for the Senate to fulfill its constitutional responsibility of advise and consent [sic], we must get all of her documents from the Clinton Library and have enough time to analyze them so we can determine whether she should be a Justice. I share the concerns of the Judiciary Committee ranking member, Senator Sessions, that Solicitor Kagan's documents will not be fully produced in time for the committee to conduct a thorough review of the nominee's record." 156 Cong. Rec. 89 (2010).

---

[3]     *See* Letter from Senator Grassley to Senator Dianne Feinstein (Aug. 28, 2018), *available at* https://www.judiciary.senate.gov/imo/media/doc/2018-08-28%20CEG%20to%20Feinstein%20(Committee%20Confidentiality).pdf .

But unlike for this nominee, the executive branch provided all the requested documents for Justice Kagan's nomination.

Senator Merkley is likely to succeed on his claim that the privilege and confidentiality assertions are overbroad and improper, because the constitutional mandate to deliberate on presidential nominees would be rendered meaningless if the executive branch could block the Senate from obtaining the critical information necessary to evaluate them. Absent a reasonably complete documentary record, Senators are prevented from fulfilling their constitutional responsibility of complying with the Advice and Consent Clause. In addition, given the lack of a log or other description of documents, Senator Merkley and his colleagues lack a method of knowing even the subject matter of the documents being withheld on the basis of privilege, nor can Senators who are not on the Judiciary Committee meaningfully assess more than a miniscule percentage of the confidential documents. *See Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 107 (D.D.C. 2008) ("privilege logs have great practical utility . . . helping to narrow the dispute between the parties and enhance the possibility of resolution.") In fact, what is known about the process of releasing documents — that Mr. Burck, a private citizen with various unresolved conflicts of interests arising out of his existing roster of clients, has decided which documents to release and withhold — only deepens the apparent impropriety of the documents' designations.

In sum, Senator Merkley is likely to succeed on his claim that the documents have been improperly withheld given the sheer volume of documents at issue, the substitution of a partisan, conflicted private actor to control the release of documents for a neutral government actor,  the profound importance of the advice and consent process for Supreme Court nominations, and the

burden placed "upon the claimant of executive privilege to demonstrate a proper entitlement to exemption from disclosure." *United States v. AT&T*, 86 F.R.D. 603, 607 (D.D.C. 1979).

       c.      Courts Regularly Adjudicate Disputes of Privilege and Confidentiality

      Although the case concerns executive branch actions that have prevented the Senate from executing its independent constitutional duties properly,  federal courts in this context routinely adjudicate disputes over the scope of executive privilege and confidentiality, just as this Court should do here. *See Comm. on Oversight v. Holder*, 979 F. Supp. 2d 1, 14, 22 (D.D.C. 2013) ("[t]his case involves the application of a specific privilege to a specific set of records responsive to a specific request, and the lawsuit does not invite the Court to engage in the broad oversight of either of the other two branches"; "judges are regularly called upon to rule upon the applicability of privileges or exclusions asserted by the executive.")

      In *United States v. Nixon*, the Supreme Court rejected the notion that either "the doctrine of separation of powers [or] the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." 418 U.S. 683, 706 (1974). In the years since, this and higher courts have routinely reached the merits of the appropriate scope of executive privilege. *See, e.g., Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 455 (1977) (holding that the Presidential Recordings and Materials Preservation Act does not violate executive privilege); *Judicial Watch v. Dep't of Justice*, 365 F.3d 1108, 1116-17 (D.C. Cir. 2004) ("Further extension of [executive] privilege to internal Justice Department documents that never make their way to the Office of the President on the basis that the documents were created for the sole purpose of advising the President on a non-delegable duty is unprecedented and unwarranted."); *In re Sealed* Case, 121 F.3d 729, 752 (D.C. Cir. 1997) ("[executive] privilege only applies to communications that

[presidential] advisers and their staff author or solicit and receive in the course of performing

their function of advising the President on official government matters."); *Senate Select Comm.*

*on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) ("the

Executive cannot, any more than the other branches of government, invoke a general

confidentiality privilege to shield its officials and employees from investigations by the proper

governmental institutions into possible criminal wrongdoing."); *Miers*, 558 F. Supp. 2d at 72

("the mere fact that the President himself – let alone his advisors, as here – is the subject of the

subpoena in question has not been viewed historically as an insurmountable obstacle to judicial

resolution."). As this Court explained in *Miers*:

> Rather than running roughshod over separation of powers principles, the Court
> believes that entertaining this case will reinforce them. Two parties cannot
> negotiate in good faith when one side asserts legal privileges but insists that they
> cannot be tested in court in the traditional manner. That is true whether the
> negotiating partners are private firms or the political branches of the federal
> government.

*Miers*, 558 F. Supp. 2d at 99.

This Court is capable of entertaining a dispute over the Advice and Consent Clause, and

Defendant Trump and Defendant Burck have violated it through their repeated and

unprecedented intervention into Senatorial processes.

### 2.      Senator Merkley Has Standing

To establish standing, first, "the plaintiff must have suffered an injury in fact – an

invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or

imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992). Second, the injury and the conduct complained of must be causally connected, and third,

it must be likely that the injury will be redressed by a favorable decision. *Id*. at 561.

Senator Merkley has suffered two types of concrete injuries: a personal injury and an institutional injury cognizable under *Coleman v. Miller*, 307 U.S. 433 (1939).

### a.      Personal Injury

Senator Merkley has suffered cognizable personal injuries. *See Powell v. McCormack*, 395 U.S. 486, 489 (1969). Defendants' withholding of documents, both under the executive privilege and "committee confidential" designations, has hampered his ability to persuade other Senators to vote against the nomination. The availability of new documentary information about a judicial nominee can change another Senator's mind; in fact, in the past Senator Merkley has personally been successful in influencing a colleague's ultimate vote on a judicial nominee by presenting his colleague with documents regarding the nominee. Merkley Decl. ¶¶ 14-17. Especially given the existence of Senators who appear undecided, Senator Merkley's claim does not hinge on an "abstract dilution of institutional legislative power." *Raines v. Byrd*, 521 U.S. 811, 826 (1997). Instead, Senator Merkley himself is being prevented from taking specific, concrete acts – acts that he has successfully taken in the past – that have the potential to aid the deliberative process and impact the confirmation process.

Because he is not a member of the Senate Judiciary Committee, Senator Merkley has been particularly aggrieved by the improper designation of documents as "committee confidential." Merkley Decl., ¶ 26. Unlike in *Raines*, Defendants' acts have not "damage[d] all Members of Congress and both Houses of Congress equally." *Id.*, 521 U.S. at 821. While Members of the Judiciary Committee, as well as their staff members, have easy access to the over 140,000 pages of documents marked "committee confidential," Senator Merkley must make an appointment with Senators Grassley or Feinstein, review the documents personally, and leave without making copies.  Merkley Decl., ¶ 26; *see* Letter from Senator Grassley to Senator Dianne

Feinstein (Aug. 28, 2018), *available at* https://www.judiciary.senate.gov/imo/media/doc/2018-08-28%20CEG%20to%20Feinstein%20(Committee%20Confidentiality).pdf.  He cannot have his staff do the review or talk with his staff about the documents he reviewed.  He was one of the few, and may still be the only Senator not on the Judiciary Committee, to even attempt these cumbersome steps.  Senator Merkley was unable to review many of the "committee confidential" documents under these restrictive conditions.  And even as to the documents he did review, Senator Merkley may not discuss the documents' contents with his staff, experts, or the public.  Merkley Decl., ¶ 26.

Although not a member of the Judiciary Committee, Senator Merkley has an interest in obtaining full information about Supreme Court appointments.  As the D.C. Circuit has explained, "[e]ach [member of Congress] participates in the law-making process; each has a voice and a vote in that process; and each is entitled to request such information from the executive agencies as will enable him to carry out the responsibilities of a legislator." *Murphy v. Dep't of Army*, 613 F.2d 1151, 1157 (D.C. Cir. 1979). The same is true of each Senator's advice and consent role; each member participates in the process, has a voice and vote, and is entitled to information relevant to his or her determination.  But Senator Merkley has an interest in the advice and consent role not shared by many other Senators.  He, for example, gave a speech lasting over 15 hours regarding the nomination of Neil Gorsuch to the Supreme Court.  Merkley Decl., ¶ 11.  For these reasons, Defendants' actions have had an asymmetrical impact, "singl[ing]

out [Senator Merkley] for specially unfavorable treatment as opposed to other Members of [his]

respective bod[y]." *Raines*, 521 U.S. at 821.[4]

Defendants' actions also have harmed Senator Merkley due to his Oregonian

constituents' particular interest in the nomination. His office has seen an unprecedent influx of

communications and inquiries from constituents regarding the nominee, including on the topics

of Judge Kavanaugh's views on women's constitutional right to reproductive health services and

his potential to allow Special Counsel Mueller's investigation into Russia's attack on the 2016

election to be undermined. Merkley Decl. ¶ 18. While Senator Merkley has sought to respond to

these communications to the extent possible, and has communicated frequently with his

constituents, his communications have been negatively impacted by the incomplete information

with which the executive has forced him to operate. *Id.* ¶ 19.

Two factors heighten the harm suffered by the Senator from Defendants' actions. First,

an appointment to the Supreme Court secures lifetime tenure. As a result, it is not the case that, if

Senator Merkley "were to retire. . . the claim would be possessed by his successor instead,"

meaning that "[t]he claimed injury thus runs . . . with the Member's seat." *Raines*, 521 U.S. at

811. It is Senator Merkley specifically, and not any person who serves as a Senator from Oregon

---

[4]     The asymmetry of harm suffered by Senators also explains why Senator Merkley has
"not been authorized to represent [his] respective House[] of Congress in this action." *Raines*,
521 U.S. at 829. It stands to reason that the Senate Judiciary Committee, whose members have
been relatively less harmed by the executive's interference in their advice and consent duties, has
less motivation to bring suit. Unlike in *Raines*, where "both Houses actively oppose[d]
[plaintiffs'] suit," *id.*, Senator Merkley brings this suit as an individual not because his action is
opposed by the Senate, but because he is especially harmed by Defendants' actions. Further, "the
fact that the case had not been authorized by the institution was a relevant consideration, but not
dispositive, in determining that the *Raines* plaintiffs lacked standing." *Blumenthal v. Trump*,
Case No. 17-1154, 2018 U.S. Dist. LEXIS 167411, *36 (D.D.C. 2018).

in the future, who has the obligation to deliberate and vote on this appointment. The infrequency and import of Supreme Court nominations generally,[5] distinguish Senator Merkley's claim from that of individual legislators seeking documents on more transient and less pressing occasions. *Cf Walker v. Cheney*, 230 F. Supp. 2d 51, 55 (D.D.C. 2002) (Comptroller General sought documents to "undertake an investigation of the President's energy policy task force"); *Cummings v. Murphy*, Case No. 17-cv-02308, 2018 WL 3869132 at *1, *4 (D.D.C. 2018) (members of House Oversight Committee sought information in order to "evaluate GSA's oversight of" the lease agreement with Trump Old Post Office, LLC).

Second, no known remedy, political or otherwise, can undo an unconstitutional process that results in the lifetime confirmation of a Supreme Court Justice. Such an appointment has never in history been reversed by the legislature, executive, or judiciary. *Cf. Raines,* 521 U.S. at 829 (noting that members of Congress could "repeal the Act or exempt appropriations bills from its reach"); *Cummings v. Murphy*, Case No. 17-cv-02308, 2018 WL 3869132 at *15 (D.D.C. 2018) ("availability of political avenues of redress," such as possibility of issuing a subpoena, suggested that plaintiffs did not have standing).

b.   **Institutional Injury under *Coleman v. Miller***

Senator Merkley has also suffered the type of institutional injury that confers standing on individual legislators under *Coleman v. Miller*, 307 U.S. 433 (1939). In *Coleman*, the Supreme Court held that a bloc of Kansas legislators whose votes would have been sufficient to defeat a

---

[5]      Between 1789 and 2017, Presidents have made 162 nominations to the Supreme Court, of which 125 received Senate confirmation. Cong. Research Serv., *Supreme Court Nominations, 1789 to 2017: Actions by the Senate, the Judiciary Committee, and the President* (July 6, 2018), available at https://fas.org/sgp/crs/misc/RL33225.pdf

constitutional amendment had standing to challenge the Lieutenant Governor's tie-breaking vote

cast in favor of the amendment. *Id*. at 438.[6] The Supreme Court reasoned that "these senators

have a plain, direct and adequate interest in maintaining the effectiveness of their votes." *Id*.

*Coleman* has since been interpreted to suggest that "vote nullification is an institutional injury

that is personal . . . to the legislators entitled to cast the vote that has been nullified." *Blumenthal*

*v. Trump*, Case No. 17-1154, 2018 U.S. Dist. LEXIS 167411, *26 (D.D.C. 2018). Notably,

"complete vote nullification" is not "the only instance in which an individual legislator can assert

institutional injury consistent with *Raines*." *Cummings v. Murphy*, Case No. 17-cv-02308, 2018

WL 3869132 at *14. At minimum, "whether *Coleman*'s complete nullification standard

represents the only exception to *Raines*' general prohibition on suits alleging institutional injury

– or whether *Raines* permits a legislator to assert other institutional injuries that are sufficiently

concrete and particularized – is arguably an open question." *Id.*

    This case presents a scenario in which the actions taken by the executive branch hew so

closely to complete nullification that Senator Merkley's claim falls into the category of

institutional injury recognized by *Coleman*. As explained in *Blumenthal*, the Advice and Consent

Clause is an "unusual constitutional provision," which unambiguously prohibits the President

from effectuating the appointment of a Supreme Court Justice without first allowing the Senate

to deliberate and vote on his choice of nominee. *Blumenthal*, 2018 U.S. Dist. LEXIS 167411 at

*34 n.8 (comparing structure of Emoluments Clause and Advice and Consent clause). And like

the *Coleman* legislators, Senator Merkley and his colleagues have a direct interest in maintaining

---

[6]     The Kansas legislators' action was not brought on behalf of the state senate as an
institutional plaintiff. Like Senator Merkley, the state legislators brought suit as individual
members of the legislature. *See Coleman v. Miller*, 307 U.S. 433 (1939)

the efficacy of his vote. The executive branch's interference in the Senate's ability to deliberate

is unprecedented, effectively denying Senator Merkley and other colleagues the constitutionally

meaningful vote to which they are entitled. While a nominal vote on Judge Kavanaugh will

undoubtedly occur on the Senate floor, its value will have been cancelled by the constitutionally

impoverished deliberations preceding it.

The lack of an adequate remedy for the *Coleman* legislators was critical to the Supreme

Court's determination that their votes had been nullified:

> We think the key to understanding the Court's treatment of *Coleman* and its use of
> the word nullification is its implicit recognition that a ratification vote on a
> constitutional amendment is an unusual situation. It is not at all clear whether
> once the amendment was "deemed ratified," *see Raines*, 521 U.S. at 822, the
> Kansas Senate could have done anything to reverse that position.

*Campbell v. Clinton*, 203 F.3d 19, 22-23 (D.C. Cir. 2000). As noted above, Senator Merkley also

loses any possibility of remedy once the Senate votes on the nominee's appointment, thus

strengthening his claim to standing pursuant to *Coleman*.

### c.      Causation and Redressability

Defendant Burck and others working at the direction of Defendant Trump have caused

Senator Merkley's injuries.  They have asserted executive privilege over vast quantities of

documents, thereby withholding them from production entirely. Defendant Burck has also

designated other documents as "committee confidential," thereby severely restricting Senator

Merkley's ability to review and discuss them.

These injuries can be redressed by the Court.  It should order President Trump and

Defendant Burck to provide a log of documents that are being withheld, detailing for the parties

and Court the information necessary to ascertain whether they have properly asserted privilege. It

also should allow Plaintiff, a staff member, and his counsel to have reasonable access to the

documents marked committee confidential so that they can challenge the status of documents

that they consider improperly designated.  And, if access to a log and "committee confidential"

documents cannot be provided before a vote on the nominee, the Court should ensure that the

review processes are completed expeditiously and then the Senate may decide on the actions, if

any, that it shall take based on the information provided.

### 3. This Case Presents a Justiciable Question Concerning the Separation of Powers

The dispute between the parties is not a "political question" that would render the dispute

nonjusticiable. A political question lacks a single defining element, but the following are

characteristics that may render a dispute nonjusticiable:

> a textually demonstrable constitutional commitment of the issue to a coordinate
> political department; or a lack of judicially discoverable and manageable
> standards for resolving it; or the impossibility of deciding without an initial policy
> determination of a kind clearly for nonjudicial discretion; or the impossibility of a
> court's undertaking independent resolution without expressing lack of the respect
> due coordinate branches of government; or an unusual need for unquestioning
> adherence to a political decision already made; or the potentiality of
> embarrassment from multifarious pronouncements by various departments on one
> question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962). "Deciding whether a matter has in any measure been

committed by the Constitution to another branch of government, or whether the action of that

branch exceeds whatever authority has been committed, is itself a delicate exercise in

constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the

Constitution." *Id.* This Court has already held that the scope of executive privilege in an inter-

branch dispute does not implicate the concerns spelled out in *Baker v. Carr*, as it does not

address the merits of policy decisions and there are guiding legal principles to apply. *Comm. on

Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d at 10.

In *Powell v. McCormack*, Congress excluded a member-elect from his seat in the House of Representatives, 395 U.S. 486 (1969). Member-elect Powell sued, alleging that although the Constitution granted the House the power to punish and expel its members, the Congressional members had violated the Constitution by refusing to seat Powell. The Court agreed, holding that even if the Constitution gave the House a "textually demonstrable commitment" to police its members, it could not do so by excluding duly elected members, as the Constitution also listed qualifications for House members to which the House could not add. *Id.* at 532. The same is true here: the Constitution commits the power to nominate to the President and the President alone, but that does not give the executive branch the power to frustrate the Senate's advice and consent role or render any dispute over such interference nonjusticiable.

Abdicating on political question grounds would not respect the separation of powers but instead undermine it. As this Court has explained in analogous circumstances, to give the President "the final word would elevate and fortify the executive branch at the expense of the other institutions that are supposed to be its equal, and do more damage to the balance envisioned by the Framers than a judicial ruling on the narrow privilege question posed by the complaint." *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d at 12.

Even when the Supreme Court has held certain disputes to be political questions, it has remained clear that circumstances like this one remain justiciable. In *Nixon v. United States*, a federal judge challenged the constitutionality of the Senate's impeachment procedures. 506 U.S. 224 (1993). Although the Constitution clearly assigned the impeachment process to the Senate alone, Justice Souter concurred, explaining that although internal Senate procedures are typically unreviewable, "[o]ne can, nevertheless, envision different and unusual circumstances that might justify a more searching review. . . . If the Senate were to act in a manner seriously threatening

the integrity of its results . . . judicial interference might well be appropriate. In such

circumstances, the Senate's action might be so far beyond the scope of its constitutional

authority, and the consequent impact on the Republic so great, as to merit a judicial response

despite the prudential concerns that would ordinarily counsel silence." *Id.* at 253-54 (Souter, J.,

concurring). Precisely such circumstances are present here. Because the claim is justiciable and

the constitutional violation is clear, Plaintiff is likely to succeed on the merits.

**B.**     **PLAINTIFF WILL SUFFER IMMEDIATE, IRREPARABLE HARM ABSENT PRELIMINARY RELIEF**

        This action is Senator Merkley's sole avenue for relief. Without the Court's intervention,

Senator Merkley will suffer irreparable harm from the executive branch's refusal to produce and

restrictions on access to information necessary for him and other Senators to evaluate whether to

give advice and consent. His harm is immediate and certain. Once the Senate holds a vote on the

nomination, Senator Merkley will be permanently deprived of his ability to comply with his

constitutional mandate.

        In evaluating whether harm is irreparable, the court evaluates "whether – if the violation

were to occur - it could be remedied by the Court." *Advance Am. Cash Advance Ctrs., Inc. v.

FDIC*, Civ. No. 14-953, 2017 U.S. Dist. LEXIS 27887, *29 (D.D.C. 2017) (citing *Chaplaincy of

Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006)). In Senator Merkley's

case, a violation would be beyond remediation.

        As a result of the actions of Defendants Trump and Burck, Senator Merkley is unable to

use the information in the documents to try to persuade colleagues in the Senate to share his

views of the nominee. Especially because several Senators have indicated that they are

undecided, and others may be open to altering their views of the nominee based on new

information, the information contained in the documents being withheld or restricted could alter

the outcome of the nominee's appointment.  Merkley Decl., ¶¶ 14-17.  He, unlike Senators serving on the Judiciary Committee, has been particularly aggrieved by the cumbersome process by which he may view only a miniscule amount of the documents designated "committee confidential." *Id*. ¶ 26. Senator Merkley has been unable to keep his constituents fully apprised of the nominee's qualifications and views due to the incomplete information available to him. *Id.*, ¶¶ 18-19.

Senator Merkley and his colleagues in the Senate also face an imminent irreparable institutional injury. When he took the oath of office, Senator Merkley swore to uphold the Constitution. Among his constitutional duties as a Senator is fulfilling the Advice and Consent role that rests solely with each Senator. Yet, through their refusals to produce documents and their restrictions on the documents they did produce, Defendants President Trump and Mr. Burck have so thoroughly degraded the advice and consent process as to render any nominal vote that occurs on the nominee to be constitutionally meaningless. *Id*. ¶ 24.

At present, the Senate is on the precipice of holding a vote on the nomination.  Once the Senate votes, reparation of the constitutional violation will lie beyond the power of the courts or political process. For Senator Merkley, this court action and the present motion present the sole avenue for relief.[7]  Such an impending deadline, especially when coupled with imminent non-economic injury, satisfy the D.C. Circuit's standards for irreparable harm. *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("after the registration

---

[7]     The fact that five other Senators have sought, without success, to obtain the documents through the FOIA process underscores the lack of alternative available relief. *See* Senators File Suit For Hidden Kavanaugh Documents, (Sept. 17, 2018), *available at* https://www.blumenthal.senate.gov/newsroom/press/release/senators-file-suit-for-hidden-kavanaugh-documents.

deadlines for the November election pass, 'there can be no do over and no redress'"); *see also*

*Doe v. Mattis*, 889 F.3d 745, 765 (D.C. Cir 2018) (imminent transfer of a U.S. citizen who

allegedly was an enemy combatant out of U.S. custody would deprive court of jurisdiction);

*Kirwa v. United States DOD*, 285 F. Supp. 3d 21, 42 (D.D.C. 2017) (delay in naturalization

applications constituted irreparable harm).

Further, where a plaintiff alleges that the Constitution has been violated, irreparable harm

is presumed. *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod*

*v. Burns*, 427 U.S. 347, 373 (1976) (plurality)); *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir.

2008) ("[u]nlike monetary injuries, constitutional violations cannot be adequately remedied

through damages and therefore generally constitute irreparable harm.") This principle holds

especially true in the present circumstances, in which non-speculative questions regarding the

adequacy of a core constitutional process are implicated. *See, e.g., Marks v. Stinson*, 19 F.3d 873,

878 (3d Cir. 1994) (finding that plaintiffs, and "even entire state[s]," suffer irreparable injury

when right to free and fair elections is violated).

## C.     THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT PRELIMINARY RELIEF

The balance of equities and the public interest also support preliminary relief.  Here, the

Senate, the Supreme Court, the Constitution, and the public interest in an open government, are

all being harmed by an unnecessarily swift and secretive confirmation process.  The present rush

to confirm the nominee serves no offsetting public interests.

The President will be able to nullify the Senate's Constitutional duty to give advice and

consent if he or she can cherry-pick which documents to produce.  Then-Senator and now-

Attorney General Sessions explained the importance of a fulsome record in 2010, when he noted,

"[T]he public record of a nominee [there, Elena Kagan] to such a lifetime position as Justice on

the Supreme Court is of such importance that we cannot go forward without these documents. I hope we will get those in a timely fashion. If not, I think we will have no choice but to ask for a delay in the beginning of the hearings." 156 Cong. Rec. 79 (2010).  As described above, the Senate received the full public record of Justice Kagan.  It has not, however, received close to this nominee's full public record.  Yet, unlike when Justice Kagan was nominated, the Senate is willing to "go forward without these documents."

Unless the Court grants the requested temporary restraining order, the current course will weaken the Senate as an institution and undermine the check and balance on the presidential appointment power that Hamilton contemplated in the Federalist No. 76.  Speaking on the Senate floor four years ago, Senator Orrin Hatch, who is a senior member of the Judiciary Committee, said that "From our right to debate and amend through regular order, to our role giving advice and consent to the President's nominees, the Senate has emasculated itself. By doing so, we only abandon our responsibilities, discard our authorities, and lay ourselves prostrate before a politically destructive President."  Senator Orrin Hatch Press Releases, *Hatch: Restore the Senate to the World's Greatest Deliberative Body* (July 22, 2014), *available at* https://www.hatch.senate.gov/public/index.cfm/2014/7/hatch-restore-the-senate-to-the-world-s-greatest-deliberative-body.  The type of "lay[ing] ourselves prostrate" before the President of which Senator Hatch warned is happening now.

Damage likewise will be done to the Supreme Court as an institution.  Part of the value of the Advice and Consent Clause is to give the public confidence that the persons selected to fill important roles have been fully vetted.  Steven Friedland, *"Advice and Consent" in the Appointments Clause: From Another Historical Perspective*, 65 Duke L.J. 173, 177-78, 190 (2015) ("Public hearings eliminate the shadow of secrecy and the obvious pale of cronyism,

where exposure of bias and corruption is more likely to occur than if a confirmation was based

on only a unilateral nomination and approval by the same branch."; "The new public nature [of

the appointments process] is generally a positive development, bringing the appointments

process to people across the country in considerable numbers. In some ways, the expanded

scrutiny has generated more dialogue and transparency.'). The public interest suffers when

elected leaders are unable to do what their constituents elected them to do: vet and deliberate on

a nominee who will serve a lifetime appointment and be entrusted with critical decisions

affecting the rights and lives of the members of the public.

Finally, the wholesale invocation of executive privilege and over-designation of

documents as "committee confidential" on behalf of President Trump guarantees that the public

itself is kept wholly in the dark regarding a multitude of information regarding the nominee.

"'[T]he public. . . has a right to every man's evidence,'" and "exceptions to the demand for every

man's evidence are not lightly created nor expansively construed, for they are in derogation the

search for the truth." *United States v. Nixon*, 418 U.S. 683, 709 (1974) (quoting *Branzburg v.

Hayes*, 408 U.S. 665, 688 (1972)). The unprecedented volume of information that is being

withheld from public view flies in the face of the public's democratic interest in information

about government actors (or, in this case, someone nominated to assume a seat on the nation's

highest court). As explained by Justice Douglas,

> The generation that made the nation thought secrecy in government one of the
> instruments of Old World tyranny and committed itself to the principle that a
> democracy cannot function unless the people are permitted to know what their
> government is up to.

*EPA v. Mink*, 410 U.S. 73, 105 (1973) (Douglas, J., dissenting) (quoting HENRY STEELE

COMMAGER, THE NEW YORK REVIEW OF BOOKS 7 (Oct. 5, 1972).

It also goes without saying that the public has an interest in preserving respect for the Constitution. The government and the public have no legitimate interest in carrying out unconstitutional procedures. *See United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971).

Arrayed against these public interests is presumably the public interest in an expeditious appointment process. But Defendants have offered no justification why Judge Kavanaugh's confirmation must take place before the National Archives releases his records. Defendant Grassley himself has rejected the idea that filling a vacant seat on the Supreme Court is a matter which cannot be temporarily delayed. As he noted, "[T]he court can deal with a vacancy and continue its work. It can order a case to be reargued after the vacancy is filled. It can reschedule a case for a later time. It can reach an evenly divided decision and resolve the issue another day." Charles Grassley, *Sky Won't Fall With One Less Justice*, DES MOINES REGISTER (Apr. 10, 2016).

## VI. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Temporary Restraining Order should be granted.

Dated this 2th day of October, 2018.

RESPECTFULLY SUBMITTED,

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
Samuel Weiss* (NY Bar # 5383229)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St. NW
Suite 900
Washington, DC 20005

34

(202) 662-8600
kclarke@lawyerscommittee.org

* Member of the NY bar only; practicing in the District of Columbia under the supervision of members of the D.C. Bar while application for D.C. Bar membership is pending. *Pro hac vice* motion to be submitted.

Cyrus Mehri (D.C. Bar # 420970)
U.W. Clemon (D.C. Bar # AL0013)
Michael D. Lieder (D.C. Bar # 444273)
Joanna K. Wasik (D.C. Bar # 1027916)
MEHRI & SKALET, PLLC
1250 Conn. Ave., NW
Suite 300
Washington, DC 20036
(202) 822-5100
cmehri@findjustice.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JEFF MERKLEY,

  *Plaintiff,*

  v.

DONALD J. TRUMP et al.,

  *Defendants.*

No. 17-cv-255 (TSC)

Electronically Filed

Hon. Amy Berman Jackson

**DECLARATION OF SENATOR JEFF MERKLEY IN SUPPORT OF
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

Pursuant to Title 28 U.S.C. Section 1746, I, Jeff Merkley, hereby declare and state as follows:

1.      My name is Jeff Merkley. I am over the age of eighteen years. I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others, and I am competent to testify to them.

**Background**

2.      I am a United States Senator from Oregon.  I have held this position since 2009.

3.      I began my career in public service as an intern for the former Oregon Senator Mark Hatfield. At the time, I never imagined that I would one day return to hold Senator Hatfield's seat. My parents provided a foundation for this journey. My mother instilled a strong work ethic in me; she told me to do my best, and to do what's right. My father read the newspaper, turned on the evening news, and discussed ways to improve our communities and

1

nation. Later, I became the first in my family to attend college. I have been very fortunate to live the American dream.

4.      Prior to my election to the U.S. Senate, I served in the Oregon House of Representative for five terms. I represented two different districts located in Multnomah County covering the easternmost section of Portland. From 2007 to 2009, I served as Speaker of the Oregon House of Representatives.

5.      In 2008, I ran for the U.S. Senate and defeated then-incumbent Gordon Smith. I was sworn in as a Senator on January 6, 2009. I won reelection in 2014.

6.      It is a great honor to serve as a U.S. Senator.

**My Advice and Consent Duties As a U.S. Senator**

7.      When I was sworn into office in 2009, I took an oath to "support and defend the Constitution of the United States." It is my allegiance to this oath, and my duty to the Constitution, that has motivated me to bring this lawsuit.

8.      I understand that our Constitution lays out a very clear framework for the appointment of Justices to the Supreme Court: the President of the United States nominates an individual, and the Senate proceeds to review the record of the individual to determine if that individual is of fit character to serve. This strategy was crafted by the Founding Fathers.

9.      In the Federalist Papers, with which I am familiar, Alexander Hamilton wrote extensively about the framework for advice and consent crafted by the Founders. In addressing the role of the Senate, he wrote that "the necessity of their concurrence" "would be an excellent check upon the spirit of favoritism in the President, and would tend greatly to prevent the appointment of unfit characters . . . ." The Federalist No. 76 (Alexander Hamilton). I understand

from Alexander Hamilton's writings that the Senate process exists in order to review the record of

an individual and determine: is that individual fit character or unfit to hold the office?

10.      As a Senator, I believe that I have a constitutional obligation to refrain from

impeding the President's power to nominate individuals to fill vacancies on the Supreme Court.

So, too, the President cannot impede in the exercise of the Senate in reviewing the record of an

individual, because this role is reserved by the Constitution exclusively for the Senate.

11.      I have taken seriously my advice and consent duties. In 2017, I spoke on the

Senate floor for fifteen hours, from approximately 6:45 pm to 4:20 am, about the nomination of

now-Justice Neil Gorsuch. In this speech, I detailed then-nominee Gorsuch's record on important

issues such as workers' rights. My goal was to make sure that, before the Senate held a vote on

his appointment, my Senate colleagues as well as the public were fully apprised of now-Justice

Gorsuch's record and my opinion of his qualifications.

12.      I consider the review of nominees to the Supreme Court, including the present

nominee, to be one of my fundamental responsibilities as a Senator. All of us – Republicans,

Democrats, northern Senators and southern Senators, those from the East and West coasts and the

heartland — have this same responsibility.

13.      I believe that the review of a nominee requires a full review of his or her entire

record. If we do not review a nominee's full record, we cannot perform our constitutional duty.

14.      Having access to the full record of a nominee is critical to the deliberations in

which Senators engage. Senators often will use information gleaned from documents about a

nominee to engage in discussions with other Senators, learn about other Senators' positions and

understand what they find important, and ultimately attempt to persuade them to take a certain

3

position or vote a certain way. Documentary records thus form a backbone of the Senatorial deliberations process that is required under the Advice and Consent clause.

15.     The idea that new information about a nominee can alter the outcome of his or her appointment is not merely hypothetical. Any Senator may change his or her opinion about a nominee up until the time that a vote of the full Senate is taken. For example, I understand that Senator Rand Paul was initially opposed to the appointment of Mike Pompeo for Secretary of State. However, after deliberating about new information regarding Mr. Pompeo's stances about foreign intervention abroad, I understand that Senator Paul changed his stance and ultimately voted to confirm Mr. Pompeo to his post in the Trump administration.

16.     To give another example: I understood that, on September 28, the office of Senator Flake announced the Senator's intention to cast a vote in the Judiciary Committee to allow the Senate to move forward with the nomination of Judge Kavanaugh. However, I learned that, based upon Senator Flake's deliberations regarding testimony from Judge Kavanaugh and Dr. Blasey Ford that had been presented at a hearing the previous day, he changed his mind, calling for a delay in the vote on the nomination so that the FBI could proceed with a limited investigation. I have heard that the results of the investigation may influence the ultimate vote of Senator Flake, as well as others. This example shows that, if new information comes to light regarding the nominee, it has real potential to influence the advice and consent process. I believe that the documents that are being withheld by the executive branch may contain such new information.

17.     Further, I have had some success in convincing other senators to change their minds regarding judicial nominees in the past. Earlier this year, for example I shared information about the writings and conduct of a nominee to the 9th Circuit Court of Appeals with several of

4

my Republican colleagues who had voted for cloture to advance the nomination to a final vote. One of my colleagues cited that information in his decision to reverse position and oppose the nominee. Because that one colleague changed his position, the nominee would have lost a confirmation vote and the President withdrew the nomination.

18.     I communicate regularly with constituents regarding matters before the Senate. My Oregonian constituents are particularly interested in the nomination of Judge Kavanaugh to the Supreme Court. In fact, I have received over 9,000 phone calls and 51,000 emails from constituents on this topic; this is among the highest level of constituent interest that I have seen regarding any single topic since my becoming a Senator in 2009. Many constituents have asked me in particular about Judge Kavanaugh's views on women's constitutional right to reproductive health services, his potential to allow President Trump to undermine Special Counsel Robert Mueller's investigation into Russia's attack on the 2016 election, the nominee's truthfulness in his hearings, and concerns about his character in light of the several allegations of sexual assault against him and his conduct at the subsequent Judiciary Committee hearing.

19.     While I have done my best to respond to the inquiries, and have sent over 30,000 communications regarding the nomination of Judge Kavanaugh, being deprived of information about the nominee hampers my ability to keep my constituents apprised of matters that are important to them.

20.     In addition, it is important for the democratic process that the public understand and believe that I, and the rest of my colleagues in the Senate, are fully vetting and deliberating on each individual nominated by the President. If the public loses faith in the process, we face a dangerous breakdown in constitutional and democratic norms.

**Interference In My Ability to Carry Out My Constitutional Duties**

5

21.     I believe that the executive branch has interfered with the Senate's, and my, ability to perform the advice and consent function in at least three ways.

22.     First, I understand that the White House Counsel summoned certain Republican Senators to a meeting at the White House. At the meeting, White House officials caused the Republican Senators to change their views on the production of documents that Judge Kavanaugh had authored or contributed to during his tenure as White House Staff Secretary. Second, I have been told and read that William Burck, a private attorney who formerly worked with the nominee during the tenure of President George W. Bush, was given the power to selectively release documents regarding Judge Kavanaugh in place of the usual document release process from the National Archives. I also understand that he informed the Judiciary Committee that executive privilege had been asserted over more than 100,000 pages of documents, thereby blocking their release to either the Senate or the public. Third, I understand that Mr. Burck designated another 141,000 pages of documents released to the Senate Judiciary Committee as "Committee Confidential," thereby barring the Senators from releasing or describing the content of those documents to their constituents.

23.     These three means by which the executive branch has prevented Senators from gaining access to critical information from the years in which Judge Kavanaugh was a public employee and from disclosing information to the public have deprived me, as well as my colleagues in the Senate, of our ability to carry out our advice and consent duties which the Constitution delegates exclusively to the Senate.

24.     In fact, the advice and consent process has been so thoroughly weakened by the executive's actions that, unless corrective action is taken, I believe any eventual vote by the

Senate on the nominee will be irrevocably deficient. In effect, the executive has stripped the Senate of a constitutionally meaningful vote under Article II, Section 2, Clause 2.

25.     The fact that a Supreme Court Justice is a lifetime appointment that cannot later be reversed by the legislature, executive, or judiciary, other than through the impeachment process, magnifies the harm that Defendants have wrought.

26.     I have tried to overcome the obstacles created by the executive branch to the very limited extent possible.  Because I am not a member of the Judiciary Committee, I am unable to review the contents of the documents designated as "Committee Confidential" without taking cumbersome steps.  I set up a meeting to review documents designated as "Committee Confidential."  I had to go to the room where they were stored, and could not make copies, preventing me from reviewing documents elsewhere.  I could not use one of my staff members, let alone an expert, to help me with the review.  I reviewed documents for several hours in that room, where I was allowed to take handwritten notes.  It was a miniscule percentage of the universe of documents.  I am not allowed to discuss what I saw with anyone other than another Senator or a Judiciary Committee staffer, so that I was unable to gain experts' insights into the significance of the document or share my views on those documents with the public. Furthermore, given the very limited time that I and other Senators have, the inability to allow staff or other individuals to review those documents limits how thorough any review of the documents can be.

27.     I am also concerned that, without the Senate's having access to a plenary record regarding the nominee, the public is losing faith in the advice and consent process and the Senate's ability to adequately fulfill its constitutional role.

I, Jeff Merkley, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __2__ day of __October__ 2018, in Washington, D.C.

_____
Jeff Merkley

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JEFF MERKLEY,

        *Plaintiff*,

        v.

DONALD J. TRUMP et al.,

        *Defendants*.

No. 17-cv-255 (TSC)

Electronically Filed

Hon. Amy Berman Jackson

## **PROPOSED ORDER**

The Court has reviewed Plaintiff's Motion for Temporary Restraining Order and all papers submitted in support of or in opposition to the motion and conducted such proceedings as appropriate given the time constraints in this matter.  Based upon this review, the Court finds that the plaintiff has satisfied the standards for issuance of the temporary restraining order set out below.

The Court makes the following findings of fact and conclusions of law based on the current record:

1.      This action was filed on September 26, 2018 by Plaintiff, Senator Jeff Merkley of Oregon.  The Defendants are President Donald Trump, Leader Mitch McConnell and Chairman Charles Grassley, private lawyer William Burck, the Secretary and Sergeant of Arms of the Senate, and the National Archives.

2.      On October 2, 2018, Plaintiff filed a motion for a temporary restraining order against Defendants and sought associated declaratory relief.

3.      To obtain a temporary restraining order, a party must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. As described below, Plaintiff has shown each of these four elements.

**Likelihood of Success on the Merits**

4.      Article II, Section 2 of the United States Constitution states that the President "shall nominate, and by the Advice and consent of the Senate, shall appoint… Judges of the [S]upreme Court."  The common current phrase for advice and consent is "with the deliberation and approval of the Senate."

5.      The Senate's paramount constitutional duty in the course of providing advice and consent is to satisfy itself that the nominee is fully qualified by virtue of education, experience, integrity and character to receive a lifetime appointment based upon the review of a complete record.  *See Charles Mathias, Jr. Advice and Consent: The Role of the United States Senate in the Judicial Selection Process*, 54 U. Chi. L. Rev. 200, 206-07 (1987).

6.      Plaintiff has alleged in the Complaint three acts of deliberate and substantial interference by the executive branch into the U.S. Senate's advice and consent constitutional duties with respect to the current nomination for the vacancy on the United States Supreme Court.  Plaintiff seeks relief through a temporary restraining order as to two of them.

7.      Through a declaration, copies of documents, and news media reporting, Plaintiff has presented evidence that the executive branch outsourced the professional, neutral process of collecting and producing documents for a Supreme Court nominee from the National Archives to a private attorney, William Burck.  Mr. Burck's role is not only unprecedented, but rife with conflicts of interests.  Mr. Burck informed the Chairman of the U.S. Senate Judiciary Committee

Charles Grassley and his committee members that the White House and the Department of Justice had decided to withhold, based on executive privilege, over 100,000 pages responsive to the Committee's requests for certain documents from the period when the nominee served as an associate counsel and senior associate counsel under former President George W. Bush. Defendant Burck and/or other officials acting at the request of President Trump failed to produce a privilege log or similar document that would permit evaluation of the legitimacy of the withholding of the documents on the basis of the sweeping and broad invocation of executive privilege. Defendant Trump also failed to indicate the basis for failing to disclose documents concerning the nominee's tenure as Staff Secretary under former President George W. Bush.

8.     It is unprecedented for the executive branch to invoke executive privilege as a basis for withholding a large percentage of documents sought by the Senate Judiciary Committee in the course of exercising its advice and consent duties.  And the involvement of Defendant Burck, a private attorney, in the process exacerbates the suspect nature of the process used to determine which documents would be withheld based on executive privilege.

9.     Plaintiff has shown a probability of prevailing on the merits that the Defendant Trump and Defendant Burck may not engage in such an unprecedented attempt to withhold documents based on executive privilege without Defendant Trump producing a privilege log or similar document identifying the withheld documents and the bases for the withholding.  As with privilege logs produced in litigation, any such logs should contain sufficient information that the propriety of the withholding can be determined based on the information in the log.

10.     Defendant Burck also informed the Chairman of the Senate Judiciary Committee and his committee members that about 147,000 pages of documents responsive to the Committee's requests for certain documents from the period when the nominee served as an

associate counsel and senior associate counsel under President George W. Bush had been designated as "Committee Confidential."  Plaintiff, like other Senators who are not on the Judiciary Committee, has extremely limited access to the documents and may not use them to influence the thinking of other Senators or the public about the current nominee.

11.     It also is unprecedented for the executive branch to designate such a large volume of otherwise relevant documents as "Committee Confidential."

12.     Plaintiff has shown a probability of success on the merits that the Defendants may not engage in such sweeping use of "executive privilege" claims and "Committee Confidential" designations without Plaintiff having an opportunity to, at minimum, review the privilege log and assess the validity of the designations.

13.     Plaintiff has established he has standing by showing that he has suffered injury in fact with a concrete injury that is not hypothetical, that derives from the defendants' conduct, and is redressable.  *See Lujan v Defenders of Wildlife*, 504 U.S. 555(1992).  Senator Merkley has suffered personal injuries as well as an institutional injury of the nature cognizable under *Coleman v. Miller*, 307 U.S. 433 (1939).  *See also Blumenthal v. Trump*, 2018 U.S. Dist. LEXIS 167411 (D.D.C. 2018).  The courts have authority to resolve disputes such as this one over the separation of powers. *Marbury v. Madison*, 5 U.S. 137 (1803); *see also Comm. On Oversight & Gov't Reform v Holder*, 979 F. Supp. 1, 12 (D.D.C. 2013) ("the final word would elevate and fortify the executive branch at the expense of the other institutions that are supposed to be its equal.").

### Plaintiff Will Suffer Immediate, Irreparable Harm If a TRO Is Not Granted

14.     If a TRO is not granted, Defendants will likely commence with a vote on the nominee within the next few days, thereby denying Plaintiff the opportunity to resolve the constitutional issues raised in his complaint.

15.     The Plaintiff is more prejudiced by the Defendants' actions than are members of the Senate Judiciary Committee.  They can review a limited number of documents that were designated as "Committee Confidential," which he cannot effectively do.

16.     If a TRO is not granted, the Plaintiff will lose the ability to use the full public record to try to persuade other Senators to adopt his position on the current nominee. The Plaintiff will not have the benefit of a full record in communicating with his constituents about this nomination which, as with all Supreme Court nominations, is a matter of great public interest.

17.     If a TRO is not granted, the Senate's ability to hold a constitutionally meaningful vote on the current nominee will be nullified as a result of the inability of Plaintiff and other Senators to properly fulfill their advice and consent duties.

**The Balance of Equities and the Public Interest**

18.     President Trump has nominated Judge Kavanaugh for a lifetime appointment on the nation's highest court.  The high nature of the position for which he has been nominated makes it important that Senators have all relevant information before them prior to making a decision.

19.     Without entry of the requested TRO, a precedent will be established permitting a president and his/her designees inside the executive branch from withholding documents based on executive privilege that the Senate regularly and routinely seek in fulfilling its advice-and-consent role without providing a privilege log or other meaningful information to help assess or

check the appropriateness of the withholding.  This will permanently impair the ability of the

Senate to act as an effective check on the President's appointment authority.

20.     In a few short weeks, the National Archives, which has been a neutral arbiter of

the release of relevant documents regarding Supreme Court nominees for over fifty years, will

have completed their review and be prepared to release the nominee's documentary record

requested by Defendant Grassley. The impending disclosure of documents by the National

Archives can help Plaintiff and the Senate fulfill their advice and consent obligation.

**The Temporary Restraining Order**

The Court grants Plaintiff's request for relief as follows:

a.     Defendant Trump shall promptly provide a document identifying the materials

withheld individually or by reasonably precise categories with sufficient detail for the parties and

the Court to ascertain whether the executive privilege designation was properly asserted as to

each document or category of documents.  This document should be in the form of a privilege

log, such as often prepared during discovery in civil litigation.  The presumption shall be in favor

of production of documents and the burden of establishing privilege is on Defendant Trump.  If

during the course of preparing this document Defendants determine that any documents were

erroneously withheld, they shall immediately produce them to the United States Senate.  If,

based on information reflected on the privilege log, the Plaintiff challenges any of the

designations, the Court will determine if the challenged documents have been misclassified.

b.     The Plaintiff, one member of his staff, and his counsel in this litigation may have

reasonable access to the documents designated as "Committee Confidential."  The parties shall

promptly work out reasonable safeguards to prevent any disclosure of confidential material.  If

the Plaintiff challenges any of the designations, the Court will determine if the challenged

documents have been misclassified.

      c.      All parties shall be available for a Rule 16 pretrial conference on October __,

2018.  The parties shall meet and confer before then concerning the matters to be covered in a

Rule 16 conference and the matters identified in Fed. R. Civ. P. 26(f).

      d.      Defendants would not be substantially injured by issuance of the limited

temporary restraining order set forth above. Accordingly, the Court concludes that payment of a

security by Plaintiff pursuant to Fed. R. Civ. P. 65(c) is unnecessary at this time.

      e.      Nothing herein prevents Plaintiff from seeking further relief if he is dissatisfied

with the actions taken by the Senate.

      f.      The findings and conclusions above are solely for the purposes of the motion for a

temporary restraining order and shall not be law of the case in subsequent proceedings, if any, in

this matter.

      So ordered.


_____       _____

                                       Judge Amy Berman Jackson, U.S. District Court