**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

JEFF MERKLEY, United States Senator,

    *Plaintiff*,

    v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
*et al.*,

    *Defendants*.

Case No. 18-cv-2226 (ABJ)

---

## <u>MOTION TO DISMISS</u>

  Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, the Government Defendants move to dismiss Plaintiff's claims with prejudice.  The grounds for this motion are set forth in the accompanying memorandum of points and authorities.  A proposed order is also attached.

Dated: October 5, 2018

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ERIC R. WOMACK
Assistant Branch Director

/s/   *Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar No. 995500)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 11504
Washington, DC 20005
Phone: (202) 305-8576
Fax: (202) 616-8470
Email: stephen.pezzi@usdoj.gov

*Attorneys for the Government Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JEFF MERKLEY, United States Senator,<br><br>   *Plaintiff*,<br><br>  v.<br><br>DONALD J. TRUMP, in his official<br>capacity as President of the United States,<br>*et al.*,<br><br>   *Defendants*. | Case No. 18-cv-2226 (ABJ) |

**GOVERNMENT DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND IN**
**<u>SUPPORT OF GOVERNMENT DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

LEGAL STANDARD.......................................................................................................... 8

    a.    Motion to Dismiss............................................................................................ 8

    b.    Motion for a Temporary Restraining Order .................................................... 9

ARGUMENT .................................................................................................................... 10

    I.    PLAINTIFF LACKS STANDING. ................................................................ 12

        A.    Plaintiff lacks Article-III standing as an individual U.S. Senator
            to redress his allegations of institutional harms.................................... 12

            1.    Senator Merkley alleges no personal injury................................. 15

            2.    Senator Merkley's alleged institutional injury cannot confer
                 standing. ...................................................................................... 18

            3.    Historical practice further undermines Senator Merkley's
                 claim to standing. ....................................................................... 23

        B.    Plaintiff's claim is not redressable, because any relief ordered by
            this Court that could actually remedy his injury would itself be
            unconstitutional.................................................................................... 25

    II.    PLAINTIFF'S COMPLAINT RAISES A NON-JUSTICIABLE POLITICAL
        QUESTION.................................................................................................... 27

    III.    PLAINTIFF LACKS ANY PRIVATE CAUSE OF ACTION TO SEEK
        RELIEF RELATING TO THE PRODUCTION OF DOCUMENTS OR A
        PRIVILEGE LOG......................................................................................... 30

    IV.    THE SENATE DEFENDANTS ARE IMMUNE FROM PLAINTIFF'S SUIT
        UNDER THE SPEECH OR DEBATE CLAUSE. ......................................... 35

    V.    PLAINTIFF IS NOT ENTITLED TO EMERGENCY INJUNCTIVE RELIEF. ......... 38

        A.    Plaintiff has not demonstrated irreparable harm that could be remedied by
            an order from this Court........................................................................ 39

        B.    The balance of equities and the public interest weigh against last-minute
            judicial intervention in a sensitive, intra-Senate political dispute. ....... 42

CONCLUSION................................................................................................................. 44

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*Alaska Legislative Council v. Babbitt*,
    181 F.3d 1333 (D.C. Cir. 1999) ............................................................................ 18

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ............................................................................................... 31

*Am. Hosp. Ass'n v. Price*,
    867 F.3d 160 (D.C. Cir. 2017) ............................................................................ 27

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
    135 S. Ct. 2652 (2015) ........................................................................................... 20

*Armstrong v. Exec. Office of the President*,
    90 F.3d 553 (D.C. Cir. 1996) ............................................................................... 32

*Arpaio v. Obama*,
    27 F. Supp. 3d 185 (D.D.C. 2014),
    *aff'd*, 797 F.3d 11 (D.C. Cir. 2015) ................................................................... 41

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................. 9

*Baird v. Norton*,
    266 F.3d 408 (6th Cir. 2001) ............................................................................... 18

*Baker v. Carr*,
    369 U.S. 186 (1962) ............................................................................................... 27

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................. 9

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018) ........................................................................................... 40

*Blumenthal v. NARA*,
    No. 18-cv-2143 (D.D.C. filed Sept. 17, 2018) ..................................................... 33

*Blumenthal v. Trump*,
    No. 17-1154 (EGS), 2018 WL 4681001 (D.D.C. Sept. 28, 2018) .......................... 22

*Campbell v. Clinton*,
    52 F. Supp. 2d 34 (D.D.C. 1999) ......................................................................... 24

*Campbell v. Clinton*,
   203 F.3d 19 (D.C. Cir. 2000) ............................................................. 18, 20, 23, 24

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ........................................................................ 39

*Chenoweth v. Clinton*,
   181 F.3d 112 (D.C. Cir. 1999) ................................................................... 18, 24

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
   58 F.3d 738 (D.C. Cir. 1995) ............................................................................ 9

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ........................................................................................ 12

*Cobell v. Kempthorne*,
   455 F.3d 301 (D.C. Cir. 2006) ........................................................................ 10

*Cobell v. Norton*,
   391 F.3d 251 (D.C. Cir. 2004) .......................................................................... 9

*Coleman v. Miller*,
   307 U.S. 433 (1939) ........................................................................................ 14

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*,
   15 F. Supp. 2d 1 (D.D.C. 1997) ...................................................................... 10

*Comm. on Judiciary v. Miers*,
   558 F. Supp. 2d 53 (D.D.C. 2008) ....................................................... 14, 34, 35

*Comm. on Oversight & Gov't Reform v. Holder*,
   979 F. Supp. 2d 1 (D.D.C. 2013) ............................................................. 34, 35

*Common Cause v. Biden*,
   909 F. Supp. 2d 25 (D.D.C. 2012) .................................................................. 18

*Conservation Force, Inc. v. Jewell*,
   733 F.3d 1200 (D.C. Cir. 2013) ...................................................................... 12

*Cummings v. Murphy*,
   321 F. Supp. 3d 92 (D.D.C. 2018) ........................................................... *passim*

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ........................................................................................ 12

*Dastmalchian v. U.S. Dep't of Justice*,
   71 F. Supp. 3d 173 (D.D.C. 2014),
   *aff'd*, No. 14-5273, 2015 WL 3372295 (D.C. Cir. May 4, 2015) ..................... 38

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ....................................................................... 10

*Doe I v. State of Israel*,
   400 F. Supp. 2d 86 (D.D.C. 2005) .................................................................... 27

*Doe v. McMillan*,
   412 U.S. 306 (1973) .......................................................................................... 36

*Eastland v. United States Servicemen's Fund*,
   421 U.S. 491 (1975) ............................................................................... 35, 36, 37

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice*,
   15 F. Supp. 3d 32 (D.D.C. 2014) ...................................................................... 10

*English v. Trump*,
   279 F. Supp. 3d 307 (D.D.C. 2018),
   *appeal dismissed*, No. 18-5007, 2018 WL 3526296 (D.C. Cir. July 13, 2018) ...................... 31

*Fla. Audubon Soc'y v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) ............................................................................ 12

*Goldwater v. Carter*,
   444 U.S. 996 (1979) .......................................................................................... 24

*Gravel v. United States*,
   408 U.S. 606 (1972) ............................................................................... 36, 37, 38

*Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*,
   639 F.3d 1078 (D.C. Cir. 2011) ........................................................................ 40

*Gregg v. Barrett*,
   771 F.2d 539 (D.C. Cir. 1985) .......................................................................... 43

*Haase v. Sessions*,
   835 F.2d 902 (D.C. Cir. 1987) ............................................................................ 8

*Harrington v. Bush*,
   553 F.2d 190 (D.C. Cir. 1977) .......................................................................... 20

*Hunter Grp. v. Smith*,
   164 F.3d 624 (4th Cir. 1998) ............................................................................ 39

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
   933 F. Supp. 2d 58 (D.D.C. 2013) ...................................................................... 9

*Kilbourn v. Thompson*,
   103 U.S. 168 (1880) .......................................................................................... 36

*Kissinger v. Reporters Comm. for Freedom of the Press*,
   445 U.S. 136 (1980) ............................................................................................ 32

*Kucinich v. Bush*,
   236 F. Supp. 2d 1 (D.D.C. 2002) ................................................................ 15, 17, 18

*Kucinich v. Def. Fin. & Accounting Serv.*,
   183 F. Supp. 2d 1005 (N.D. Ohio 2002) ............................................................ 15, 18

*Lambda Legal Def. & Educ. Fund, Inc. v. HHS*,
   No. 18-cv-2130-RC (D.D.C. 2018) ........................................................................ 42

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .......................................................................... 8-9, 41

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................... 9, 12

*Nat'l Conference on Ministry to Armed Forces v. James*,
   278 F. Supp. 2d 37 (D.D.C. 2003) ......................................................................... 10

*Navistar, Inc. v. EPA*,
   No. 11-cv-449, 2011 WL 3743732 (D.D.C. Aug. 25, 2011) ....................................... 39

*Newdow v. U.S. Cong.*,
   313 F.3d 495 (9th Cir. 2002) ............................................................................... 18

*Nixon v. United States*,
   506 U.S. 224 (1993) ........................................................................... 27, 28, 29, 30

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................................... 42

*Phillip v. Fairfield Univ.*,
   118 F.3d 131 (2d Cir. 1997), *aff'd*, 159 F.3d 636 (D.C. Cir 1998) ......................... 10

*Porteous v. Baron*,
   729 F. Supp. 2d 158 (D.D.C. 2010) ....................................................................... 37

*Powell v. McCormack*,
   395 U.S. 486 (1969) ........................................................................................... 15

*Pursuing America's Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ............................................................................. 10

*Raines v. Byrd*,
   521 U.S. 811 (1997) ............................................................................... *passim*

*Riegle v. Fed. Open Market Comm.*,
  656 F.2d 873 (D.C. Cir. 1981) ........................................................... 43

*Roe v. Wade*,
  410 U.S. 113 (1973) ........................................................................... 42

*Schultz v. Sundberg*,
  759 F.2d 714 (9th Cir. 1985) ............................................................. 38

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ........................................................... 10

*Sierra Club v. U.S. Dep't of Energy*,
  825 F. Supp. 2d 142 (D.D.C. 2011) ................................................... 41

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*,
  231 F.3d 20 (D.C. Cir. 2000) .............................................................. 8

*United States v. AT&T*,
  551 F.2d 384 (D.C. Cir. 1976) ........................................................... 35

*Walker v. Cheney*,
  230 F. Supp. 2d 51 (D.D.C. 2002) .................................... 15, 21, 22, 24

*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................................... 12

*Waxman v. Thompson*,
  No. CV 04-3467 MMM, 2006 WL 8432224 (C.D. Cal. July 24, 2006) ........... 19, 34

*West Virginia v. HHS*,
  145 F. Supp. 3d 94 (D.D.C. 2015),
  *aff'd sub nom. W. Va. ex rel. Morrissey v. HHS*, 827 F.3d 81 (D.C. Cir. 2016) ..... 13

*Wisc. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ........................................................... 39

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................... 9, 41, 42

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ....................................................................... 30

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) ........................................................................... 27

**Constitutional Law**

U.S. Const. art. I, § 6, cl. 1……………………………………………………………………35

U.S. Const. art. II, § 2, cl. 2..…………………………………………………………………38

**Statutes**

5 U.S.C. § 552(a) ........................................................................................................ 32

5 U.S.C. § 2954........................................................................................................... 17

31 U.S.C. § 716(b)(2) ................................................................................................. 20

44 U.S.C. § 2204............................................................................................... 3, 6, 32, 33

44 U.S.C. § 2205............................................................................................... 4, 5, 24, 33

44 U.S.C. § 2208............................................................................................... 7, 26

44 U.S.C. §§ 2201-09 ................................................................................................. 3

**Rules**

Fed. R. Civ. P. 12(b) ................................................................................................... 8

## INTRODUCTION

United States Senator Jeff Merkley filed this lawsuit on September 26, 2018, several months into Senate deliberations regarding the nomination of the Honorable Brett M. Kavanaugh to be an Associate Justice of the United States Supreme Court.  Senator Merkley, the only Plaintiff, alleges in his complaint that a large group of defendants, including the President, the Senate Majority Leader, and the Chairman of the Senate Judiciary Committee, have "prevented the Plaintiff and his colleagues from fulfilling their constitutional obligations to provide advice and consent regarding a nomination to the Supreme Court of the United States by advancing and potentially concluding the nominee's confirmation hearing before the National Archives releases his records."  Compl., Prayer for Relief.  Plaintiff seeks a judicial order enjoining the Senate from "hold[ing] or permit]ing a vote on the nominee's confirmation."  *Id.*

Plaintiff's requested relief is unprecedented.  The Supreme Court in *Raines v. Byrd* described the dire consequences that would result if all disputes between the Executive and Legislative Branches of government were routinely submitted for judicial review—an outcome that would forever disrupt the constitutional separation of powers.  Plaintiff would have this Court go further still, requesting that the Court intervene in an *intra*-Branch dispute and enjoin *members of his own house of Congress* to purportedly protect Plaintiff's ability to provide advice and consent.  In other words, the Court is asked to intervene by judicial fiat to preserve Plaintiff's ability to provide advice and consent in the precise manner that he thinks is appropriate—by restricting the same powers of an apparent majority of Plaintiff's colleagues.

Such a request is not permitted by Article III of the United States Constitution.  The only circumstance that has been recognized by the Supreme Court and the D.C. Circuit to permit individual legislator standing requires a plausible allegation that a legislator's vote has been

1

"completely nullified" by Executive action.  But in construing this exception, the D.C. Circuit has repeatedly emphasized its exceedingly narrow scope, and that the existence of political remedies by the Legislative Branch to counteract the action of the Executive may suffice to overcome such an allegation.  Here, there is no plausible allegation that Plaintiff's vote has been "completely nullified," let alone by an action that is external to the body in which he sits.  To the contrary, the political remedy that has been granted Plaintiff by virtue of his election to the Senate—to vote for or against Judge Kavanaugh's nomination—continues to exist with full force.  Whenever a vote takes place on the nomination, Plaintiff will be entitled to participate.  The fact that he might be disappointed with the outcome of that vote (or its precise timing) is a political result, not a basis for lawsuit in federal court.

As Plaintiff's complaint makes clear, this is purely a political dispute, primarily between Plaintiff and his fellow Senators.  It is *not* a case about the assertion of executive privilege in response to a congressional subpoena, nor is it one of the many cases that are currently pending in this district that concern requests for similar records under the Freedom of Information Act. Plaintiff has not made any formal requests for documents from any of the defendants in this lawsuit that could provide a potential basis for a cause of action in federal court.

Plaintiff's strategic attempt to narrow his requested relief in his motion for temporary restraining order—filed a week after the complaint and mere days before a vote on cloture—does not change the fundamentally political nature of this case.  And Plaintiff's motion cannot amend his complaint or his allegations of purported injury, which ultimately would require that this Court *actually enjoin a Senate vote*, in order for Plaintiff's claim of injury to be actually redressed.  And it cannot change the fact that the complaint presents one claim and one claim only, under the Advice and Consent Clause of Article II, Section 2 of the Constitution.  Whether conceived of as

2

a grievance between Senator Merkley with his Senate colleagues, a grievance between Senator Merkley and the Executive Branch, or some combination thereof, this claim is simply not justiciable in the federal courts.

For these and other reasons, this lawsuit should be dismissed in its entirety for lack of subject-matter jurisdiction, and Plaintiff's motion for a temporary restraining order should be denied. The Court therefore need not even consider the four traditional factors for time sensitive injunctive relief, which, in any event, also weigh strongly against Plaintiff's extraordinary request, given the lack of diligence Plaintiff has shown in pursuing this lawsuit, and the public interest that weighs against eleventh hour judicial intervention in an intra-Senate political fight over a pending Supreme Court nomination.

## BACKGROUND

On the evening of July 9, 2018, the President of the United States nominated Brett M. Kavanaugh of Maryland, currently a United States Circuit Judge, to be an Associate Justice of the Supreme Court of the United States. In the 2000s, before his appointment to the D.C. Circuit, Judge Kavanaugh worked for several years in the White House, for President George W. Bush, as both an Associate White House Counsel, and eventually as White House Staff Secretary. Accordingly, as required by the Presidential Records Act ("PRA"), all of the records that Judge Kavanaugh generated during his time working in the White House are currently in the possession of the George W. Bush Presidential Library and Museum ("the Bush Library"), a subcomponent of the United States National Archives and Records Administration ("NARA"). *See* 44 U.S.C. §§ 2201-09.

That very evening of July 9, 2018, predicting correctly that NARA would soon be inundated with both FOIA requests from the general public, *id.* § 2204(c)(1), and so-called

"Special Access Requests" from Congress under the Presidential Records Act ("PRA"), *id.* § 2205(2)(C), NARA staff, of their own initiative, began the process of preparing Judge Kavanaugh's White House records for processing, review, and eventual release, consistent with the PRA. NARA initially estimated that there were approximately 900,000 pages of records from Judge Kavanaugh's time working in the White House Counsel's Office, and approximately 2,000,000 to 4,000,000 pages of records from his time as Staff Secretary to President Bush..

On July 27, 2017, the Chairman of the Senate Judiciary Committee, Senator Charles Grassley, sent a letter to the Bush Library, requesting a subset of the records from the set of 900,000 or so pages of documents from Judge Kavanaugh's time in the White House Counsel's Office. In particular, this Special Access Request from the Senate Judiciary Committee requested the following records:

- Emails sent to, from, CC, or BCC Judge Kavanaugh during his time working in the White House Counsel's Office

- The paper records from Judge Kavanaugh's office files during his time working in the White House Counsel's Office

- Records relating to Judge Kavanaugh's nomination to the D.C. Circuit

Grassley Ltr. of July 27, 2018 at 1.[1]  The Special Access Request, consistent with prior Senate requests for executive branch records in connection with judicial nominations, did not request materials subject to privilege. Chairman Grassley set a deadline of August 15, 2018 for the production to be completed.

---

[1] *Available at* https://www.archives.gov/files/foia/07.27.2018-grassley-to-bush-library-re-kavanaugh.pdf

On August 2, 2018, the General Counsel of NARA, Gary Stern, replied by letter to Chairman Grassley, confirming receipt of the request.[2]  Mr. Stern also informed Chairman Grassley that, given the massive volume of records at issue, it would not be possible to fulfill his request by the requested deadline of August 15, 2018 and that, instead, NARA would need until the end of October 2018.  By way of explanation, NARA pointed out that "the total volume of records that NARA reviewed for the nomination of Justice Roberts was approximately 70,000 pages, and the volume for Justice Kagan's nomination was 170,000 pages."  Stern Ltr. of Aug. 2, 2018, at 2.  The Kavanaugh set happened to be much larger.

Because the Presidential Records Act provides that "the Presidential records of a former President shall be available to such former President or the former President's designated representative," 44 U.S.C. § 2205(3), former President George W. Bush requested Judge Kavanaugh's White House Counsel records on July 12, 2018.  Pursuant to an agreement reached between the Senate Judiciary Committee and President Bush (through President Bush's "designated representative" under the PRA, William Burck), President Bush and his representatives, along with a team of private attorneys from several national law firms, endeavored to promptly review all of the documents that were responsive to Chairman Grassley's original request to NARA.  As a courtesy to the Senate Judiciary Committee, President Bush authorized his representatives to produce these documents directly to the Committee.

As contemplated by the PRA itself, before President Bush's representatives released President Bush's White House records to the Senate Judiciary Committee and the general public, they first consulted with the current President and *his* representatives—in this case, the White House Counsel's Office and the Department of Justice.  They also consulted with NARA.  As part

---

[2] *Available at* https://www.archives.gov/files/foia/stern-letter-to-grassley-8-2-2018.pdf

of that consultation process, ultimately, the Department of Justice and the President made determinations with respect to whether certain documents were suitable for immediate public release, and whether certain documents were privileged in whole or in part (and thus non-responsive to this particular request, by its terms).  Ultimately, as explained in a letter dated August 31, 2018,[3] less than 30,000 documents were concluded to be privileged and therefore non-responsive.  Neither the former President nor the current President formally invoked any form of privilege with respect to President Bush's production as the Senate Judiciary Committee did not request such documents.

Some of the records that were provided to the Senate Judiciary Committee by President Bush were subject to various PRA restrictions, *see* 44 U.S.C. § 2204(a), and thus were not suitable for immediate public release under longstanding practices of the Committee.  Those documents were, however, made available to the Judiciary Committee and staff on a "committee confidential" basis.  The "committee confidential" documents were also made available to all members of the United States Senate, under conditions set by Chairman Grassley.  *See* Compl. ¶¶ 12-13, ECF No. 1.

Meanwhile, notwithstanding the fact that President Bush's representatives have now completed their review and production of the same records, Senator Grassley's original Special Access Request to NARA remains pending, and NARA continues to process records for public release to the greatest extent permitted by law, as fast as they are able, consistent with the procedures set forth in the PRA.  NARA has publicly produced a few thousand pages of records (essentially, Judge Kavanaugh's D.C. Circuit nomination file) and has processed approximately

---

[3]   Available at   https://www.judiciary.senate.gov/download/2018-08-31-burck-to-grassley_-accounting-of-kavanaugh-whco-records.  (This August 31, 2018 letter was updated by a subsequent September 6, 2018 letter.)

300,000 of the 900,000-or-so pages within the potential universe of records called for by Chairman Grassley's request.  NARA has now noticed tens of thousands of those documents for public release in whole or in part, pursuant to 44 U.S.C. § 2208.[4]  NARA is prohibited by law, however, from actually releasing those documents to the public until both the former President and the current President have the opportunity to weigh in to determine whether any constitutional privileges apply.  *See id.*  Those consultations between NARA and the current and former Presidents are ongoing.

On September 26, 2018, Jeff Merkley, the junior Senator from Oregon, filed this lawsuit, alleging a violation of the Advice and Consent Clause of Article II, Section 2 of the United States Constitution, which provides that "[t]he President, . . . by and with the Advice and Consent of the Senate, shall appoint . . . Judges of the supreme Court . . . ."  Senator Merkley named the following individuals as defendants: Donald J. Trump (in his official capacity as President of the United States), NARA, Senator McConnell, Senator Grassley, Julie Adams (in her official capacity as Secretary of the Senate), Michael Stenger (in his official capacity as the Senate Sergeant at Arms and Doorkeeper), and President Bush's designated representative under the Presidential Records Act, William Burck.  Plaintiff's complaint alleges that defendants have "prevented the Plaintiff and his colleagues from fulfilling their constitutional obligations to provide advice and consent regarding a nomination to the Supreme Court of the United States by advancing and potentially concluding the nominee's confirmation hearing before the National Archives releases his records."  Compl. Prayer for Relief.  As part of his Prayer for Relief, Plaintiff requests a judicial order enjoining the Senate from "hold[ing] or permit]ing a vote on the nominee's confirmation."  *Id.*

---

[4] *See* Letters of Notification of Intent to Release Presidential Records, *available at* https://www.archives.gov/foia/pra-notifications

One week later, on October 3, 2018, Senator Merkley filed a motion for a temporary restraining order. Pl.'s Mot. for Temporary Restraining Order ("TRO Mot."), ECF No. 5. The motion for a temporary restraining order focused primarily on Senator Merkley's desire for additional access to documents, a privilege log, and related ancillary relief.

On October 3, 2018, the Senate Majority Leader filed a motion for cloture on Judge Kavanaugh's nomination. 164 Cong. Rec. S6506 (daily ed. Oct. 3, 2018). On October 5, 2018, the Senate agreed to the motion and invoked cloture on the nomination pursuant to Senate Rule XXII. As of this filing, debate in the Senate continues under the limits provided for in Rule XXII.

## LEGAL STANDARD

### a.    Motion to Dismiss

The Government Defendants[5] move to dismiss for lack of subject-matter jurisdiction and for failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(1), (b)(6).

Under Rule 12(b)(1), a plaintiff seeking to invoke the jurisdiction of a federal court bears the burden of establishing that the court has jurisdiction to hear his claims. *See U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000). As relevant here, a plaintiff's lack of constitutional standing is "a defect in subject matter jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). Because the elements necessary to establish jurisdiction are "not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must

---

[5] As reflected in the amended notice of appearance filed earlier today, ECF No. 11, undersigned counsel from the Department of Justice currently represents both the Executive Branch Defendants (*i.e.*, the President of the United States in his official capacity and the National Archives and Records Administration ("NARA")) and the Senate Defendants (*i.e.*, Senators McConnell and Grassley, the Senate Sergeant at Arms, and the Secretary of the Senate) (collectively, the "Government Defendants"). If this litigation proceeds further, and anything changes with respect to the Department of Justice's representation of the Senate Defendants, undersigned counsel will promptly file a second amended notice of appearance. William Burck, is not a federal employee, and is represented here by private counsel.

be supported in the same way as any other matter on which the plaintiff bears the burden of proof,

*i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice;" nor do

"'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S.

at 555).   Courts do not assume the truth of legal conclusions included in the complaint.   *Id.*

### b.      Motion for a Temporary Restraining Order

Plaintiff seeks a temporary restraining order.   "The standard for issuance of the

extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is

very high."   *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C.

2013) (citation omitted).   Interim injunctive relief is "never awarded as of right," *Winter v. Nat.

Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking

the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251,

258 (D.C. Cir. 2004).   A party moving for a temporary restraining order or a preliminary injunction

"must demonstrate '(1) a substantial likelihood of success on the merits, (2) that it would suffer

irreparable injury if the injunction is not granted, (3) that an injunction would not substantially

injure other interested parties, and (4) that the public interest would be furthered by the

injunction.'"   *Jack's Canoes*, 933 F. Supp. 2d at 75-76 (quoting *CityFed Fin. Corp. v. Office of

Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)); *see also League of Women Voters of United

States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) ("A party seeking a preliminary injunction must

make a 'clear showing that [the] four factors, taken together, warrant relief.'" (quoting *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)).[6]

"The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation." *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) (quotation omitted). Therefore, when, as here, the movant seeks mandatory injunctive relief—*i.e.*, an order that "would alter, rather than preserve, the status quo"—an even higher standard applies, and "the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (quoting *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997)), *aff'd*, 159 F.3d 636 (D.C. Cir 1998). "A district court should not issue a mandatory preliminary injunction unless the facts and the law clearly favor the moving party." *Nat'l Conference on Ministry to Armed Forces v. James*, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) (internal quotations omitted).

## ARGUMENT

As the courts of this Circuit and the Supreme Court have repeatedly held, individual legislators generally lack standing to raise political disputes that they may remedy through the political process. Even when those options are seemingly limited by the actions of another political

---

[6] "[T]he D.C. Circuit has recently suggested that the sliding scale approach may no longer be applicable after the Supreme Court's decision in *Winter*, and that a more stringent test applies instead." *See Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 38 (D.D.C. 2014) (citing *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (likelihood of success on the merits and irreparable harm may be "independent, free-standing requirement[s] for a preliminary injunction" (citation omitted))); *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh & Henderson, JJ., concurring) ("[U]nder the Supreme Court's precedents, a movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm, among other things.").

branch, the D.C. Circuit has again and again foreclosed the possibility of resolution of these political disputes by judicial fiat. This case does not even present the seemingly closer case for legislative standing that the D.C. Circuit has repeatedly rejected. In addition to an inter-Branch dispute, Plaintiff asks the Court to intervene in an *intra*-Branch dispute, despite the fact that he retains all of his traditional political tools as a member of the Senate regarding the judicial nomination at issue, including—most critically—his right to vote.

Even setting aside the patent standing defects, Senator Merkley's complaint also raises non-justiciable political questions of the sort that are inappropriate for judicial resolution, given the lack of any textually manageable standards for adjudicating an Advice and Consent Clause claim of this sort, and the lack of any textually contemplated role for the federal judiciary (rather than the President and the Senate alone) in the nomination process. And Senator Merkley cannot use his constitutional claims to seek various forms of document-related relief as if this were, say, a FOIA lawsuit, given his failure to submit any pre-litigation request for documents in any form, and the lack of any statutory right to information identified in the complaint.

Finally, setting aside these multiple threshold defects that warrant dismissal of these claims and denial of Senator Merkley's motion for a temporary restraining order (and the Speech or Debate Clause that immunizes the Senate Defendants entirely), the extraordinary remedy of a temporary restraining order or preliminary injunction is not appropriate here, given Senator Merkley's delay in filing suit, the slim prospects that any lawful court order here could actually remedy any of the harms he seeks to avoid, and the public interest in avoiding last-minute judicial intrusion into a the judicial confirmation process.

## I.      PLAINTIFF LACKS STANDING.

Although Plaintiff's complaint suffers from a variety of threshold legal defects, the most obvious one is that Senator Merkley—as one of one-hundred United States Senators—has no standing to seek redress for institutional harms that he (allegedly) faces in his official capacity as a United States Senator.  Such institutional (as opposed to personal) harms are the only ones that he actually alleges here.  Senator Merkley's claims are also not redressable by any order from this Court that would be consistent with the Constitution.  Accordingly, this case should be dismissed in its entirety for lack of Article-III standing.

### A.      Plaintiff lacks Article-III standing as an individual U.S. Senator to redress his allegations of institutional harms.

Article III's limits on federal court jurisdiction are "founded in concern about the proper— and properly limited—role of the courts in a democratic society."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  The Supreme Court has explained that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).  Plaintiff must thus show that he has standing as a "predicate to any exercise of [this Court's] jurisdiction," *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996), and the "'irreducible constitutional minimum' of standing contains three elements: (1) injury-in-fact, (2) causation, and (3) redressability."  *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1207 (D.C. Cir. 2013) (quoting *Lujan*, 504 U.S. at 560-61).  Principles of Article-III standing require a court to "put aside the natural urge to proceed directly to the merits" and instead "carefully inquire as to whether [plaintiffs] have met their burden of establishing that their claimed injury is personal, particularized, concrete, and otherwise judicially cognizable."  *West Virginia v. HHS*, 145 F. Supp.

3d 94, 110 (D.D.C. 2015) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 (1997)), *aff'd sub nom.*, *W. Va. ex rel. Morrissey v. HHS*, 827 F.3d 81 (D.C. Cir. 2016).

The leading precedent addressing standing by individual legislators, *Raines v. Byrd*, was a challenge by six members of Congress to the Line Item Veto Act, which gave the President the authority to cancel spending provisions in an appropriations bill without vetoing the bill in its entirety.  That statute provided that "[a]ny Member of Congress or any individual adversely affected by [this Act] may bring an action, in the United States District Court for the District of Columbia, for declaratory judgment and injunctive relief on the ground that any provision of this part violates the Constitution."  *Raines*, 521 U.S. at 815-16.  The *Raines* plaintiffs argued that the Act had injured them by "alter[ing] the legal and practical effect of [their] votes . . . on bills containing . . . vetoable items," by "divest[ing] [them] of their constitutional role in the repeal of legislation," and by "alter[ing] the constitutional balance of powers between the Legislative and Executive Branches."  *Raines*, 521 U.S. at 816 (citation omitted).

The Supreme Court held that the plaintiffs lacked Article-III standing.  The Court stressed that, under Article III, the plaintiff's injury must be "personal," to ensure "that he has a 'personal stake' in the alleged dispute."  *Raines*, 521 U.S. at 818-19 (citations omitted).  But the plaintiffs in *Raines* "d[id] not claim that they ha[d] been deprived of something to which they personally [were] entitled."  *Id.* at 821.  Rather, the injuries they asserted—alteration of the legal and practical effect of their votes in Congress—constituted a form of institutional injury, "a loss of political power, not loss of any private right," which stemmed exclusively from their status as members of Congress.  *Id.*  Thus, their injury was "not claimed in any private capacity but solely because they [were] Members of Congress."  *Id.*  As the Court elaborated:

> If one of the Members were to retire tomorrow, he would no longer
> have a claim; the claim would be possessed by his successor instead.

> The claimed injury thus runs (in a sense) with the Member's seat, a
> seat which the Member holds (it may quite arguably be said) as
> trustee for his constituents, not as a prerogative of personal power.

*Id.*; *see also, e.g.*, *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 69 (D.D.C. 2008) (describing

*Raines*: "[T]he asserted injury actually ran to the institution of Congress, not to the individual

Members who brought suit.  Put another way, the Members had suffered no injury that granted

them individual standing because the actual injury was incurred by the institution.").

Having concluded that the plaintiffs had alleged "no injury to themselves as individuals,"

the Court then determined that the injury that the plaintiffs had asserted in their capacity as

members of Congress (what the Court referred to as "institutional injury") was inadequate.  *See*

*Raines*, 521 U.S. at 821-26, 829.  In only one prior case, the Court observed, had it "upheld

standing for legislators . . . claiming an institutional injury."  *Id.* at 821.  The Court construed that

case, *Coleman v. Miller*, 307 U.S. 433 (1939), as standing solely for the narrow proposition that

"legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act

have standing to sue if that legislative action goes into effect (or does not go into effect), on the

ground that their votes have been completely nullified." *Raines*, 521 U.S. at 823 (emphasis added).

By contrast, the plaintiffs in *Raines* claimed that, as a result of the Line Item Veto Act, their votes

on future appropriations bills would be "less 'effective' than before, and that the 'meaning' and

"'integrity' of their vote ha[d] changed."  *Id.* at 825.  The Court found "a vast difference between

the level of vote nullification in *Coleman* and the abstract dilution of institutional legislative

power" alleged in *Raines*, *id.* at 825-26, and concluded that the plaintiff legislators had not alleged

an interest sufficient to establish Article-III standing.

This case must be dismissed for lack of standing under *Raines*, and the D.C. Circuit cases

that have consistently interpreted that case narrowly, *see, e.g.*, *Campbell v. Clinton*, 203 F.3d 19

(D.C. Cir. 2000); *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999).  To have standing under *Raines*, an individual legislator must either allege (1) that they "have been deprived of something to which they personally are entitled," 521 U.S. at 821, or (2) state an institutional injury "severe enough to meet *Coleman*'s strict 'complete nullification' standard."  *Kucinich v. Def. Fin. & Accounting Serv.*, 183 F. Supp. 2d 1005, 1009 (N.D. Ohio 2002); *see also Cummings v. Murphy*, 321 F. Supp. 3d 92, 105 (D.D.C. 2018); *Kucinich v. Bush*, 236 F. Supp. 2d 1, 5, 8 (D.D.C. 2002); *Walker v. Cheney*, 230 F. Supp. 2d 51, 66 (D.D.C. 2002). Senator Merkley has done neither.

1.   Senator Merkley alleges no personal injury.

Individual legislators may have standing if "they have been deprived of something to which they personally are entitled—such as their seats as Members of Congress after their constituents had elected them." *Raines*, 521 U.S. at 821; *see also Powell v. McCormack*, 395 U.S. 486, 496 (1969).  Senator Merkley, however, is not "personally entitled" to any of the relief that he has demanded in this suit.  Rather, the *Senate as a whole*—that is, Senator Merkley and his ninety-nine colleagues—has a textually identified constitutional role in consenting (or not) to the President's nominees for judicial office.

When Senator Merkley participates in the advice-and-consent process—including but not limited to his efforts to seek the information, documents, and other relief that he hopes to obtain from this lawsuit—he does so exclusively in his capacity as a United States Senator, in contemplation that he might obtain documents for the benefit of the entire Senate, so that Plaintiff and his colleagues may be well informed about this particular Supreme Court nomination. Plaintiff's papers make this clear, repeatedly explaining that the relief sought here is necessary so that "Senator Merkley *and his colleagues*" may "properly exercise *their* constitutional obligation to provide advice and consent on the qualifications of the nominee" and "fully assess the nominee's

fitness to assume the position of an Associate Justice of the United States Supreme Court." Compl. ¶ 2 (emphases added); *id.* Prayer for Relief (seeking a "judgment declaring that Defendants have prevented the Plaintiff *and his colleagues* from fulfilling their constitutional obligations") (emphasis added). Any diminution in Senator Merkley's ability to perform his assigned role in the advice and consent process is thus "a type of institutional injury. . . which necessarily damages all Members" of the United States Senate "equally." *Raines*, 521 U.S. at 821. It is in no sense an injury personal to Senator Merkley himself.

To be sure, Senator Merkley does *label* many of the harms he claims to be suffering as "personal" injuries, rather than "institutional" ones. *See* TRO Mot. at 21-24. But that label is entirely superficial, as all of the purportedly "personal" injuries Senator Merkley claims to be suffering from relate directly and completely to his official work as a U.S. Senator. He alleges:

- "Defendants' withholding of documents, both under the executive privilege and 'committee confidential' designations, has hampered his ability to persuade other Senators to vote against the nomination." TRO Mot. at 21.

- "Senator Merkley has an interest in the advice and consent role not shared by many other Senators. He, for example, gave a speech lasting over 15 hours regarding the nomination of Neil Gorsuch to the Supreme Court." TRO Mot. at 22.

- Senator Merkley's communications with his constituents "have been negatively impacted by the incomplete information with which the executive has forced him to operate." TRO Mot. at 23.

Labels aside, none of these harms are "personal" in the relevant sense—they are purely institutional. Just as in *Raines*, if Senator Merkley retired tomorrow, he would no longer have any role to play in the advice and consent process, and all of these alleged harms would evaporate; any such rights to participate in the advice and consent process "would be possessed by [his] successor instead." *Raines*, 521 U.S. at 821; *Cummings*, 321 F. Supp. 3d at 109 ("Plaintiffs have not been

singled out for specially unfavorable treatment like Adam Clayton Powell.  Rather, their claimed

injury is institutional because it is rooted in a right granted to them as Members of Congress.");

*Kucinich*, 236 F. Supp. 2d at 7 ("Simply put, *Raines* teaches that generalized injuries that affect all

members of Congress in the same broad and undifferentiated manner are not sufficiently 'personal'

or 'particularized,' but rather are institutional, and too widely dispersed to confer standing.").

Accordingly, Senator Merkley has not been "personally" injured by the conduct about which he

complains.

On this point, Judge Mehta's recent opinion in *Cummings v. Murphy* is highly instructive.

In *Cummings*, seventeen Members of Congress brought suit under the so-called

> "Seven Member Rule," which is embodied in 5 U.S.C. § 2954.
> Adopted by Congress in 1928, section 2954 provides in pertinent
> part that, upon request of the Committee on Oversight and
> Government Reform of the U.S. House of Representatives . . . "or
> of any seven members thereof," an Executive agency "shall submit
> any information requested of it relating to any matter within the
> jurisdiction of the committee." 5 U.S.C. § 2954 (emphasis added).
> The Seven Member Rule thus provides a statutory mechanism for
> members of the minority party to obtain records from the Executive
> Branch to support the Committee's oversight function.

*Cummings*, 321 F. Supp. 3d at 95.  Notwithstanding this explicit statutory provision (for which

Senator Merkley has no analogue), Judge Mehta still found that "[t]he threshold—and, ultimately,

dispositive—issue in [that] case is whether Plaintiffs, as individual members of the House

Oversight Committee, have standing to sue GSA to produce the records requested under section

2954." *Id.* at 101.

The court concluded that plaintiffs lacked standing, and dismissed for lack of

subject-matter jurisdiction under *Raines*.  With respect to plaintiffs' claims of a personal injury,

Judge Mehta concluded that their interests in "gaining access to information related to GSA's lease

with Trump Old Post Office LLC in order to carry out their oversight responsibilities related

17

exclusively to their duties in their official capacities as members of the House Oversight Committee," and therefore failed as insufficiently personal under *Raines*. *Id.* at 110 (alterations omitted).

      2.   <u>Senator Merkley's alleged institutional injury cannot confer standing</u>.

Because Senator Merkley only alleges an injury in his capacity as a United States Senator, he is attempting to assert what *Raines* referred to as an "institutional injury."  (At times, he does acknowledge this reality, explicitly seeking to assert an institutional injury.  *See* TRO Mot. at 24-27.)  But pursuant to *Raines*, individual legislators generally lack standing to vindicate institutional interests unless, as in *Coleman*, "their votes have been completely nullified." 521 U.S. at 823.  The D.C. Circuit has repeatedly reaffirmed this narrow reading of *Raines* and *Coleman*.  *See Chenoweth v. Clinton*, 181 F.3d 112, 116-17 (D.C. Cir. 1999) ("Although *Coleman* could be interpreted more broadly, the *Raines* Court read the case to stand only for the proposition that 'legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect) on the ground that their votes have been completely nullified.'"); *Common Cause v. Biden*, 909 F. Supp. 2d 9, 25, 26 (D.D.C. 2012) ("The D.C. Circuit has interpreted the *Coleman* exception to mean 'treating a vote that did not pass as if it had, or vice versa.'" (quoting *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000)).[7]

Senator Merkley has not alleged that any votes he has cast or will cast have been "completely nullified."  Instead, he makes only the far more modest claim that his failure to obtain certain documents and information (on top of the hundreds of thousands of pages of documents

---

[7] *See also Newdow v. U.S. Congress*, 313 F.3d 495, 499 (9th Cir. 2002); *Baird v. Norton*, 266 F.3d 408, 411-12 (6th Cir. 2001); *Alaska Legislative Council v. Babbitt*, 181 F.3d 1333, 1337-38 (D.C. Cir. 1999); *Kucinich*, 236 F. Supp. 2d at 7 & n. 7; *Kucinich*, 183 F. Supp. 2d at 1009.

already available to him for review in connection with Judge Kavanaugh's nomination, *see* Compl. ¶ 11), has adversely affected his ability to meaningfully carry out his role in the advice and consent process in the precise way that he desires.  In fact, this lawsuit expressly seeks the opposite—to *delay* an upcoming Senate vote,[8] which Senator Merkley can (and presumably will) participate in in his full capacity as a U.S. Senator.

In other words, his claim is not that his vote has been nullified, or even diminished in effect as in *Raines*, but only that the Senate's ability to consider and debate the nomination has been impaired.  Senator Merkley's asserted injury is thus at least one large step removed even from the claimed dilution of legislative power that *Raines* and its progeny have consistently *rejected* as an inadequate basis for legislators' standing.  *See Waxman v. Thompson*, 2006 WL 8432224, at *7 (C.D. Cal. July 24, 2006) ("Because plaintiffs do not claim that defendant's failure to produce the requested documents nullified their votes, and assert only that they have been required to vote and legislate without full access to information, *Coleman* provides no basis for a finding that plaintiffs have standing to sue.").  Legislative standing under the "vote nullification" exception in *Coleman* is a rarity; legislative standing in a case in which a legislator can vote but *does not want to yet* is unheard of.[9]

---

[8] *See* Compl., Prayer for Relief ¶ 3(b); Supplemental Decl. of Sen. Merkley, ECF No. 9-1, ¶ 25 ("I believe . . . that a limited order from this Court of the type that I have requested has the potential to positively impact the confirmation process.  For example, such an order . . . may prompt the Senate to postpone the final vote on his confirmation.").

[9] *Coleman* is inapposite for (at least) another reason.  As the D.C. Circuit has observed, "the federal constitutional separation of powers concerns that underlay the [Supreme Court's] decision in *Raines* (and which [the D.C. Circuit] emphasized in *Chenoweth*) were not present in . . . *Coleman*," which was a case brought by members of a state legislature.  *Campbell*, 203 F.3d at 22; *see also Harrington v. Bush*, 553 F.2d 190, 205 n.67 (D.C. Cir. 1977) ("A separation of powers issue arises as soon as the *Coleman* holding is extended to United States legislators.").  This is a significant distinction.  In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015), the Supreme Court held that a state legislature had standing to challenge a state initiative that removed congressional redistricting authority from the state

On these issues, Judge Bates's decision in *Walker v. Cheney*—a case that presented a much stronger case for legislative standing than this one—is highly instructive.   In *Walker*, the Comptroller General—an officer of the Legislative Branch with "broad authority to carry out investigations and evaluations for the benefit of Congress"—had begun an inquiry into the "conduct and composition" of the National Energy Policy Development Group chaired by the Vice President.  230 F. Supp. 2d at 53-55.  The Office of the Vice President refused to disclose certain information.   The Comptroller General filed suit to obtain the documents, invoking explicit statutory authority (for which Senator Merkley has no analogue here) under 31 U.S.C. § 716(b)(2) to bring "a civil action in . . . [d]istrict [c]ourt . . . to require the head of [an] agency to produce a record." *Id.* at 54.

The court concluded (correctly) that the Comptroller General lacked standing under *Raines*.  Judge Bates first determined that the Comptroller General had suffered no personal injury, because his interest in the documents related exclusively to his statutory responsibilities as Comptroller General.  *See Walker*, 230 F. Supp. 2d at 66 ("Mr. Walker's interest in this dispute is solely institutional, relating exclusively to his duties in his official capacity as Comptroller General of the United States.  Although the Vice President's refusal to disclose the requested documents may have frustrated plaintiff in his efforts to fulfill his statutory role, plaintiff himself has no personal stake in this dispute.").  The court next determined that "[t]he institutional injury [the Comptroller General] suffer[ed] . . . [was] also insufficient to confer standing." *Id.*  Although the

---

legislature.  The Court reasoned that the initiative—which amended the state constitution—"would 'completely nullif[y]' any vote by the Legislature now or 'in the future,' purporting to adopt a redistricting plan." *Id.* at 2665 (quoting *Raines*, 521 U.S. at 823-24).  In so holding, the Court emphasized that the case before it "does not touch or concern the question whether Congress has standing to bring a suit against the President" because "[t]here is no federal analogue to Arizona's initiative power," whereas "a suit between Congress and the President would raise separation-of-powers concerns." *Id.* at 2665 n.12.

Comptroller General sought to enforce "a statutory right to information," the court recognized that the Comptroller General was acting as an agent for Congress, exercising investigatory prerogatives delegated to him by Congress, and therefore his claim of injury must be evaluated in terms of the harm to Congress. *Id.* at 66-67. Because the Comptroller General sought the records at issue to "assist Congress in determining whether and to what extent future legislation, relating . . . to national energy policy or openness in government, may be appropriate," and in "conducting oversight of the executive branch's administration of existing laws," the alleged harm amounted at most to an impairment of Congress's general interests in lawmaking and oversight, an "abstract dilution of institutional legislative power" which was insufficient to confer standing. *Id.* at 67-68 (quoting *Raines*, 521 U.S. at 826).

Thus, even when there is an explicit statutory cause of action that provides for the production of records, and a dispute that is solely between the political branches, legislative standing is inappropriate. In some ways, Senator Merkley, like the plaintiff in *Walker*, seeks information in order to perform his official Senate functions. *Compare Walker*, 230 F. Supp. 2d at 58 ("The Comptroller General alleges that he seeks such information . . . in order to aid Congress in considering proposed legislation, assessing the need for and merits of further legislative changes, and conducting oversight of the executive branch's administration of existing laws."), *with* Compl. ¶ 2 ("This improper process . . . prevents Senator Merkley and his colleagues from properly exercising their constitutional obligation to provide advice and consent . . . .").

In other important ways, however, *unlike* in *Walker*, this dispute is not even, primarily, between the political branches—it is largely an intra-Senate dispute, between Senator Merkley and his fellow legislators. *See, e.g.*, Compl. ¶ 23 ("[Defendant Grassley] has pushed for a Committee vote before the documents necessary to fulfill the Senate's obligation of advice and consent were

available . . . and permitted the executive branch to invoke 'presidential privilege' without demanding any basis for the assertion of the privilege or the production of the privilege log."); *id.* ¶ 51 ("Defendants McConnell and Grassley have discarded the accepted principle that nomination hearings on Supreme Court nominees should only proceed upon receipt of all relevant documents from the National Archives."); *id.* ¶ 52 ("Chairman Grassley has refused to request documents from the nominee's tenure as White House Staff Secretary."). For that reason, his claim to standing is far *weaker* than the (already unsuccessful) plaintiff in *Walker*.[10]

*Cummings* also undermines Plaintiff's claims to an institutional injury. The *Cummings* plaintiffs' claimed institutional injury failed for three separate reasons: (1) the lack of supportive historical precedent for their lawsuit, 321 F. Supp. 3d. at 114; (2) "[t]he absence of approval from the House to commence [the] suit to remedy an institutional injury," which ultimately proved "fatal to plaintiffs' assertion of standing," *id.* at 117; and (3) the theoretical (albeit challenging) availability of alternative legislative remedies—*i.e.*, "attempt[ing] to convince a majority of their

---

[10] Judge Sullivan's recent opinion in Blumenthal v. Trump, No. 17-1154 (EGS), 2018 WL 4681001 (D.D.C. Sept. 28, 2018), is not to the contrary. Although the Department of Justice respectfully disagrees with Judge Sullivan's finding of legislative standing in that case, it is no help to Senator Merkley. Judge Sullivan's reasoning is based on his interpretation of the Foreign Emoluments Clause, pursuant to which the President must first seek congressional consent before accepting any foreign emoluments. And yet, his reasoning continues, accepting the factual allegations in that complaint as true in that case, the President allegedly has already accepted foreign emoluments without congressional consent, thus allegedly depriving members of Congress the opportunity to vote before such acceptance. That is, in Judge Sullivan's view, the Members' injury in that case was due to the President, not their colleagues in Congress. But here, were Senator Merkley able to convince a majority of his Senate colleagues to take a different approach to considering Judge Kavanaugh's nomination—whether it be through delaying a Senate vote to allow more time for the Archives to respond to the pending request from the Judiciary Committee, requesting a broader set of documents from the National Archives, issuing a formal subpoena for some or all of the materials in question, and so on—Senator Merkley could achieve all of the goals he is now seeking to accomplish through this litigation

colleagues on the House Oversight Committee to join in their demand," *id.* Senator Merkley's claim to standing fails for all of the same reasons

Senator Merkley also argues that he lacks "any possibility of remedy once the Senate votes on the nominee's appointment, thus strengthening his claim to standing." TRO Mot. at 26; *see also id.* at 24 ("[N]o known remedy, political or otherwise, can undo an unconstitutional process that results in the lifetime confirmation of a Supreme Court Justice."). This is simply inaccurate, but more importantly, it misses the point. Senator Merkley has ample legislative remedies *now*— he may simply persuade a majority of his Senate colleagues to approach this process differently. He may also vote against the nominee if he is dissatisfied with either the nominee, or how the advice and consent process has played out in this instance (or for any other reason or no reason at all).

3.      Historical practice further undermines Senator Merkley's claim to standing.

In holding that the plaintiffs in *Raines* lacked standing, the Supreme Court also relied on "historical practice"—that is, "analogous confrontations" between the Legislative and Executive Branches where "no suit was brought on the basis of claimed injury to official authority or power," but which, had the courts entertained suit, would have "plunged [the courts] into . . . bitter political battle[s] being waged between the President and Congress." *Raines*, 521 U.S. at 826-27.

In Senator Merkley's words, his lawsuit presents an "unusual request." Supplemental Decl. of Sen. Merkley, ECF No. 9-1, ¶ 23 ("I come to the Court as a last resort. I thought that it was such an unusual request that I should hold back until my role was directly obstructed."). On this point, Senator Merkley is right: There is no history or tradition that would support treating inter-Branch disputes—let alone *intra*-Senate disputes, like this one here, which includes Senators on both sides of the litigation—over the scope of the Senate's requests for information in connection

with its advice and consent function as "Cases" or "Controversies" within the meaning of Article III. *See Chenoweth*, 181 F.3d at 113-14 ("Historically, political disputes between Members of the Legislative and Executive Branches were resolved without resort to the courts."); *Walker*, 230 F. Supp. 2d at 71-72. Although the political Branches have struggled since the founding of the Republic over access to information—even where, *unlike* here, a majority of one or both houses of Congress was aligned in its opposition to some position taken by the Executive Branch—these disputes have nearly always been resolved not through the judiciary, but through political pressure, negotiation, and compromise.

Indeed, Senator Merkley and any like-minded colleagues have a myriad of "political tools with which to remedy their purported injury." *Campbell*, 203 F.3d at 24. Among the numerous means at the Senate's disposal to obtain information from the Executive Branch—even setting aside the simple procedural pathway provided by the Presidential Records Act that has *already* been invoked here by the Senate Judiciary Committee, *see* 44 U.S.C. § 2205(2)(C)—are control over appropriations, powers of investigation, and the subpoena power, all of which ensure that courts are drawn into disputes of a political nature only on rare occasions of true institutional impasse between the Executive and Legislative Branches, rather than at the behest and expedience of individual legislators (let alone with respect to disputes *between* individual legislators). *See Campbell v. Clinton*, 52 F. Supp. 2d 34, 43 (D.D.C. 1999) (citing *Goldwater v. Carter*, 444 U.S. 996, 997-98 (1979) (Powell, J., concurring)). If Senator Merkley is dissatisfied with the Senate Judiciary Committee's approach to requesting documents with respect to the nomination of Judge Kavanaugh, he may seek to persuade a majority of his colleagues in the Senate (or a majority of the Judiciary Committee, or of any other Senate committee with the power to request documents from the National Archives or serve formal subpoenas) to take a more aggressive approach. His

own papers confirm that he understands this, and that his primary gripe is with his colleagues on the Senate Judiciary Committee—not the Executive Branch at all.  *See, e.g.*, TRO Mot. at 23 ("[Defendant Grassley] has pushed for a Committee vote before the documents necessary to fulfill the Senate's obligation of advice and consent were available, abdicated the designation of 'Committee Confidential' to a private attorney, and permitted the executive branch to invoke 'presidential privilege' without demanding any basis for the assertion of the privilege or the production of the privilege log.").  That he has apparently failed to succeed in these efforts of persuasion thus far does not justify unprecedented judicial intervention in an intra-Senate squabble.

More fundamentally, however, even without all of these tools in Senator Merkley's political arsenal, and even if all of these attempts at persuasion and politicking prove to be entirely and permanently unsuccessful, Senator Merkley retains the most important political tool of all: his Senate vote.  There is no dispute that if and when Judge Kavanaugh (or any judicial nominee) is brought to the floor for a vote, Senator Merkley may vote for or against the nominee, for any reason or no reason at all.  That simple fact is entirely fatal to any claim that Senator Merkley's vote has been "nullified," and confirms that he lacks standing to assert any institutional injury as a member of the Senate.

### B.   Plaintiff's claim is not redressable, because any relief ordered by this Court that could actually remedy his injury would itself be unconstitutional.

On top of all that, Senator Merkley also has a redressability problem.  Tellingly, despite his attempt to focus on the actions of the Executive Branch defendants in his motion for TRO, the injuries that Senator Merkley alleges in his Complaint include his fellow members of the Senate as a necessary and causal link.  As one example, Senator Merkley alleges that "[Defendant Grassley] has pushed for a Committee vote before the documents necessary to fulfill the Senate's obligation of advice and consent were available, abdicated the designation of "Committee

Confidential" to a private attorney, and permitted the executive branch to invoke "presidential privilege" without demanding any basis for the assertion of the privilege or the production of the privilege log."  Compl. ¶ 23.  And "Chairman Grassley has refused to request documents from the nominee's tenure as White House Staff Secretary."  *Id.* ¶ 52.

Accordingly, to redress his purported "advice and consent" injuries, Senator Merkley would, among other things, need an injunction that would expand the scope of Senator Grassley's prior request for documents and demand the removal of certain privilege assertions.  Such relief, however, is unavailable for multiple reasons, including, as discussed more fully below, because it is prohibited by the Speech and Debate Clause, *see infra*, Section IV.

Perhaps for this very reason, Plaintiff's TRO requests narrower relief against the Executive Branch only.  But the TRO does not, and could not, change the standing allegations of the complaint, which suggest that the alleged advice-and-consent injury will continue to occur despite the relief requested in the TRO.  And even if that were not the case, the TRO (unlike the complaint) fails to request an injunction against the Senate's decision to hold a vote, which is now likely to occur this weekend.  There is simply no possibility—even with an order from this Court—that the National Archives could review and process for release (let alone complete the 60-90 business-day consultation period required by the Presidential Records Act before presidential records may be released, *see* 44 U.S.C. § 2208) the 600,000-or-so outstanding pages of Judge Kavanaugh's records from his time in the White House Counsel's Office, or the two-to-four million outstanding pages of Judge Kavanaugh's records from his time as White House Staff Secretary, or produce a meaningful privilege log associated with the production that has already been made by

representatives of former President Bush, or provide any similar relief before the time the Senate

is likely to vote on Judge Kavanaugh's nomination.[11]

Because Plaintiff has not even requested—and this Court in any event could not issue—

any lawful order that would actually remedy the harm of which Plaintiff complains, his claims are

not redressable.  Senator Merkley lacks standing for this independent reason.

## II.   PLAINTIFF'S COMPLAINT RAISES A NON-JUSTICIABLE POLITICAL QUESTION.

Even if Senator Merkley could somehow overcome his standing problems, this suit is also

barred by the political-question doctrine.  The political-question doctrine is "a natural outgrowth

of fidelity to the concept of separation of powers."  *Doe I v. State of Israel*, 400 F. Supp. 2d 86,

111 (D.D.C. 2005).  "It is based upon respect for the pronouncements of coordinate branches of

government that are better equipped and properly intended to consider issues of a distinctly

political nature."  *Id.*  "A controversy is nonjusticiable—*i.e.*, involves a political question—where

there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political

department; or a lack of judicially discoverable and manageable standards for resolving it . . . .'"

*Walter L. Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 369 U.S. 186,

217 (1962)); *see also Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 197-98 (2012).  To

determine whether the political-question doctrine bars a particular suit, "the courts must, in the

first instance, interpret the text in question and determine whether and to what extent the issue is

textually committed."  *Nixon*, 506 U.S. at 228.  As a practical matter, however, "the concept of a

---

[11] That is all setting aside the fact that there is no legal basis for such an order in a case brought not under FOIA or the Presidential Records Act but the Advice and Consent Clause, *see infra* Section III, and that such an order would also be inappropriate on the ground that ordering the impossible is an abuse of discretion, *see Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 166 (D.C. Cir. 2017).

textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Id.* at 228-29.

In the *Walter Nixon* case, the Supreme Court was faced with the question whether the Senate's decision to "allow a committee of Senators to hear evidence against an individual who has been impeached and report that evidence to the full Senate"—rather than allowing the impeached individual to present evidence to the full Senate directly—"violates the Impeachment Trial Clause" of the Constitution, which provides that the "Senate shall have the sole Power to try all Impeachments." 506 U.S. at 226. The Supreme Court unanimously dismissed the case as a non-justiciable political question. Although the Court explained that generally, "courts possess power to review either legislative or executive action that transgresses identifiable textual limits," *id.* at 237, it ultimately concluded "that the word 'try' in the Impeachment Trial Clause does not provide an identifiable textual limit on the authority which is committed to the Senate," *id.* at 238.

*Nixon* instructs that this case, too, presents a non-justiciable political question. Here, the relevant constitutional text is similarly concise: "The President, . . . by and with the Advice and Consent of the Senate, shall appoint . . . Judges of the supreme Court . . . ." Other than briefly assigning roles amongst the various branches—that is, the President "shall appoint" Supreme Court Justices, with the Senate's role limited to providing "Advice and Consent" with respect to presidential  nominees—the precise contours of the "Advice and Consent" process remain undefined. In other words, just as in *Nixon*, the text of the Advice and Consent clause "lacks sufficient precision to afford any judicially manageable standard of review of the Senate's actions." 506 U.S. at 230.

28

Nor has Plaintiff come up with any judicially manageable standards of his own; Plaintiff offers little more than conclusory statements, without any explanation or legal analysis, that the Clause has been violated on these facts.  That failing is particularly acute in a case of this sort, in which Plaintiff does not allege some obvious violation of traditional (or textually required) Advice and Consent Clause procedures.  Instead, Plaintiff's claims are based on the novel theory—citing no authority in support—that "[a]bsent a reasonably complete documentary record, Senators are prevented from fulfilling their constitutional responsibility of complying with the Advice and Consent Clause."  TRO Mot. at 18.  So the Court is left to guess how and why, exactly, there has been a violation of the Advice and Consent Claus here.  How many documents, on Plaintiff's view, need to be produced before this constitutional violation is remedied?  Is a privilege log enough?  Neither Plaintiff, nor any constitutional text or precedent offers any hints.

Also as in *Nixon*, Plaintiff "do[es] not offer evidence of a single word in the history of the Constitutional Convention or in contemporary commentary that even alludes to the possibility of judicial review in the context of" the Senate's role in the Advice and Consent process with respect to presidential nominees.  Nor have Plaintiffs cited a single judicial decision providing anything remotely similar to the sort of judicial review they appear to contemplate from this Court.  This also suggests that Plaintiff's suit raises a political question.

Finally, also as in *Nixon*, "judicial review" of the Senate's Advice and Consent function in a case like this one "would be inconsistent with the Framers' insistence that our system be one of checks and balances."  506 U.S. at 234-35.  Just as the Supreme Court was concerned that accepting plaintiff's argument in *Nixon* would improperly "place final reviewing authority with respect to impeachments in the hands of the same body that the impeachment process is meant to regulate," Senator Merkley's argument here would allow federal-court management of the process

by which the political branches decide who should serve on the federal courts—even though the Constitution itself identifies only the President and the Senate as the relevant players.

Perhaps recognizing that a straightforward application of the political-question doctrine bars his complaint, Senator Merkley, oddly, relies heavily on a *concurring* opinion in *Nixon*, in which Justice Souter—writing only for himself—generally agreed with the majority's resolution of that case, but also reserved the possibility that in some extreme circumstance, "the Senate's action might be so far beyond the scope of its constitutional authority, and the consequent impact on the Republic so great, as to merit a judicial response despite the prudential concerns that would ordinarily counsel silence."  506 U.S. at 253-53 (Souter, J., concurring in the judgment) (cited in TRO Mot. at 28-29).  But this case bears no resemblance to the two examples provided by Justice Souter: impeachment "upon a coin toss, or upon a summary determination that an officer of the United States was simply 'a bad guy.'"  *Id.*  In any case, Justice Souter's views attracted no other votes, and it is the Opinion for the Court that is binding here.  That is sufficient to dispose of Senator Merkley's claims under the political-question doctrine, whatever the appropriate outcome in some future case resembling Justice Souter's coin-toss-impeachment hypothetical.

## III.   PLAINTIFF LACKS ANY PRIVATE CAUSE OF ACTION TO SEEK RELIEF RELATING TO THE PRODUCTION OF DOCUMENTS OR A PRIVILEGE LOG.

**a.**  Not every statute or constitutional provision creates a judicially enforceable private cause of action.  *Cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017) ("The decision to recognize an implied cause of action under a statute involves somewhat different considerations than when the question is whether to recognize an implied cause of action to enforce a provision of the Constitution itself. . . . [I]t is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation."); *Alexander v.*

*Sandoval*, 532 U.S. 275, 286 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.").  Here, Senator Merkley brings one claim only, under the Advice and Consent Clause.  *See* Compl. ¶¶ 85-89; Mot. for Expedited Hearing at 2, ECF No. 9 ("This is a suit brought under the Advice and Consent Clause of the United States Constitution.").

Assuming (without conceding the point[12]) that a freestanding claim seeking judicial enforcement of the Advice and Consent Clause can ever be viable, *but see supra*, Section II, such a claim surely cannot provide a cause of action to seek the production of documents or a privilege log or manage the timing and nature of specific document productions made in response to requests made by individuals and entities other than the actual plaintiff.  (The Advice and Consent Clause, of course, is silent about the production of documents.  *Cf. English v. Trump*, 279 F. Supp. 3d 307, 330 (D.D.C. 2018) ("[F]ree-standing principles about the Senate's advice and consent power say nothing about the Dodd-Frank Act's specific statutory scheme."), *appeal dismissed*, No. 18-5007, 2018 WL 3526296 (D.C. Cir. July 13, 2018).)  By contrast, a variety of federal statutes provide for similar *statutory* remedies for those who seek—as Senator Merkley now apparently does—to obtain old government records.

**b.**  As relevant background: both the FOIA, the familiar statute which applies to federal agency records, and the more rarely invoked Presidential Records Act ("PRA"), which applies to Presidential and Vice Presidential records, provide for the disclosure of Executive Branch records, but the timing and circumstances of disclosure differ under the two statutes.  FOIA provides for

---

[12] Although the Court need not decide the question to resolve this case, the government defendants are not aware of any precedent that would support the existence of a judicially created private right of action under the Advice and Consent Clause.  By the same token, Plaintiff has not identified any waiver of sovereign immunity that would allow him to bring this sort of lawsuit against the government defendants in this case.

the disclosure of records of an "agency," 5 U.S.C. § 552(a), subject to nine statutory "exemptions." Generally, an agency must respond to a request for records under FOIA within twenty working days, and must "make a determination with respect to any appeal within twenty [working] days," *id.* § 552(a)(6)(A)(ii), although these time limitations may, in "unusual circumstances," be extended. *Id.* § 552(a)(6)(B)(I). The term "agency" under the FOIA, however, does not encompass "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." *Kissinger v. Reporters Comm. For Freedom of the Press*, 445 U.S. 136, 156 (1980). So with respect to presidential records—as all of Judge Kavanaugh's records from his time working in the White House are, with the exception of those that are "purely personal"—the PRA imposes upon the National Archives "an affirmative duty to make [Presidential and Vice Presidential] records available to the public as rapidly and completely as possible," subject to the conditions set forth in the statute. *Id.* To that end, many presidential records become available to the public beginning five years after the President leaves office, either through individual FOIA requests or when the Library has processed the records. *See* 44 U.S.C. § 2204(b)(2) & (c)(1).

For six categories of information, however, the President, prior to leaving office, may "specify durations, not to exceed 12 years, for which access shall be restricted[.]" *Id.* § 2204(a); *see Armstrong v. Executive Office of the President*, 90 F.3d 553, 556 (D.C. Cir. 1996) (PRA records "are to be made publicly available five years after [the President or Vice President] leaves office, except that national defense and certain other information is to be made available no later than 12 years after the end of a [P]resident's term."). During that period, the Archivist, after consulting with the former President (or his "designated representative," 44 U.S.C. § 2205(3)), determines whether a particular presidential record falls within one of the restricted categories. *Id.*

§ 2204(b)(3).   Importantly, during the 12-year restriction period, the Archivist's restriction decisions generally "shall not be subject to judicial review," *id.*  Because the George W. Bush administration ended in January of 2009, all of the records described in Senator Merkley's complaint are still subject to the 12-year restriction period imposed by the PRA.

Individuals may file FOIA requests with the National Archives seeking presidential records during the period more-than-five but less-than-twelve years after the end of a presidential administration.  The Archives processes those requests, in some respects, like any FOIA request to any agency.  What is different, however, is that the Archives also applies PRA "restrictions," on top of and in addition to any applicable FOIA exemptions.  And unlike with respect to FOIA litigation those PRA "restriction" determinations are *not* subject to judicial review.  *See id.*

Senator Merkley does not allege that he has ever filed any FOIA request with the National Archives seeking a single document from Judge Kavanaugh's time in the White House.  Nor did he join in a lawsuit recently filed by several of his Senate colleagues, after they *did* file such requests and were disappointed with the speed of the response they received from the Archives. *See generally Blumenthal v. NARA*, No. 18-cv-2143 (RDM) (D.D.C. filed Sept. 17, 2018). Accordingly, this Court cannot provide the sort of FOIA or Presidential Records Act relief to Senator Merkley that the *Blumenthal* plaintiffs are seeking in their FOIA litigation, with respect to judicial review of NARA's response to *actual FOIA requests they submitted*, seeking all of the same documents Senator Merkley is concerned about now (and more).  Although NARA does not concede that the *Blumenthal* plaintiffs are entitled to any particular remedy in that case—whether it be a privilege log, *Vaughn* index, a particular expedited processing schedule or any similar relief—those plaintiffs *at least filed a FOIA request*, pursuant to statutory mechanisms that permit at least some limited judicial review and management of NARA's response (not to mention federal

subject-matter jurisdiction).  Senator Merkley has done no such thing.  For that reason, he does not pursue—and could not have pursued—any FOIA or Presidential Records Act claims in this lawsuit.

For this reason alone, Plaintiff's myriad requests for document-related relief in his motion for temporary restraining order are improper, and to the extent Plaintiff seeks to (effectively) amend his complaint through his TRO motion, to pursue relief under FOIA or the Presidential Records Act, Plaintiff fails to state a claim.[13]

**c.**  Finally, for similar reasons, Plaintiff's heavy reliance on case law relating to subpoena compliance by the Executive Branch is entirely inapplicable to the legal questions presented to the Court in this case.  To be sure, as this Court is well aware, congressional *committees* have sometimes been held to have standing to litigate against the Executive Branch, especially in the subpoena enforcement context.  *See, e.g.*, *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 14 (D.D.C. 2013); *Miers*, 558 F. Supp. 2d at 67.  But such suits bear no resemblance to this one, in which the only Plaintiff, a single Senator acting without the authorization of the full Senate or any Senate committee, brings a freestanding claim under the Advice and Consent Clause—rather than seeking to enforce a duly served congressional subpoena for specific documents.  *See Cummings*, 321 F. Supp. 3d at 113-14 ("[W]hen courts have entered the fray to resolve informational disputes between the political branches, they have done so exclusively in the context of subpoena enforcement actions."); *Waxman*, 2006 WL 8432224, at *11 ("Plaintiffs' suit cannot be compared to a subpoena enforcement suit brought by a committee or subcommittee of the House.  The House . . . must authorize such suits.  When a congressional committee sues to

---

[13] Alternatively, and by the same token, any belated FOIA or Presidential Records Act claim that Plaintiff might try to bring here would also be subject to dismissal for failure to exhaust administrative remedies.  Plaintiff, after all, has never actually submitted a request to NARA.

enforce a subpoena, it does so only after a resolution of the full House citing the witness for contempt. This is necessary, the District of Columbia Circuit has observed, to prevent 'a wayward committee [from] acting contrary to the will of the House,' and to protect the witness from 'aberrant subcommittee or committee demands.'" (quoting *United States v. AT&T*, 551 F.2d 384, 393 & n.16 (D.C. Cir. 1976)); *see also, e.g.*, *Holder*, 979 F. Supp. 2d at 7 (noting that "the Speaker of the House authorized the General Counsel of the House to initiate this action"); *Miers*, 558 F. Supp. 2d at 69-70.

*   *   *

In sum, even if Plaintiff had standing, and even if this suit were not barred by the political-question doctrine, Plaintiff brought only one claim, under the Advice and Consent Clause, which provides no right to documents or information. The records and information that Senator Merkley seeks may be available by other statutory avenues, but Plaintiff has pursued none of them here. Accordingly, any claim relating to the production of documents fails to state a claim, and any related relief requested in Plaintiff's motion for a temporary restraining order should be denied.

## IV.   THE SENATE DEFENDANTS ARE IMMUNE FROM PLAINTIFF'S SUIT UNDER THE SPEECH OR DEBATE CLAUSE.

The Court should also dismiss the claims against Senator McConnell, Senator Grassley, the Senate Sergeant-at-Arms, and the Secretary of the Senate (collectively, the "Senate Defendants") because Plaintiff's claims against them are barred by the Speech or Debate Clause of the Constitution. That Clause provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. "The purpose of the Clause is to insure that the legislative function the Constitution allocates to Congress may be performed independently." *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 502 (1975). To further this goal of legislative independence, the Clause protects from

35

judicial inquiry activities that are an "integral part of the deliberative and communicative processes . . . with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States*, 408 U.S. 606, 625 (1972).

In light of the Clause's purposes, the Supreme Court has held that it provides members of Congress with immunity from suit for all actions "within the sphere of legitimate legislative activity," *Eastland*, 421 U.S. at 503, which encompasses "anything 'generally done in a session of the House by one of its members in relation to the business before it.'" *Doe v. McMillan*, 412 U.S. 306, 311 (1973) (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)). Accordingly, when Speech or Debate Clause immunity is raised in defense to a suit, the only question is whether the claims presented "fall within the 'sphere of legitimate legislative activity.'" *Eastland*, 421 U.S. at 501 (citation omitted). "[O]nce it is determined that Members are acting within the 'legitimate legislative sphere,' the Speech or Debate Clause is an absolute bar to interference." *Id.* at 503; *see also id.* at 501, 507, 509-10 & n.16 (Speech or Debate protections are absolute); *Gravel*, 408 U.S. at 623 n.14 (same).

Plaintiff sues Senators and Senate officers challenging their actions with regard to the consideration of a judicial nomination to the Supreme Court. Such a suit seeks to "question" these legislative officials about activities that fall squarely within the protections of the Clause. Plaintiffs assert that the named defendant Senators[14] have taken (or failed to take) certain actions, including

---

[14] In addition to suing Senator McConnell and Senator Grassley, plaintiff has named as defendants two Senate officers, the Secretary of the Senate and the Sergeant at Arms, for their purported role as "agents of the Congressmen defendants," *i.e.*, "staff members of the Senate whose involvement support the underlying decisions by Defendants McConnell and Grassley." Compl. ¶¶ 25, 26. The Supreme Court has held, however, that the Clause bars suits against congressional officers and employees when the actions of those individuals are like that of the Senators themselves. *See Gravel*, 408 U.S. at 618 (holding that Speech or Debate Clause

holding hearings, scheduling votes, and not requesting certain documents, that have violated the Advice and Consent Clause of the Constitution.  *See, e.g.*, Compl. ¶¶ 8, 16 ("Defendants have violated the Advice and Consent Clause . . . by holding hearings and advancing the nomination before anything close to a full documentary record of the nominee is available to the Senate or the public."); 23 ("[Defendant Grassley] has pushed for a Committee vote before the documents necessary to fulfill the Senate's obligation of advice and consent were available, abdicated the designation of 'Committee Confidential' to a private attorney, and permitted the executive branch to invoke 'presidential privilege' without demanding any basis for the assertion of the privilege or the production of the privilege log."); 51 ("Defendants McConnell and Grassley have discarded the accepted principle that nomination hearings on Supreme Court nominees should only proceed upon receipt of all relevant documents from the National Archives."); 52 ("Chairman Grassley has refused to request documents from the nominee's tenure as White House Staff Secretary."); 56 ("Majority Leader McConnell has stated publicly that he plans on scheduling a final vote on Judge Kavanaugh before October 1, 2018, weeks before all relevant documents can be produced by the National Archives.").  Moreover, the complaint requests an order that would prohibit the Senate Defendants from scheduling a hearing or holding a vote on the nomination until certain records have been released, and even maintain jurisdiction over legislative proceedings of the Senate until this Court determines that they have fully complied with its order.  *Id.* ¶¶ 3, 4.

---

protection "applies not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself"); *Eastland*, 421 U.S. at 507 ("The complaint thus does not distinguish between the activities of the Members and those of the Chief Counsel."); *see also Porteous v. Baron*, 729 F. Supp. 2d 158, 164 (D.D.C. 2010) ("[T]he Supreme Court . . . has extended [the Clause's] protections beyond Members of Congress to their aides as well.").  Here there is no allegation that the defendant Senate officers took any action that was distinguishable from the legislative activities of the named Senators.

This lawsuit, and the attendant requested relief, is unprecedented in its scope and interference with legislative activities. Whatever the scope of the Speech or Debate Clause in other contexts, it surely prohibits a suit against Senators that questions their legislative activities regarding the consideration of a judicial nomination.[15] As Plaintiff himself concedes, the Constitution expressly assigns to the Senate the power to provide "Advice and Consent." *See id.* ¶ 87; U.S. Const. art. II, § 2, cl. 2. Accordingly, the procedures for considering a pending judicial nomination, including any votes taken thereon, plainly concern "matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625; *Schultz v. Sundberg*, 759 F.2d 714, 717 (9th Cir. 1985) (per curiam) (stating that, in applying legislative immunity clause in state constitution—which provided identical protection as U.S. Constitution's Speech or Debate Clause—"'a confirmation vote on the [executive's] proposed appointees [is] clearly legislative in nature'") (quoting district court); *Dastmalchian v. DOJ*, 71 F. Supp. 3d 173, 178 (D.D.C. 2014) (Speech or Debate immunity barred suit against Senate Judiciary Committee arising out of judicial confirmation), *aff'd*, No. 14-5273, 2015 WL 3372295 (D.C. Cir. May 4, 2015).

Plaintiff's request for relief against the Defendant Senators and the named officers of the Senate is therefore prohibited by the Speech or Debate Clause, and Plaintiff's complaint against them should be dismissed on that basis.

## V.    PLAINTIFF IS NOT ENTITLED TO EMERGENCY INJUNCTIVE RELIEF.

For the reasons explained above, this lawsuit should be dismissed in its entirety for lack of subject-matter jurisdiction, *see supra* Sections I & II, or for failure to state a claim upon which relief can be granted, *see supra* Section III, and with respect to the Senate Defendants in particular,

---

[15] As Plaintiff's Complaint makes clear, the Senate Judiciary Committee has already considered and rejected motions to issue subpoenas for the very materials plaintiff seeks in this lawsuit. Compl. ¶¶ 81-84.

also pursuant to the Speech or Debate Clause, *see supra* Section IV.  For those same reasons, Plaintiff is unlikely to succeed on the merits of any claim here, and the Court could therefore deny Plaintiff the extraordinary remedy of a temporary restraining order or a preliminary injunction on that basis alone.

Even setting aside the merits, however, Plaintiff falls well short of carrying his burden on any of the other factors relevant to his request for injunctive relief.  In particular, Plaintiff's own strategic decisions in this litigation undermine his claim to imminent irreparable harm, which is in any event speculative and unsupported.  And the balance of equities and public interest weigh strongly against Plaintiff's virtually unprecedented attempt to pull the judiciary, at the last minute, into the middle of a sharply political, intra-Senate dispute about a pending Supreme Court nomination.  For these additional reasons, Plaintiff's motion for temporary restraining order should be denied.

### A.    Plaintiff has not demonstrated irreparable harm that could be remedied by an order from this Court.

The D.C. Circuit "has set a high standard for irreparable injury."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The party seeking injunctive relief must show that its injury is "both certain and great," and that it is "actual and not theoretical."  *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  It is a "well known and indisputable principle[]" that an "unsubstantiated and speculative" allegation of harm cannot constitute "irreparable harm" sufficient to justify injunctive relief.  *Id.*  Moreover, the movant "'must demonstrate a causal connection between the alleged harm and the actions to be enjoined; a preliminary injunction will not issue unless it will remedy the alleged injuries.'"  *Navistar, Inc. v. EPA*, 2011 WL 3743732, at *2 (D.D.C. Aug. 25, 2011) (quoting *Hunter Grp. v. Smith*, 164 F.3d 624 (4th Cir. 1998)).  Because Plaintiff has not made the requisite showing of a nonspeculative

injury that could be remedied by any lawful order from this Court, the motion should be denied on

this basis alone. *Cf. Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban

Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011) (noting that if one requirement is not met then "there

is no need to consider the remaining factors").

First, Plaintiff's approach to this litigation severely undermines his assertions that he is

facing immediate and irreparable harm.   As explained in yesterday evening's opposition to

Plaintiff's motion to expedite the hearing in this matter, ECF No. 10, and as noted by the Court at

the October 5, 2018 scheduling conference,[16] at every opportunity to assert his rights, Senator

Merkley has delayed.   A significant and unjustified delay in seeking relief undermines a plaintiff's

claim to irreparable harm that would justify extraordinary injunctive relief.  *See, e.g.*, *Benisek v.

Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[P]laintiffs' unnecessary, years-long delay in asking for

preliminary injunctive relief weighed against their request.").

Senator Merkley's only attempt at an explanation to excuse his slow pace has been his

claimed hope that "judicial intervention might turn out to be unnecessary."  Supplemental Decl. of

Sen. Merkley ¶ 22.  That is another way of saying that Senator Merkley made the conscious choice

*not* to file this lawsuit at an earlier date, even though he could have, and when it might have at

least been possible that some relief could have remedied some of the harms complained of (that is,

setting aside all of the threshold legal defects in his claims, which would of course have applied

---

[16] *See* Unofficial Tr. of Oct. 4, 2018 Scheduling Conference at 5:17-22 ("THE COURT: The lawsuit seeks equitable relief from a federal court about serious matters of constitutional significance for which time is of the essence, but your actions have not been consistent with your words.  Neither the timing of the suit nor the motion are conducive to full consideration of the issues.  The plaintiff did nothing in July or August or even early September when the hearings began or before the first date there was supposed to have been a vote.").

just as strongly at an earlier date).  Such a strategic decision, wise or not, undermines Senator Merkley's claim to imminent irreparable harm that justifies emergency injunctive relief now.

Second, any lawful order that might be issued from this Court would not actually remedy the harm that Plaintiff complains of.  The purpose of emergency injunctive relief is "to prevent irreparable harm" that is "actual" and "imminent."  *League of Women Voters*, 838 F.3d at 7.  It follows that when *granting* such relief could not and would not actually prevent the harm that the movant seeks to avoid, emergency injunctive relief is inappropriate.  As Judge Bates once put it, "[i]t would make little sense for a court to conclude that a plaintiff has shown irreparable harm when the relief sought would not actually remedy that harm.  A plaintiff may be irreparably harmed by all sorts of things, but the irreparable harm considered by the court must be caused by the conduct in dispute *and* remedied by the relief sought."  *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011) (emphasis added); *see also Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish . . . that he is likely to suffer irreparable harm *in the absence of* preliminary relief."); *Arpaio v. Obama*, 27 F. Supp. 3d 185, 207 (D.D.C. 2014) ("[T]he inability to obtain redress from an order by this Court . . . likewise dooms the plaintiff's ability to show irreparable harm."), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015).

Such is the case here.  As discussed above, *see supra*, Section I.B, none of the relief Senator Merkley has actually requested here would remedy the harms he complains of (at least on the timeline the parties and the Court are now faced with), and broader forms of relief that he has *not* requested—*i.e.*, an injunction to stop the upcoming Senate votes—is an unavailable remedy because of constitutional constraints (as he appears to understand).  For the same reasons that those legal and practical obstacles doom Plaintiff's claim to redressability as a matter of Article-III standing, *see supra*, Section I.B, they also undermine his case for emergency injunctive relief.

Finally, for more conventional reasons, Plaintiff's attempt to establish irreparable harm is conclusory and insufficient to meet his burden to show a clear entitlement to the extraordinary remedy of a temporary restraining order or preliminary injunction.  Plaintiff boldly speculates, with no support, that "the information contained in the documents being withheld or restricted could alter the outcome of the nominee's appointment."  TRO Mot. at 29-30; *see also, e.g.*, *id.* at 12 ("It is reasonable to believe that some documents that Defendants have made unavailable to the Senator would shed additional light on the nominee's attitude toward [*Roe v. Wade*].").  But aside from this sort of speculation, Plaintiff has made no concrete showing as to how any particular document or category of documents might actually make any difference to the Senate's consideration of Judge Kavanaugh's nomination.  Plaintiff can only speculate that such critical records exist, and so the "irreparable harm" that he claims is necessarily "unsubstantiated and speculative."[17]

## B. The balance of equities and the public interest weigh against last-minute judicial intervention in a sensitive, intra-Senate political dispute.

A party seeking a temporary restraining order or preliminary injunction must also demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  "These factors merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Once again, Plaintiff has not met his burden.

Courts have long avoided, wherever possible, stepping into the middle of intra-Branch disputes "[w]here a congressional plaintiff could obtain substantial relief from his fellow

---

[17] Yesterday, Judge Contreras came to a similar conclusion in denying a motion for a temporary restraining order or for a preliminary injunction in a FOIA case seeking certain of Judge Kavanaugh's records.  *See Lambda Legal Defense & Education Fund, Inc. v. HHS*, No. 18-cv-2130-RC, ECF No. 11 (D.D.C. Oct. 4, 2018) ("[T]here is no indication that any responsive records exist.  The request covers a time period between ten and over fifteen years ago, and nothing suggests it would have been within Kavanaugh's responsibilities as White House Staff Secretary to communicate with HHS officials on any topic, much less on the topic to which the request is directed.").

legislators through the enactment, repeal, or amendment of a statute." *Riegle v. Fed. Open Market Comm.*, 656 F.2d 873, 881 (D.C. Cir. 1981). For example, the doctrine of equitable discretion prevents courts from interfering in affairs of Congress "which properly could, and should, [be] decided by appeal to one's fellow legislators." *Gregg v. Barrett*, 771 F.2d 539, 545 (D.C. Cir. 1985).

Similar considerations, inherent in our system of separated powers, weigh against granting Plaintiff's motion for immediate injunctive relief in this case. Rather than convince a majority of his Senate colleagues to take a different approach to its advice and consent role with respect to the nomination of Judge Kavanaugh, Senator Merkley seeks relief from the courts at the eleventh hour. Whether this case is viewed as a dispute between Senator Merkley and his colleagues in the Senate, *see, e.g.*, Compl. ¶ 9 (accusing Senator Grassley of "depriving the Judiciary Committee of relevant documents"), or a dispute between Senator Merkley and the Executive Branch, Senator Merkley should direct his appeals to his fellow Senators. *Riegle*, 656 F.2d at 881. If those appeals succeed, this litigation would not be necessary—as Plaintiff himself appears to acknowledge. *See* Supplemental Decl. of Sen. Merkley ¶ 22 ("While I had initially filed the Complaint in the lawsuit on September 26, I chose not to ask for the Court's intervention at that time because I had reason to believe that judicial intervention might turn out to be unnecessary.").

To be sure, Senator Merkley has apparently tried to pursue at least some of such efforts, and (at least so far) has been unsuccessful. "Admittedly, had these paths been readily available, [Plaintiff] would not have filed this action. But the fact that a political remedy is hard to achieve does not automatically swing open the doors to the federal courts." *Cummings*, 321 F. Supp. 3d at 117. Were the opposite true, federal judges would routinely find themselves refereeing messy

43

disagreements both within and between the political branches—an outcome that is inconsistent with Article III and the constitutional traditions of our Republic.

## CONCLUSION

For these reasons, this case should be dismissed for lack of subject-matter jurisdiction, and Plaintiffs' motion for a temporary restraining order should be denied.

Dated: October 5, 2018

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ERIC R. WOMACK
Assistant Branch Director

/s/   *Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar No. 995500)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 11504
Washington, DC 20005
Phone: (202) 305-8576
Fax: (202) 616-8470
Email: stephen.pezzi@usdoj.gov

*Attorneys for the Government Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| JEFF MERKLEY, United States Senator, |
| *Plaintiff*, |
| v. |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, |
| *Defendants*. |

Case No. 18-cv-2226 (ABJ)

**[PROPOSED] ORDER**

Upon consideration of the Government Defendants' October 5, 2018 motion to dismiss, and the entire record herein, it is hereby

**ORDERED** that the motion is **GRANTED**; and it is further

**ORDERED** that this case is dismissed in its entirety, with prejudice, for lack of subject-matter jurisdiction**.**

**SO ORDERED.**

Date: _____                  _____

AMY BERMAN JACKSON
United States District Judge

Dated: October 5, 2018

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ERIC R. WOMACK
Assistant Branch Director

/s/   *Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar No. 995500)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 11504
Washington, DC 20005
Phone: (202) 305-8576
Fax: (202) 616-8470
Email: stephen.pezzi@usdoj.gov

*Attorneys for the Government Defendants*